UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.                                                                                                                         15-cr-627 JAP

**JENNIFER AMEZCUA-AGUIRRE**,

    Defendant.

## MEMORANDUM OPINION AND ORDER

On May 21, 2015, Defendant Jennifer Vanessa Amezcua-Aguirre filed a MOTION FOR SUPPRESSION OF THE EVIDENCE (Motion to Suppress) (Doc. No. 20). On June 12, 2015, the government filed a RESPONSE IN OPPOSITION (Response) (Doc. No. 27). On June 19, 2015, Defendant filed a REPLY (Doc. No. 28). On June 22, 2015, the Court held a hearing on the Motion to Suppress. Drug Enforcement Administration (DEA) Special Agent Jarrell W. Perry (Agent Perry) was the only witness who testified at the hearing. However, the entire encounter between Agent Perry and the Defendant was recorded and the audio recording was introduced into evidence as Government Exhibit 2.

**I.      Background**

"Amtrak Train No. 4, the august 'Southwest Chief',…has been traveling the rails through Albuquerque since 1939." *United States v. Miller*, 811 F.Supp. 1485 (D.N.M. 1993) (Parker, J.), *rev'd*, 21 F.3d 1025 (10th Cir. 1994). As this Court noted in 1993, trains are "[i]cons of American folklore; venerated objects of our nation's songs." *Id.*; *see also id. n.1* (cataloging American folk songs about trains). Trains have a deep metaphorical, even philosophical significance to modern society. "The railway…[is a] premise[] whose thousand-year conclusion

no one has yet dared to draw." Friedrich Nietzsche, *Human, All too Human: A Book for Free Spirits* 378 (R. J. Hollingdale trans.) (Cambridge 1996).

Fortunately, the Court's focus is not the train's thousand-year legacy, but merely the sequence of events that occurred on the Amtrak Southwest Chief on a single day in February, 2015. On that day, Defendant Jennifer Amezcua-Aguirre rode the Southwest Chief into Albuquerque with a substantial quantity of heroin strapped to her back, concealed underneath several layers of clothing. Agent Perry found that heroin and arrested her. The question is whether Agent Perry discovered the heroin by violating the Defendant's constitutional rights. If so, the Court must suppress the heroin and any further evidence obtained as a result of the unconstitutional search. If not, the Court must deny the Motion to Suppress.

**II.     Findings of fact**

As Rule 12 of the Federal Rules of Criminal Procedure requires, the Court makes the following findings of fact:

On February 5, 2015, Agent Perry and DEA Task Officer Pedro Gutierrez met Amtrak Train No. 4 when it arrived in Albuquerque, New Mexico. Agent Perry was not wearing a uniform; instead he was dressed in plainclothes. Agent Perry had a handgun that was under his shirt and not visible to others.

Prior to meeting the train, Agent Perry had obtained a printout of what he called a "PNR,"[1] which was admitted as government Exhibit 1. *See* Doc. No. 31-1. The PNR indicated that on February 3, 2015, Luis L. Garcia-Isicardia had used a Visa credit card, with a billing

---

[1] "PNR" has been referred to variously as an acronym for (1) "Passenger Name Registry" (BRIEF REQUESTING DISCLOSURE OF THE IDENTITY OF THE AGENT'S SOURCE OF THE PASSENGER NAME REGISTRY (Doc. No. 30) at 1), (2) "Passenger Name Record" (at the hearing on the Motion to Suppress and in the government's additional briefing on whether the source of the PNR should be disclosed to the Defendant), (3) "Passenger Name Reservation" (*see* Steven Nelson, *DEA Spy Earned Nearly $1 Million Handing Over Amtrak Passenger Information*, U.S. News & World Report, Aug. 12, 2014, http://www.usnews.com/news/articles/2014/ 08/12/dea-spy-earned-nearly-1-million-handing-over-amtrak-passenger-information), and (4) "Passenger Named Report" (*United States v. McKenzie*, 779 F.Supp.2d 1246, 1247 (D.N.M. 2011) (Browning, J.)).

address in San Luis, Arizona, to purchase two one-way train tickets, one in his name and the other in the name of the Defendant, Jennifer Vanessa Amezcua-Aguirre. The tickets were for travel, in a private roomette on Amtrak Train No. 4, from Flagstaff, Arizona, to Chicago, Illinois, on February 5, 2015.

After Amtrak Train No. 4 arrived in Albuquerque, Agent Perry went to Roomette No. 8 on Sleeper Car No. 430. Roomette No. 8 is approximately 6.5 feet long and 4.5 feet wide.

The recording of the encounter between Agent Perry and the Defendant began a few seconds before Agent Perry knocked on the door to Roomette No. 8.[2] At 0 minutes and 40 seconds after starting the recording, Agent Perry identified himself as a police officer and asked the Defendant if he could speak to her. The Defendant in a clear voice assented, "Sure." Agent Perry never told Defendant that she did not have to speak to him or that she had a right not to cooperate.

At the inception of this conversation, Agent Perry was standing in the hallway of the upper level of the train to the side of the door to Roomette No. 8. While Agent Perry was talking to the Defendant and Garcia-Isicardia, Officer Gutierrez was about twelve feet down the hallway from Roomette No. 8 and out of sight of the Defendant and Garcia-Isicardia. The Defendant and Garcia-Isicardia were the only persons inside Roomette No. 8. Agent Perry asked to see their tickets and identifications, which they provided and which Agent Perry promptly returned. Both the Defendant and Garcia-Isicardia said they were born in Flagstaff but lived in Las Vegas.

When Agent Perry asked, "What takes you out to Chicago?" the Defendant responded, "To have a trip." Defendant said, "We have a week to go and come back." Agent Perry next queried, "Are you coming back on the train also?" to which Defendant replied, "Most likely."

---

[2] A timer on the recording reflects when different events occurred. The knocking on the door begins at approximately 0 minutes and 20 seconds after the start of the recording.

Agent Perry then inquired where they would be staying in Chicago and the Defendant said they did not know. That prompted Agent Perry to remark, "Don't have any idea yet?" to which Defendant responded, "No."

After some further conversation about travel, Agent Perry explained why he was talking to them by stating, "And you all boarded in Flagstaff, you probably realized there wasn't a lot of security on the train so sometimes we got a problem with people carrying contraband on the train, weapons, illegal narcotics, anything illegal. That's basically why we're here and what we're doing."

Then, Agent Perry asked if they had any luggage. The Defendant reported that she and Garcia-Isicardia had two pieces of luggage downstairs on the lower level. Agent Perry asked, "Would you voluntarily consent to a search of those bags for contraband?" and the Defendant promptly and clearly acquiesced, "Yes." Straightaway Agent Perry asked, "Would you also give me permission to search the items that you have inside of your bedroom?" Without hesitation Defendant distinctly said, "Yes."

At approximately 6 minutes and 30 seconds into the encounter, the following exchange took place:

> Agent Perry: Ma'am, would you give me permission to enter your room to conduct a search…
> Defendant: Yes.
> Agent Perry: Of your room for contraband?
> Defendant: Yes.

Soon thereafter, Agent Perry requested permission to search the Defendant's purse:

> Agent Perry: And Ma'am, this is your purse here?
> Defendant: Yes.
> Agent Perry: Would you give me permission to search that also?
> Defendant: Sure.

4

Agent Perry's search of Roomette No. 8 took less than two minutes. At approximately 8 minutes and 17 seconds after the beginning of the recording Agent Perry asked the Defendant and Garcia-Isicardia if they would show him the bags they had downstairs. The recording indicates that it took a little less than a minute for Agent Perry, the Defendant, and Garcia-Isicardia to go downstairs to where the luggage was located. At approximately 9 minutes and 11 seconds Agent Perry can be heard saying, "These two?" and soon thereafter Defendant said, "This is his; that one's mine." Agent Perry then asked Defendant and Garcia-Isicardia, "Would you give me permission to search your bag for contraband?" Defendant responded, "Yes" and Garcia-Isicardia said in Spanish, "Claro que sí." (of course).

The search of the Defendant's and Garcia-Isicardia's luggage took place in a passageway on the lower level of the bi-level Sleeper Car No. 430. Only Agent Perry, the Defendant, and Garcia-Isicardia were in the immediate area of the luggage, but during the search, which lasted a little longer than seven minutes, several people can be heard passing by in the hallway.

After Agent Perry finished searching the Defendant's and Garcia-Isicardia's luggage, the tenor of the dialogue between Agent Perry and the Defendant changed dramatically. This occurred approximately 16 minutes and 19 seconds into the encounter. At that point Agent Perry asked: "Would you consent for a pat-down search of your person, ma'am, for contraband?" Instead of giving a short, direct answer---as she had done previously when Agent Perry had requested permission (1) to speak to the Defendant, (2) to see the Defendant's ticket and identification, (3) to consent to a search of her luggage, (4) to search items inside Defendant's bedroom, (5) to enter the Defendant's roomette for a search for contraband, and (6) to look through Defendant's purse—Defendant retorted with a question: "Can I know what's the problem?" Up to this juncture, Defendant knew that affording Agent Perry the opportunity to

conduct the various searches he had requested would not result in discovery of contraband. Without equivocation the Defendant had rapidly and definitively given Agent Perry permission to do the things he had asked to do. Now, knowing that Agent Perry was homing in on where she was keeping heroin, the wily Defendant changed her tactics.

Defendant's question seemed to discombobulate Agent Perry. He dissembled somewhat by mentioning security and by saying he was going to other cars to "talk to as many people as we can."

Agent Perry tried again: "Do you have anything…do you have a shirt underneath that shirt?" Defendant said she did and asked if there was a "woman around" who could conduct the pat-down. Agent Perry rejoined: "We don't have a female here." Trying a different tack, Agent Perry continued: "How 'bout if I just use the back of my hand? That be okay with you?" This prompted the Defendant to counter-offer: "If you could bring a woman, I can just get undressed; if that's okay with you."

Again, in a rather conspicuous attempt to extricate herself from a sticky situation, Defendant avoided directly answering Agent Perry by using a quasi-question. Agent Perry fumbled his reply: "Well, na, well, I don't have a fe, we don't have a female that's available to come do the…."

Defendant detoured the interaction with a suggestion that Agent Perry had singled her out: "It's that I'm just seeing it's only us." Agent Perry tried to oppugn Defendant's accusation by saying: "Once I get done talkin' to you, I'm gonna go talk to other passengers." Defendant continued: "Like in the train, I was the picked one" and ". . . on this train I was the one that was picked." To these comments, Agent Perry responded untruthfully: "No, you weren't the one we picked."

Having taken the offensive, Defendant further tried to distract Agent Perry by cagily suggesting that Agent Perry had a racial motive for investigating her: "I just felt like so. . .racist or something." Undeterred, Agent Perry persisted: "Do you have a shirt underneath that shirt?" After Defendant said she did, Agent Perry asked: "Would you be able just to lift up the, the, the outer shirt so I can see inside what you have underneath?" Defendant's unequivocal, quick, and firm response was "No."

Agent Perry then proposed: "How 'bout if I just use the back of my hand and pat-down around your waist, around your back?" Defendant's undisputed response was: "No, what for?" (This occurred about 18 minutes and 04 seconds after the recording began.) Next is the critical and highly contested section of the recording. Both sides agree that Agent Perry replied: "To make sure you don't have anything strapped to your body." The parties vehemently disagree about what was uttered next. The government's transcript reads:

    Defendant: "Okay."

In stark contrast, the Defendant's version is:

    Defendant: "Mmhuh."

Agent Perry arrested Defendant immediately following Defendant's mumble.

After carefully, intently, and repeatedly listening to the recording, the Court finds that the Defendant's muddled, ambiguous utterance is simply unintelligible. However, the Court also finds that her vocal expression definitely was not "Okay," or words close to that, or any other verbalization indicating consent to a pat-down. While the Court could not fathom the "Mmhuh" offered by the Defendant, the Court agrees that it is closer to the recorded incomprehensible mutter than to what the government propounds.

There is no evidence that Defendant made non-verbal facial or other gestures indicating that she assented to a touching of her mid-section.

Throughout his colloquy with the Defendant, Agent Perry always was polite and spoke with an unremarkable tone of voice. Occasionally, he spoke rapidly, but not aggressively or with significant forcefulness; he did not order or command. Until he arrested the Defendant, Agent Perry never touched her.

### III.    Legal Standard

#### A.    The consent search exception to the Fourth Amendment's warrant requirement

"The right of the people to be secure in their persons…against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "The ordinary remedy in a criminal case for violation of the Fourth Amendment is suppression of any evidence obtained during the illegal police conduct." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108 (10th Cir. 2006) (citing *Mapp v. Ohio*, 367 U.S. 643, 648 (1961)).

At issue in this case is the exception for warrantless searches conducted with the valid consent of the person whose property is searched. The exception has two elements: (1) the person challenging the search must have consented to the search; and (2) that consent must be valid. While the first element is relatively straightforward, the second is anything but. *See* 1-12 John Wesley Hall, Search and Seizure § 12.05 (5th ed. 2013). Indeed, prior to the Supreme Court's decision in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), courts followed two vastly

different approaches to determining the validity of consent to a search: (1) a "waiver of a known right" theory, which required the government to show that the defendant had knowingly waived the defendant's rights under the Fourth Amendment; and (2) a more lenient "voluntariness" approach, where knowledge of Fourth Amendment rights (and waiver thereof) was not a necessary condition for valid consent. *See* Hall, *supra*, at § 12.05.

*Schneckloth* resolved the debate, holding that "knowledge of the right to refuse consent is one factor to be taken into account, [but] the government need not establish such knowledge as the *sine qua non* of an effective consent." 412 U.S. at 227. The Supreme Court adopted a 'totality of the circumstances' standard for determining consent, analogizing to criminal confessions, where the question is only whether the defendant was coerced, not whether the defendant knew the constitutional rights he was giving up. *Id.* at 224.[3] The Supreme Court wanted to give courts the flexibility to accommodate legitimate police investigative techniques—albeit at the expense of clarity. *See id.* at 229 ("To approve [consent] searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity.").

　　B.　　<u>Test for determining voluntary consent to a search after *Schneckloth*</u>

Before *Schneckloth*, courts applied the totality of the circumstances test to determine the validity of consent irrespective of whether the legal standard was "knowing waiver" or "voluntariness." *See*, *e.g.*, *Nelson v. United States*, 208 F.2d 505, 509 (D.C. Cir. 1953); *Cipres v. United States*, 343 F.2d 95 (9th Cir. 1965); *Rogers v. United States*, 369 F.2d 944, 948 (10th Cir. 1966) (Bratton, D.J., sitting by designation). *Schneckloth* held that the totality of the circumstances inquiry remains, but that the outcome-determinative question was no longer

---

[3] This analogy has been criticized. *See* John B. Wefing & John G. Miles, *Consent Searches and the Fourth Amendment: Voluntariness and Third Party Problems*, 5 Seton Hall L. J. 211 (1973–1974).

9

whether a defendant had *knowingly waived* his right to withhold consent, but rather whether the defendant had *voluntarily* consented to the search.[4]

Nor did *Schneckloth* drastically change the burden of proof at suppression hearings. Before *Schneckloth*, the government had the burden of proving waiver with "clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied." *Judd v. United States*, 190 F.2d 649, 651 (D.C. Cir. 1951) (citing *Amos v. United States*, 255 U.S. 313, 317 (1921)). Although *Schneckloth* changed the applicable legal standard, the burden of proving that a defendant voluntarily consented to a search remains with the government. *See*, *e.g.*, *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998).

District courts apply a "two-part test for determining the validity of a consent search. Under this test, the [government] must: (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) prove that this consent was given without implied or express duress or coercion." *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) (citation omitted). As to the first part, the question is straightforward: did the defendant give unequivocal, specific, and intelligent consent to the search? If not, the evidence must be suppressed. If so, the court must then determine whether the defendant's consent was obtained through duress or coercion.

In *United States v. Thompson*, 546 F.3d 1223, 1226 (10th Cir. 2008), the Tenth Circuit Court of Appeals set out the following factors for determining the voluntariness of consent:

(1) The physical context of the encounter, especially whether the encounter takes place in the presence of other civilians;
(2) Physical restraints (if any);

---

[4] The two inquiries, though distinct in theory, are difficult to separate in practice. When "the Fourth Amendment permits police officers to approach individuals at random in…public places…[and] request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate[,]" *Florida v. Bostick*, 501 U.S. 429, 431 (1991), what separates a reasonable person's knowledge that he or she could refuse to cooperate with the officer's request and actual knowledge of rights under the Fourth Amendment?

10

      (3) Whether the police are in plain clothes or are uniformed;
      (4) Whether the officers' service weapons are visible;
      (5) The number of officers present, their demeanor and tone of voice;
      (6) Whether and for how long officers retain the defendant's personal effects or identification; and
      (7) Whether the defendant was advised of his right not to cooperate.

Other decisions more or less adopt the same set of factors, with variations. Thus in *United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009), the court noted that "a request to accompany an officer to the police station" might also weigh against a finding of voluntariness. 556 F.3d at 1138 (citing *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005)). Whatever the particular factors that are evaluated, the overarching task is determining "'the coercive effect of police conduct, taken as a whole,' on a reasonable person." *United States v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994) (en banc) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)).

      But while 'totality' might have a certain meaning in common parlance, i.e., "the quality or state of being complete or comprehensive," Webster's Third New Int'l Dictionary 2415 (1968), it has no such meaning here. Some 'circumstances,' it turns out, are not part of the totality. Thus, a district court may not consider whether a police officer asks incriminating questions of the defendant. *Little*, 18 F.3d at 1506. Nor may it accord "determinative weight" to the location of the encounter and the size of its confines, if any. *Id.* Nor may it give any weight at all to the defendant's or the police officer's subjective perceptions of the encounter. *United States v. Abdeni*, 361 F.3d 1282, 1292–93 (10th Cir. 2004).

      After nearly 50 years of jurisprudential refinement to the standard set down in *Schneckloth*, the reader might be forgiven for expecting a district court's reasoning in this field to be guided by a set of clear-cut and predictably-applied criteria. Reader, you are wrong. This Court's exasperated remark in 1998 is as true today as it was then: "evaluating the totality of circumstances in a case with numerous variables under shifting legal standards is somewhat akin

to practicing scapulimancy or pursuing some other exotic, esoteric method of divination." *United States v. Finnell*, 15 F.Supp.2d 1126, 1129 n.3 (D.N.M. 1998).

*Plus ça change, plus c'est la même chose*: the more things change, the more things stay the same. One would think that self-driving cars and inexpensive air travel would render the train an irrelevancy, but people keep boarding. *See* Nat'l Assn. of R.R. Passengers, *Amtrak Fact Sheet: Long Distance Sector* (2014), http://www.narprail.org/site/assets/files/1038/long_distance.pdf (last accessed July 24, 2015). Widespread Internet coverage has democratized public access to secondary sources describing the protections and scope of the Fourth Amendment. But people keep allowing the police to search them and later claiming they didn't know they were not required to. The growing use of lapel cameras and other digital recording equipment holds out the promise that courts need no longer depend on the (often self-serving) recollections of witnesses to resolve motions to suppress evidence. But courts continue to grapple with undeveloped evidentiary records and conflicting witness testimony in order to answer the same two questions: Did the defendant consent? And if the defendant consented, was that consent voluntary? The Court now turns to this task.

**IV.    Discussion**

    A.    <u>Whether Defendant consented to the Agent Perry's pat-down search of her torso</u>

Distilled to its core, this case is about a battle of wills. DEA Special Agent Jarrell Perry's job is to find contraband being transported by drug mules on the Southwest Chief.[5] The Defendant's job was to get heroin from A to B without arousing Agent Perry's suspicions or

---

[5] Agent Perry has been involved in 17 cases that led to motions to suppress evidence in this District. The government has prevailed in 12 of those 17 cases. Of course, this average has little, if any bearing on Agent Perry's overall success rate at finding contraband and making arrests. As he testified at the hearing on the Defendant's Motion to Suppress, Agent Perry has been involved in thousands of drug interdiction operations. Presumably most of those operations did not result in motions to suppress because there was no non-frivolous argument that the evidence should be suppressed.

giving him a justification to search her person. Just as a chess match between established grandmasters often turns on a single, miniscule error, the Defendant's Motion to Suppress turns on what exactly was said 18 minutes and 5 seconds into Agent Perry's belt tape recording. The government says it wins because the Defendant said "Okay," in response to Agent Perry's request that she consent to a pat-down search. The Defendant says she prevails because she said no such thing. The Court concludes that the drug running Defendant outwitted Agent Perry. She deftly parried Agent Perry's repeated attempts to gain permission to search her waistline; Defendant never unequivocally, or clearly, or specifically consented to him doing that. Agent Perry failed to get consent; checkmate, Defendant.

      Agent Perry testified at the hearing on the Defendant's Motion to Suppress that the Defendant said "okay" after he asked for her to consent to a pat-down. The government's transcript echoes this testimony. But this evidence falls well short of the sort of "clear and positive testimony" required to show consent for two reasons. First, the audio recording of the encounter is the best evidence of what the Defendant actually said to Agent Perry. It suffers none of the vagaries and latent biases of human recollection. And the audio recording shows, as the Defendant maintains, that the Defendant mumbled an incoherent response to Agent Perry before Agent Perry precipitously conducted the pat-down search.

      Second, even if the Defendant in fact said "Okay," to Agent Perry, this was not in response to a request to conduct a pat-down search. Recall that at 18 minutes and 4 seconds into Agent Perry's recording of his encounter with the Defendant, he asked her "How 'bout if I just use the back of my hand and pat-down around your waist, around your back?" The Defendant's undisputed response was not "Okay" or a mumbled incoherent response; it was "No, what for?" Next, Agent Perry said "To make sure you don't have anything strapped to your body." Even if

13

the Defendant then said "Okay," there is nothing to suggest that this response related back to the original request for consent as opposed to Agent Perry's more recent statement explaining why he wanted to conduct the pat-down search. In other words, Defendant's "okay" (assuming she said that, which the audio recording reveals she did not) could have been a mere acknowledgement that Agent Perry in fact wanted to conduct the search to discover drugs, not a consent to that search.

The government contends that the "Defendant's earlier refusal to lift up her shirt and her later questioning as to the purpose of [Agent] Perry's investigation" provide vital context to the question of whether Defendant consented to a pat-down. Response at 15–16. The government posits that these earlier exchanges show that Defendant slowly came to an "underst[anding]" with Agent Perry that he "was not asking her to remove her clothes, or get naked, or see her private areas," but actually "only wished to briefly pat her waist and back for the purpose of checking for contraband[.]" Response at 16 (alterations omitted). The government insists this 'understanding' demonstrates that the Defendant gave consent to the pat down.

But the government cannot argue that Defendant's subjective belief that Agent Perry was not going to let her continue on her journey unless she consented to a search is irrelevant, *see* Response at 9, while at the same time arguing that Agent Perry and the Defendant had an 'understanding' that obviated the need for Agent Perry to obtain Defendant's explicit consent. In any case, this context hardly helps the government; Defendant had twice told Agent Perry 'no' in clear and unambiguous terms. Even assuming this 'understanding' had nothing to do with the two actors' irrelevant subjective mindsets, it has no bearing on what Defendant actually said. If anything, the context before the Defendant's alleged consent (clear and unequivocal 'yes'

responses to Agent Perry's requests to search the Defendant's luggage) reinforces the conclusion that Defendant did not consent to a pat-down search.

Retreating, the government points to the physical context of the encounter itself. *See* Response at 4–8. To be sure, the totality of the circumstances indicates that the encounter between Agent Perry and the Defendant was consensual. The encounter took place in public, Defendant was not physically restrained, Agent Perry was dressed in plainclothes with his service weapon concealed, he was the only officer interacting with Defendant, and he did not otherwise restrain the Defendant by, say, retaining her identification any longer than necessary. *United States v. Thompson*, 546 F.3d 1223, 1226 (10th Cir. 2008). The only factor that even arguably ends up in Defendant's favor is Agent Perry's failure to advise her of her right to withhold consent and the Defendant's (arguably irrelevant, *see* Response at 8–10) subjective belief that Agent Perry would not let her leave until he had conducted the pat-down search.

But arguing that the physical context of the encounter makes it more likely that Defendant consented to the pat-down search is to put the cart before the horse. The "totality of the circumstances" (whatever that means) would only be relevant in this case if the Defendant had consented to a search but later maintained that the consent was obtained through coercion, subtle or explicit. It does not matter whether the search is requested in the dungeon of the Bastille or in the Defendant's attorney's office if the Defendant does not actually consent.

B. <u>Whether Agent Perry had an independent justification for conducting the search</u>

The government makes an alternative argument: Even if the Defendant did not consent to the pat-down search, "there existed sufficient indicia of drug trafficking to warrant a brief investigatory detention." Response at 10. This much is true, as the Court has previously noted. At the hearing on the Defendant's Motion to Suppress, Agent Perry testified that he had obtained

15

an Amtrak PNR[6] showing that the Defendant's ticket had been purchased by her traveling companion two days before departing from Flagstaff and listed a billing address in Southern Arizona, an area known for international drug trafficking activity. Defendant's last-minute and largely undefined travel plans gave Agent Perry further grounds to detain the Defendant and question her about her possible involvement in drug trafficking.

But while this information gave Agent Perry reasonable suspicion that justified questioning the Defendant if she did not otherwise consent to the questioning, it is impossible to connect this justification for initiating the encounter with the search that ultimately yielded the drugs on the Defendant's person. Reasonable suspicion that a person is engaged in drug trafficking activity only justifies questioning and perhaps a brief detention; a pat-down search is justified only when the police officer "reasonably believes that the suspect might be armed and presently dangerous." *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Nearly 18 minutes separate Agent Perry's initial contact with the Defendant and his eventual pat-down search of her body. Nothing that occurred in the interim could support a reasonable belief that the Defendant was armed and dangerous. Accordingly, any reasonable suspicion that the Defendant was involved in drug trafficking cannot furnish an independent justification for the pat-down search.

      C.    <u>Whether the government should be ordered to disclose the source of the Amtrak PNR to Defendant</u>

At the suppression hearing, the Defendant raised a new argument: the Court should order the government to disclose to the Defendant the identity of a confidential informant who had given Agent Perry the Defendant's PNR. The Court allowed the Defendant to submit supplemental briefing on the issue, and permitted the government to respond. *See* BRIEF (Doc.

---

[6] *See supra* footnote 1.

16

No. 30); MOTION TO STRIKE OR IN THE ALTERNATIVE, RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION REQUESTING DISCLOSURE (Doc. No. 31); MOTION FOR LEAVE TO FILE REPLY BRIEF (Doc. No. 32); RESPONSE IN OPPOSITION (Doc. No. 33); REPLY (Doc. No. 34).

It is difficult to discern from the Defendant's supplemental briefing whether she is urging an alternative basis for suppressing the evidence Agent Perry obtained, or whether the Defendant simply wants to know the identity of Agent Perry's confidential source because it is relevant to her defense.[7] On page 3 of her supplemental brief, Defendant points to *United States v. McKenzie*, 779 F.Supp.2d 1246 (D.N.M. 2011), where the government disclosed that a DEA Agent had obtained the Defendant's PNR by paying an Amtrak representative for the information. 779 F.Supp.2d at 1252. But *McKenzie* did not address whether a defendant is entitled to know the identity of a confidential source that provides an Amtrak PNR to the arresting DEA agent, because in *McKenzie* the government had already disclosed the source. *McKenzie* stands for an entirely different proposition: that there is nothing illegal about an Amtrak agent providing a PNR to a DEA agent in exchange for a cash payment, and in any event a defendant has no standing to challenge the propriety of such an arrangement. *See id.* at 1249–50.

The government interprets the Defendant's opaque supplemental argument as an alternative argument for suppression. *See* Doc. No. 31 at 2–6. The government argues that any legal argument for suppression of evidence, gathered by using information in a PNR, was rejected by the Tenth Circuit in *United States v. Jackson*, 381 F.3d 984 (10th Cir. 2004). In *Jackson*, the court held that Amtrak's disclosure of PNRs to the DEA in violation of the Privacy

---

[7] The Defendant also devotes nearly half of her supplemental brief re-arguing issues already raised in the Motion to Suppress. The Court will therefore grant the government's motion to strike this non-responsive argument from the Defendant's supplemental briefing.

Act, 5 U.S.C. § 552a, did not require suppression of evidence obtained by using the information in the PNR. 381 F.3d 989–90.

The *Jackson* court's holding is based on two rationales. First, *Jackson* adopted the Fifth Circuit's discussion of the same argument in *Ehm v. Nat'l R.R. Passenger Corp.*, 732 F.2d 1250, 1251–53 (5th Cir. 1984). In *Ehm*, the Fifth Circuit noted that the Privacy Act applied to all federal agencies subject to the Freedom of Information Act. *Ehm*, 732 F.2d at 1252 (quoting 5 U.S.C. § 552(e)). But the *Ehm* court found that Amtrak was not subject to the Privacy Act because Amtrak's corporate charter specifically states that Amtrak is not an "agency" of the Federal government and because Amtrak does not have the characteristics of a typical federal agency. *See Ehm*, 732 F.2d at 1254–55 (quoting 45 U.S.C. § 541, *repealed by* Pub. L. No. 103-272, § 7(b), 108 Stat. 1379 (1994)); s*ee also* 49 U.S.C. § 24301(a)(3) (2007) ("Amtrak…is not a department, agency, or instrumentality of the United States Government[.]"). Second, *Jackson* interpreted *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) to hold that that Amtrak's charter is dispositive of its status as a government entity for the purposes of the Administrative Procedure Act. Accordingly, its corporate charter is also dispositive for its status as a government entity subject to FOIA and the Privacy Act.

Recent amendments to Amtrak's charter appear to have severely limited *Jackson*'s and *Ehm*'s holdings. In 2007, *Ehm* and *Jackson* were essentially superseded by Congressional amendments to Amtrak's charter. *See* 49 U.S.C. § 24301(e) (2007) ("Section 552 of title 5, United States Code, applies to Amtrak for any fiscal year in which Amtrak receives a Federal subsidy."); *see also Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. ___ (2015), slip op. at *8 ("The Freedom of Information Act applies to Amtrak in any year in which it receives a

federal subsidy, 5 U.S.C. § 552, which thus far has been every year of its existence."); 5 U.S.C. § 552a(a)(1) (2015) ("the term 'agency' means agency as defined in section 552(e) of this title[.]").

More recently, in *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. ___ (2015), the United States Supreme Court repudiated *Jackson*'s interpretation of *Lebron*. The Supreme Court noted that in *Lebron*, Amtrak argued its corporate charter should be dispositive of its status as a government entity. *Id.* (slip op., at *11) (citing *Lebron*, 513 U.S. at 392). The Supreme Court read *Lebron* to reject Amtrak's formalist argument that—even if Amtrak walks, talks and squawks like a government agency—Congress's statement that it is not a government agency is the end of the matter. The *Dep't of Transp. v. Ass'n of Am. Railroads* Court stated:

> [*Lebron* held] it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions. To hold otherwise would allow the Government to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form.

*Id.* (citations omitted). In other words, "[*Lebron*] held Amtrak is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." *Id.*

The 2007 amendments to Amtrak's charter making Amtrak a government agency under FOIA and the Privacy Act clearly supersede *Jackson*.[8] And *Dep't of Transp. v. Ass'n of Am. Railroads* repudiated *Jackson*'s conclusion that Amtrak's charter is dispositive of its status as a government entity. This raises some interesting questions: Does Amtrak's production of PNRs to the DEA in violation of the Privacy Act subject its passengers to unreasonable searches and

---

[8] Courts in this district continue to cite *Jackson* as controlling law, even after the 2007 amendments to Amtrak's charter. *See*, *e.g.*, *United States v. McKenzie*, 779 F.Supp.2d 1246, 1249 (D.N.M. 2011) (Browning, J.) ("McKenzie asserts that…his Fourth Amendment rights [were violated] when [the DEA Agent] obtained McKenzie's PNR from AmTrak [sic]. The Tenth Circuit opinion in *United States v. Jackson* refutes his argument. McKenzie's argument is therefore without a sound basis in the law, and the Court will not therefore suppress the evidence that flows from Hyland's obtaining McKenzie's PNR from an AmTrak [sic] ticket agent.").

seizures in violation of the Fourth Amendment? Does an Amtrak passenger have standing to challenge such a violation? Does a traveler's apparent consent to speak with a law enforcement officer cure any earlier Fourth Amendment violation? Is suppression the appropriate remedy if a violation is established? Answers to these questions will have to be deferred for another day, because although the Government's response to Defendant's brief discusses the issue, Defendant waived the argument by failing to raise it in either her Motion to Suppress or her supplemental brief.

## IV. Conclusion

In sum, Agent Perry failed to obtain Defendant's consent to conduct a pat-down search of her body. Because the Court will grant Defendant's Motion to Suppress, the Court will deny as moot Defendant's motion for disclosure of the source of the PNR.

IT IS ORDERED THAT

(1) Defendant's Motion to Suppress is GRANTED;

(2) The government's MOTION TO STRIKE (Doc. No. 31) is GRANTED; and

(3) Defendant's motion for disclosure of the identity of Agent Perry's confidential source (Doc. No. 30) and her MOTION FOR LEAVE TO FILE REPLY BRIEF (Doc. No. 32) are DENIED AS MOOT.

_____
SENIOR UNITED STATES DISTRICT JUDGE