1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA,

5           Plaintiff,

6      vs.                        1:15-CR-627-JAP

7    JENNIFER VANESSA AMEZCUA-AGUIRRE,

8           Defendant.

9

10          Transcript of Hearing on Motion to Suppress before The
     Honorable James A. Parker, Senior United States District Judge,
11   held in Albuquerque, Bernalillo County, New Mexico, commencing
     on Monday, June 22, 2015, at 1:43 p.m., and concluding at 4:35
12   p.m.

13

14   For the Plaintiff:  Nicholas Jon Ganjei, Esq.

15                       Joel R. Meyers, Esq.

16

17   For the Defendant:  Irma Rivas, Esq.

18                       Margaret Katez, Esq.

19

20

21

22                       John De La Rosa, CCR
                   United States Official Court Reporter
23                    421 Gold Avenue, Southwest
                    Albuquerque, New Mexico  87102
24                     Phone:  505.348.2249

25

1          (In open court.)

2              THE COURT:  Good afternoon, court's in session, have a

3    seat, please.

4              This is number 2015-627, United States of America

5    versus Jennifer Vanessa Amezcua-Aguirre.  Would counsel state

6    their appearances, please.

7              MR. GANJEI:  Good afternoon, Your Honor.  Nicholas

8    Ganjei for the United States.  At counsel table is co-counsel

9    Joel Meyers and Special Agent Jarrell Perry.

10             MR. MEYERS:  Good afternoon, Judge.

11             MS. RIVAS:  Good afternoon, Irma Rivas for

12   Ms. Amezcua-Aguirre.  With me is Margaret Katze, and the

13   defendant is in custody and being assisted by a Spanish

14   interpreter.

15             THE COURT:  I got a little frustrated in trying to

16   prepare for the hearing.  The copy of the recording of the

17   incident that was provided by the defendant was blank, so I

18   couldn't listen to that, and I didn't receive one from the

19   government.  So at some point, I need to have an intelligible

20   copy of the actual incident so I can walk through the competing

21   transcripts.

22             MR. GANJEI:  Yes, Your Honor, the United States has a

23   copy that it's willing to tender to the court.  We're planning

24   on introducing it as an exhibit for this hearing.  I would

25   assume that defense would have no objection to that seeing how

1   they provided a copy to the court of the same encounter.  We

2   could move it into evidence at this time.

3           THE COURT:  Okay.  There is no objection to that, I

4   guess?

5           MS. RIVAS:  No, Your Honor.  We want to apologize to

6   the court.

7           THE COURT:  I'm going to have to listen to it at some

8   point, which I can do after this hearing to try to determine

9   which of the two transcripts is the one that seems to fit the

10  best.

11          Now, let me ask this:  I couldn't tell from the

12  briefing where different conversations took place and who was

13  present during the different conversations.  So what I would

14  like to do is walk through one of the two transcripts, either

15  one is fine, and have you tell me where the conversations were

16  occurring and who was present during the conversations.  I

17  guess either transcript is all right for that purpose.  Why

18  don't we look at the defendant's transcript and maybe we can

19  start with that.

20          This begins with knocking on the door, and that's what,

21  Roomette 8 --

22          MR. GANJEI:  The beginning of this conversation, the

23  United States would state that this took place in bedroom

24  number 8, sleeper car number 430, of the Amtrak train in

25  Albuquerque, New Mexico.

1              THE COURT:  It starts with knocking on the door.  Is

2  the door closed?

3              MR. GANJEI:  Yes, Your Honor, the door was closed.

4              THE COURT:  Okay.  All right.  And here, in this

5  transcript, there is simply identification of the police

6  officer, but that's Agent Perry, where it says "PO."  Is that

7  correct?

8              MR. GANJEI:  Our version, Your Honor, is just

9  Agent Perry.  He's the only one encountering the two at the

10 room, Your Honor.

11             THE COURT:  Well, on the defendant's transcript where

12 it says "PO," is that always Agent Perry?

13             MS. RIVAS:  Your Honor, from what we could tell, it was

14 Agent Perry.

15             THE COURT:  Okay.  On the first page of the transcript,

16 this is occurring at Roomette 8, and he says, "Okay.  Y'all

17 traveling together?"  And a male answers "all right."  Who is

18 the male?

19             MR. GANJEI:  Your Honor, the male was identified as

20 Luis Garcia, the traveling companion to the defendant.

21             THE COURT:  All right.  Was he in the roomette with the

22 defendant?

23             MR. GANJEI:  He was, Your Honor.

24             THE COURT:  Was anyone else besides Agent Perry, the

25 defendant, and Luis Garcia present during this part of the

1    conversation on page 1?

2          MR. GANJEI:  No, Your Honor, Agent Perry was at the

3    doorway, and the two individuals were inside the room.  No one

4    else was there.

5          THE COURT:  Okay.  Let me ask on page 1 of the

6    defendant's transcript, where is Agent Perry standing while

7    this conversation is taking place?

8          MR. GANJEI:  Your Honor, he is standing outside the

9    room to his left of the doorway, to the defendant's right of

10   the doorway.

11         THE COURT:  To his left of the doorway?  Okay.  And who

12   is in the room at that time?  Are both the defendant and Luis

13   Garcia in the room?

14         MR. GANJEI:  Yes, Your Honor, both the defendant and

15   Luis Garcia are in the room.

16         THE COURT:  Now, let me ask, does the defendant agree

17   with that?

18         MS. RIVAS:  Your Honor, could I have a moment?

19         THE COURT:  Sure.

20         MS. RIVAS:  Your Honor, that's correct.

21         THE COURT:  Excuse me?

22         MS. RIVAS:  That's correct.

23         THE COURT:  That's correct?  Okay.  Where was it that

24   Agent Perry first entered Roomette 8?  Is that at the top of

25   page 7 of the defendant's transcript where he says, "Ma'am,

1    would you give me permission to enter your room to conduct a

2    search of your room?"

3           MR. GANJEI:  Your Honor, the portion that the court

4    just read would be -- we would contend the first time that

5    Agent Perry entered the room, doing so with the permission of

6    the defendant.

7           THE COURT:  Let me ask counsel for the defendant, do

8    you agree that that's the point at which Agent Perry first

9    asked for permission to enter the room and entered the room,

10   and actually entered the room?

11          MS. RIVAS:  Your Honor, we would argue that there was

12   no room for Mr. -- for Agent Perry to enter the room, but he

13   was right at the entry of the door, and that would be the first

14   time that he went inside because of the space allowed at that

15   time.

16          THE COURT:  Did he actually step in the room?  What is

17   going to be Agent Perry's testimony?

18          MR. GANJEI:  Yes, Your Honor, he entered the room at

19   that time to search, but did not enter before that time.

20          THE COURT:  So that's at the top of page -- the middle

21   of page 7 of the defendant's transcript.  Is that right?  Is

22   that where that occurs?

23          MR. GANJEI:  Yes, Your Honor, after "Would you give me

24   permission to enter your room to conduct a search of your

25   room?"

1          THE COURT:  Then he says, "Ma'am, is this your purse

2    here?"  When he asked that, was he inside the room?

3          MR. GANJEI:  At that point, Agent Perry had entered the

4    room, Your Honor.

5          THE COURT:  Okay.  Now, what will be the testimony as

6    to the length of time that occurred between the knocking on the

7    door shown on page 1 and the entry into the room on page 7 of

8    the defendant's transcript?

9          MR. GANJEI:  Your Honor, although the United States

10   would state that the recording would be the best evidence of

11   that, we would estimate probably a little bit less than five

12   minutes.

13         THE COURT:  And what's the defendant's position?  Would

14   you agree with that?

15         MS. RIVAS:  Your Honor, it was about six-and-a-half

16   minutes.

17         THE COURT:  About six-and-a-half minutes?

18         MS. RIVAS:  Yes, Your Honor.

19         THE COURT:  I couldn't tell from the transcripts how

20   long Agent Perry was in the room where he, I guess, looked at

21   the defendant's purse and told Mr. Garcia, "Don't forget his

22   wallet."

23         Let me ask this:  Tell me on the transcripts where

24   Agent Perry was in the room beginning with, I guess, where he

25   says, "Ma'am, would you give me permission to enter the room?"

1   That's on page 7.  Where on the transcript does he leave the

2   room?

3          MR. GANJEI:  Just a moment, Your Honor.

4          THE COURT:  Sure.

5          MR. GANJEI:  Your Honor, on the government's

6   transcript, it is page 10.  On the defendant's transcript, I

7   believe it's page 7.  In our transcription, it says, "No,

8   that's okay, I'll look underneath there.  Thank you.  Can I...

9   be okay if I step back here, ma'am?  Can you show me the bags

10  that you all have downstairs?"

11         THE COURT:  And what is the government's -- let's see.

12  What page of the government's transcript is this?

13         MR. GANJEI:  It is almost directly in the middle of

14  page 10 of the transcript which is the 11th page of the

15  transcript.

16         THE COURT:  Okay, I see it here.  So according to the

17  government's transcript, the defendant said "sure."  According

18  to the defendant's transcript, she says, "Mm," capital M with a

19  little M.  And then Agent Perry says, "Thank you," on both

20  transcripts.

21         Now, is that the point at which they left the room to

22  go see the bags in the luggage compartment?

23         MR. GANJEI:  Yes, Your Honor.

24         THE COURT:  Does the defendant agree with that?

25         MS. RIVAS:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  Then, looking at the top

2    of page 8 of the defendant's transcript, the first thing shown

3    there is another male, OM, saying, "Can you help me out?"  Who

4    is this?  On the government's transcript, there is an

5    unidentified male without an intelligible answer.  Any idea who

6    this unidentified male is, or other male?

7          MR. GANJEI:  We don't, Your Honor.  We don't know if

8    that's another passenger on the train.  Agent Perry has

9    informed me that there were no other agents assisting him at

10   this time, so it is not any law enforcement individual, but

11   maybe the defendant could inform the court.

12         THE COURT:  Well, you raise another question.  During

13   the time Agent Perry was -- well, let's start at the beginning.

14   Were there any other agents present when the conversation

15   began?

16         MR. GANJEI:  No, Your Honor.  Defendant mentions a

17   total of four agents, Perry, Small, Mr. Gutierrez and Special

18   Agent Banach.  Banach wasn't even at the train.  She was at the

19   Albuquerque headquarters.  Mr. Gutierrez was away from

20   Agent Perry down the hallway outside of the view of the

21   defendant, and Agent Small, I believe, was on the platform

22   during almost all of this and did not encounter defendant at

23   any time that she was arrested.  So it would be just

24   Agent Perry, we believe, through almost this entire encounter.

25         THE COURT:  Can either side help me with who is shown

1  as an unidentified male, UM, in the government's transcript on

2  page 11 of 18, or on the defendant's transcript of OM, other

3  male, shown on page 8 of 13?  Nobody knows who that voice is?

4          MR. GANJEI:  Agent Perry informs me, Your Honor, that

5  that is another passenger on the train, not related to

6  defendant or her traveling companion, and not a law enforcement

7  officer.

8          THE COURT:  Does the defendant agree with that?

9          MS. RIVAS:  Your Honor, she does not know who that

10  other person was.

11          THE COURT:  Now, when whoever this is says "can you

12  help me out," where is that conversation taking place?

13          MR. GANJEI:  Your Honor, that is not something that our

14  language specialist heard or transcribed.  That is something on

15  the defense's transcript.  Defendant was there.  She could

16  perhaps inform the court what that was, but we don't have that

17  in our transcript, so we can't answer the court's question.

18          THE COURT:  Okay.  Well, let's see where the

19  transcripts agree.  At the top of page 8 of the defendant's,

20  Agent Perry is shown as saying, "How are you doing, sir?"  And

21  a little below the middle of page 11 of the government's

22  transcript, Agent Perry is shown saying, "How are you doing,

23  sir?"  And an unidentified male says -- and I need to know if

24  this answer is in English or Spanish, it has two versions --

25          MR. GANJEI:  Your Honor, are you referring to his

1  response "bien"?

2          THE COURT:  Yes.

3          MR. GANJEI:  If it is listed as in Spanish on the left,

4  that means it was translated.

5          THE COURT:  So Special Agent Perry apparently asked

6  whoever this unidentified male is, "How are you doing, sir," in

7  English?  And the answer was "bien" in Spanish?

8          MR. GANJEI:  Yes, Your Honor.

9          THE COURT:  Okay.

10         THE COURT:  Now, can Agent Perry identify who this is,

11  who he addressed as "How are you doing, sir?"

12         MR. GANJEI:  Your Honor, he believes it is another

13  passenger, not a law enforcement officer.

14         THE COURT:  Let me ask if the defendant agrees with

15  that.

16         MS. RIVAS:  Your Honor, Ms. Amezcua doesn't know who

17  that person is.  It is possible that he was addressing a

18  passenger, but she doesn't know.  She doesn't have personal

19  knowledge.

20         THE COURT:  Doesn't know who this was?

21         MS. RIVAS:  Right.

22         THE COURT:  Okay.  On the defendant's transcript,

23  according to this, the other male says, "Sorry, sir, you have

24  plenty of time."  Was that in Spanish?  This is at the top of

25  page 8 of the defendant's transcript.

1          MS. RIVAS:  Your Honor, consistent with the way that

2     this was transcribed, it is transcribed in the language that it

3     was heard, so I believe that -- I believe it must have been in

4     English, because it was transcribed in English.

5          THE COURT:  You believe this response at the top of the

6     defendant's transcript on page 8, where it says, "Sorry, sir,

7     you have plenty of time," you think that was in English?

8          MS. RIVAS:  Yes, sir.

9          THE COURT:  What's the government's position on that?

10         MR. GANJEI:  Your Honor, that's not something that our

11    language specialist heard when she transcribed this, so we have

12    no way of verifying that.

13         THE COURT:  Does Agent Perry have any recollection of

14    some other male saying in English, "Sorry, sir, you have plenty

15    of time"?

16         MR. GANJEI:  He does not have any recollection of that,

17    Your Honor.

18         THE COURT:  Okay.  Now, let me get it straight as to

19    when the conversation at Roomette 8 ended and when the

20    conversation began at the luggage area.  Can somebody give me

21    some idea of what the relative locations are of Roomette 8 and

22    the luggage area?

23         MS. RIVAS:  Your Honor, from the diagrams that we

24    provided to the court, Roomette 8 appears to be midway down the

25    hall in the upper left, and the luggage area appears to be in

1    the middle of the hall in the lower level.

2              THE COURT:  Does Agent Perry agree with that?

3              MR. GANJEI:  Yes, Your Honor, but the defense's luggage

4    was not in the luggage area in the lower room, it was in an

5    adjoining passenger room that was used to store overflow

6    luggage.

7              THE COURT:  All right.  Where was the E passenger room

8    in relation to Roomette 8?

9              MR. GANJEI:  It is on the lower level, Your Honor, next

10   to the luggage compartment.  So defendant's diagrams are

11   correct, defendant's sleeper berth was on the upper level,

12   defendant's luggage in the transcription was on the lower

13   level, and adjacent to that in the lower level was a room used

14   to store overflow luggage where he's asking is this your oxygen

15   tank.

16             THE COURT:  Okay.  Are both sides in agreement, if you

17   look at the defendant's transcript, that the conversation in

18   the Roomette 8 ended at the bottom of page 7 of the defendant's

19   transcript?

20             MR. GANJEI:  United States agrees, Your Honor.

21             MS. RIVAS:  Yes, Your Honor.

22             THE COURT:  All right.  Now, how long was the

23   conversation while Agent Perry was inside Roomette 8 which I

24   understand begins with his question at the top of page 7,

25   "Ma'am, would you give me permission to enter your room to

1    conduct a search of your room," and then ends at the bottom of

2    the page 7 with him saying "thank you"?  How long did that

3    take?

4          MR. GANJEI:  Your Honor, the United States would just

5    be guessing.  We think the best evidence would be the actual

6    audio exhibit that's been admitted into evidence.

7          THE COURT:  Okay.

8          MS. RIVAS:  Your Honor, we believe that it was about

9    two minutes.

10         THE COURT:  About two minutes?

11         MS. RIVAS:  Yes, Your Honor.

12         THE COURT:  Is the recording measured in time?  Is

13   there something on the recording that indicates the time?

14         MR. GANJEI:  I believe the player itself, if it is

15   Windows Media Player, will have how long it's been and measured

16   against that.

17         THE COURT:  Okay.  Turning to page 8 of the defendant's

18   transcript, apparently, we have two different other males, one

19   speaking in Spanish, one speaking in English, at the top of the

20   page, and where this begins with the other male saying -- can

21   you help me out on the defendant's transcript?  Is that at the

22   lower area where the empty room with the excess baggage is

23   located?

24         MS. RIVAS:  Your Honor, we believe that conversation

25   was still upstairs.

1          THE COURT:  I'm sorry, could you speak up?

2          MS. RIVAS:  It was still upstairs.

3          THE COURT:  Under the defendant's version, when did

4    they go downstairs, according to the transcript?

5          MS. RIVAS:  Your Honor, it does appear that at the

6    bottom of page 7 is when the parties begin to walk downstairs,

7    and from what I can tell, it appears that these conversations

8    took place on the way downstairs.

9          THE COURT:  On the way downstairs?

10         MS. RIVAS:  Yes, Your Honor.

11         THE COURT:  When you say "these conversations," it is

12   the ones involving what are identified as OM at the top of page

13   8 of the defendant's transcript?

14         MS. RIVAS:  Yes, sir.

15         THE COURT:  On the defendant's transcript on page 8,

16   when was the conversation at the empty room where the excess

17   luggage is located shown on the transcript?  Is that where

18   Agent Perry asks, "These two?"

19         MR. GANJEI:  We can't say precisely when that

20   conversation began, but by the point where he's saying "these

21   two bags," it definitely was at that point downstairs.

22         THE COURT:  Does the defendant agree that that's where

23   the conversation starts down at the luggage?

24         MS. RIVAS:  Yes, Your Honor.

25         THE COURT:  Okay.  Now, how long did it take to go from

1   Roomette 8 down to the luggage?

2          MR. GANJEI:  Around 20 to 30 seconds.

3          THE COURT:  What is the defendant's position?

4          MS. RIVAS:  We think it was about one minute.

5          THE COURT:  Did Luis Garcia go down to the luggage

6   area?

7          MR. GANJEI:  Yes, Your Honor.

8          THE COURT:  Does the defendant agree?

9          MS. RIVAS:  Yes, Your Honor.

10          THE COURT:  At the point where Agent Perry says, "These

11   two," the middle of page 8 of the defendant's transcript, and

12   at the top of page 12 of the government's transcript, who was

13   present?

14          MR. GANJEI:  Your Honor, Agent Perry, the defendant,

15   Mr. Garcia, then a Task Force Officer Gutierrez was also

16   downstairs, although not in the immediate vicinity.  He was

17   further down the hallway, Your Honor.

18          THE COURT:  Well, was he in sight, or where was he

19   exactly?

20          MR. GANJEI:  Yes, Your Honor, he was within sight.

21          THE COURT:  How far?

22          MR. GANJEI:  About 10 to 12 feet, Your Honor.

23          THE COURT:  Who was the other agent?

24          MR. GANJEI:  Task Force Officer Pedro Gutierrez.

25          THE COURT:  When this conversation took place where

1   Agent Perry asks, "These two," where were the participants in

2   the conversation standing?  Where was Agent Perry, where was

3   the defendant, and where was Luis Garcia?

4          MR. GANJEI:  Your Honor, Agent Perry informs that the

5   defendant and Mr. Garcia, I believe it is, were standing

6   outside in the hallway of the common luggage area while he was

7   standing in front of the adjacent room where their luggage was

8   kept, and he was able to point or they were able to point to

9   the luggage there.

10          THE COURT:  And they could see the luggage from the

11   hallway?

12          MR. GANJEI:  They were able to physically identify the

13   baggage, pointed at them and then moved down the hallway a few

14   feet from Agent Perry.

15          THE COURT:  Does the defendant agree as to the

16   locations of the defendant, Mr. Garcia and Agent Perry in the

17   hallway?

18          MS. RIVAS:  From the information that we have,

19   Ms. Amezcua and Mr. Garcia were in a cubby.  There are two

20   doors, it appears, on the bottom.  There are two exit doors on

21   the lower level of the train.  One was closed, and they were in

22   that hallway to that door, and it's our position that the bags

23   were in a separate room while he was searching them.

24          THE COURT:  Well, could the defendant see the bags from

25   where she was standing in the hallway?

1          MS. RIVAS:  Your Honor, would the court repeat the

2    question, please?

3          THE COURT:  Could the defendant see the luggage, two

4    pieces of luggage, or the two bags, from where she was standing

5    in the hallway?

6          MS. RIVAS:  Before the search, yes.

7          THE COURT:  Okay.  Now, let me ask, on the defendant's

8    transcript, Agent Perry asks for permission to search the bags

9    for contraband.  It's shown first that he asked, "Would you

10   give me permission to search your bags for contraband?"  And

11   the defendant responded yes, and then apparently, turning to

12   Mr. Garcia and saying in Spanish, "Me permite registrar por

13   contraband en sus," and the male, who I guess is Mr. Garcia,

14   responding "claro que si," is that what is shown on the

15   transcript, that he asked both in English and in Spanish?

16         MR. GANJEI:  Your Honor, our transcript has that he

17   spoke to the defendant in English.  She said yes unequivocally,

18   spoke to Mr. Garcia in Spanish, and it looks like there is a

19   slight difference in that he actually clarified suitcases, and

20   Agent Perry said yes, and he then grants permission to search.

21   I'm sorry, Agent Perry clarified, suitcases?

22         THE COURT:  On page 9 of the defendant's transcript,

23   there's a conversation about an oxygen tank, "how about the

24   oxygen thing?"

25         MR. GANJEI:  Yes, Your Honor, I think in our

1    transcript, it is referred to as an oxygen tank which was in

2    that room not belonging to the defendant.

3            THE COURT:  In the government's transcript, it does say

4    "oxygen tank."

5            Below the middle of the page 9 of the defendant's

6    transcript, Agent Perry asks, "Excuse me, that's the only two

7    bags you have?"  And that's similar to the government's

8    transcript at the top of page 14 of the government's

9    transcript.

10           Then the defendant responds "and my purse up there,"

11   and that's consistent in both transcripts.  Then Agent Perry on

12   the defendant's transcript is shown as saying, "The purse?  No

13   luggage down here, though?"  And the defendant responds "not

14   down here," and that's essentially the same as what's shown on

15   the government's transcript on page 14.

16           All right.  Now, then Agent Perry asks the question,

17   "Okay, and you guys don't have anything on your body or

18   strapped to your person?"  The defendant says, "No."  And

19   that's consistent with the government's transcript in the

20   middle of the page 14.

21           Then Agent Perry says, "Okay, would you consent for a

22   pat-down of your person, ma'am, for contraband?"  That's

23   essentially the same as the government's in the middle of the

24   page 14.

25           Now, where are Agent Perry and the defendant when

1    Agent Perry asks, "Okay, and you guys don't have anything on

2    your body or strapped to your person?"

3           MR. GANJEI:  They are standing in the common walkway of

4    the lower level of the train.

5           THE COURT:  They are not in Roomette 8?

6           MR. GANJEI:  No, they are downstairs, Your Honor, in

7    the luggage area, in the common walkway of the train, Your

8    Honor.

9           THE COURT:  Does the defendant agree to that?

10          MS. RIVAS:  Your Honor, we would disagree in the fact

11   that they were in that hallway in that cubby that's formed with

12   the other door that was not open.

13          THE COURT:  Were they in Roomette 8?

14          MS. RIVAS:  They were not in Roomette 8.

15          THE COURT:  Were they on the lower level of the train?

16          MS. RIVAS:  Yes, near the luggage compartment, next to

17   it, where the closed doors of the train was in that inlet in

18   the hallway.

19          THE COURT:  Where is that from the stairs that go back

20   up to Roomette 8?

21          MS. RIVAS:  At the bottom of the stairs.

22          THE COURT:  They are standing at the bottom of the

23   stairs?

24          MS. RIVAS:  To one side, Your Honor.

25          THE COURT:  Okay.  Who was present when Agent Perry

1   asks the question, "Okay, and you guys don't have anything on

2   your body or strapped to your person?"

3          MR. GANJEI:  Your Honor, it was Agent Perry, the

4   defendant, her companion Mr. Garcia, Task Force Officer

5   Gutierrez was again further down the hallway of the train,

6   probably about 12 feet.

7          THE COURT:  Was Agent Gutierrez participating in this

8   conversation?

9          MR. GANJEI:  No, Your Honor.

10         THE COURT:  Anyone else around at that time?

11         MR. GANJEI:  Agent Perry informs me that there might

12  have been other passengers, but he's not sure because he was

13  concentrating on his encounter with the defendant and her

14  traveling companion, Your Honor.

15         THE COURT:  From the government's point of view, how

16  long did the conversation take between where Agent Perry says,

17  "These two," on page 8 of the defendant's transcript to where

18  he asks, "Okay, and you guys don't have anything on your body

19  or strapped to your person," on page 9 of the transcript?

20         MR. GANJEI:  Your Honor, I don't mean to be unhelpful,

21  but perhaps the audio recording would be the best evidence of

22  that.

23         THE COURT:  Does the defendant have an estimate?

24         MS. RIVAS:  Yes, Your Honor, we believe that these two

25  were asked about 9 minutes 10 seconds and the encounter ended

1    at about 16:30, so approximately seven minutes.

2         THE COURT:  Seven minutes between the time he said

3    "these two," referring to the pieces of luggage, and the point

4    at which he asks, "Okay, and you don't have anything on your

5    body or strapped to your person?"

6         MS. RIVAS:  Yes, Your Honor.

7         MR. GANJEI:  I want to clarify, she said the end of the

8    encounter.  If that means the arrest, that would --

9         THE COURT:  No, I'm talking about where he asks about

10   whether they had anything strapped to their person, which is

11   near the bottom of page 9 of the defendant's transcript.

12        MR. GANJEI:  Just to clarify, then, you are saying it

13   took approximately six minutes, approximately 7 minutes, from

14   the time he said "these two" to the time where he asked if

15   there was anything strapped to their body?  Okay, thank you,

16   Your Honor.

17        THE COURT:  Okay.  Then from the point that he asks if

18   "you guys don't have anything on your body or strapped to your

19   person," to the end of the conversation at the top of page 13

20   of the defendant's transcript, where was that taking place?

21        MR. GANJEI:  Your Honor, this is all taking place in

22   the same public thoroughfare at the bottom of the train.

23        THE COURT:  Does the defendant agree to that?

24        MS. RIVAS:  Yes, Your Honor.

25        THE COURT:  Okay.  How long did that take between the

1   time that Agent Perry asked if they had anything strapped to

2   their body or persons to the very end of the conversation at

3   the top of page 13 of the defendant's transcript?

4          MR. GANJEI:  Your Honor, we would just defer again to

5   the audio recording to the point where he asked her to turn

6   around and placed handcuffs on her, which I don't know if it is

7   necessarily reflected in the defendant's transcript, but it is

8   in the government's would be the end point of the encounter.

9          THE COURT:  Okay.  Does the defendant have an estimate

10  on that?

11         MS. RIVAS:  Yes, Your Honor.  Did the court want to

12  know to the end or to the time that she's arrested?

13         THE COURT:  Ask that again, please.

14         MS. RIVAS:  Would the court like to know from that time

15  to the point she's arrested or to the end of the recording?

16         THE COURT:  Well, let's identify when she was arrested,

17  so where would that be?  At the top of page 12 of the

18  transcript?

19         MR. GANJEI:  About a third of the way down, Your Honor,

20  at "Okay, go ahead and turn around and put your hands on your

21  back," parentheses, sound of handcuffs.

22         THE COURT:  Does the defendant agree that's the point

23  of arrest?

24         MS. RIVAS:  Yes, Your Honor.

25         THE COURT:  Okay.  How long, then, was that

1   conversation between the question by Agent Perry, "Okay, and

2   you guys don't have anything on your body or strapped to your

3   person" at the bottom of page 9, to the point of arrest which

4   is shown at the top of page 12?  How long did that occur?

5        MS. RIVAS:  We think it is approximately from 16

6   minutes 10 seconds to about 18 minutes 45 seconds, so we think

7   that's about two-and-a-half minutes.

8        THE COURT:  About two-and-a-half minutes?

9        MS. RIVAS:  Yes, Your Honor.

10       THE COURT:  What's the government's estimate?

11       MR. GANJEI:  Again, Your Honor, to the extent that this

12   is dispositive of the court's opinion, we would ask to refer to

13   the audio recording.

14       THE COURT:  Okay.  Now, was Luis Garcia present

15   throughout this time from the point where Agent Perry asked if

16   they had anything on their body until the defendant is

17   arrested?

18       MR. GANJEI:  He is, Your Honor.

19       THE COURT:  Does the defendant agree to that?

20       MS. RIVAS:  Yes, Your Honor.

21       THE COURT:  Okay.  On the government's transcript, on

22   page 17 of the government's transcript, a little bit down from

23   the top, Agent Perry says, "Okay, ma'am, I can feel a uh...can

24   you watch him, can you watch him?"  Then there is an

25   unidentified male responding "sure."  Who is that if the

1    government knows?

2         MR. GANJEI:  We were just addressing that, Your Honor.

3    From the defense's transcript, their translation, they submit

4    that he said the word "Kevin," which would refer to Agent

5    Small.  United States would object and disagrees.  Agent Perry

6    says that that statement was made to Pedro Gutierrez who is

7    physically on the train.

8         THE COURT:  So on government's transcript on page 17,

9    the first UM is Agent Gutierrez?

10        MR. GANJEI:  That is Agent Perry's recollection, Your

11   Honor.

12        THE COURT:  And then lower on the page where

13   Agent Perry says, "Okay, you got her," and the response says,

14   Yeah, no problem," is that Agent Gutierrez also?

15        MR. GANJEI:  To the best of his memory, Your Honor, at

16   that point, it is Agent Small because he had taken her out to

17   the platform.  At that point.

18        THE COURT:  This is Agent Small now?

19        MR. GANJEI:  Yes, the second unidentified male.

20        THE COURT:  Who says "no problem"?

21        MR. GANJEI:  Yes, after she's placed under arrest.

22        THE COURT:  All right.  Then the conversation

23   apparently continues in Spanish.  Who is the unidentified male

24   asking questions in Spanish at the bottom of page 17 of the

25   government's transcript?

1          MR. GANJEI:  The unidentified male, Your Honor, at that

2  point is Task Force Officer Gutierrez that Agent Perry speaks

3  to and asks to speak to Mr. Garcia.

4          THE COURT:  All right.  Who will be the government's

5  witnesses today?

6          MR. GANJEI:  Agent Perry, Your Honor.

7          THE COURT:  And for the defendant?

8          MS. RIVAS:  Your Honor, we reserve the right to have

9  Ms. Amezcua testify, but that's not our intention today.

10          THE COURT:  Okay.

11          MS. RIVAS:  Your Honor, before we begin, could I ask

12  the court to allow Ms. Amezcua to be unhandcuffed so she can

13  assist me during the hearing and take notes of anything I may

14  miss?

15          THE COURT:  Sure, I think that's fine.

16          Could you remove her handcuff?

17          What I would like to do to expedite this is to have

18  Mr. Ganjei proffer the direct testimony of Agent Perry, and

19  then I'll ask Agent Perry if everything that Mr. Ganjei said is

20  true and correct, and if he wishes to add or correct anything,

21  then we'll begin with cross examination.

22          So let me ask Mr. Ganjei to come up to the microphone

23  and Agent Perry to come up and be sworn as a witness.

24          MS. RIVAS:  Your Honor, I only have one question.  We

25  were obviously provided a recording of the incident of that

1    day, and I did inquire of the government if there were any

2    other recordings of any other encounters that day, and I would

3    ask before we begin if there were any recordings made by

4    Agent Perry that day on that train.

5            THE COURT:  Other than of your client?

6            MS. RIVAS:  Yes, Your Honor.

7            MR. GANJEI:  Your Honor, we wouldn't understand what

8    relevance that would be to this hearing.

9            THE COURT:  I don't know, were there other recordings?

10           MR. GANJEI:  I don't know.  I don't believe so, but we

11   would object as being irrelevant.

12           THE COURT:  Okay.  Well, you don't have any that you

13   can provide to counsel?

14           MR. GANJEI:  I do not, Your Honor.

15           THE COURT:  Please raise your right hand and be sworn.

16                     **JARRELL WAYNE PERRY,**

17   after having been duly sworn, testified as follows:

18           MR. GANJEI:  I understand the court wants me to

19   proffer.  Does it wish for me to go into Agent Perry's training

20   and experience which I think I'm not prepared to discuss, but I

21   would?

22           THE COURT:  That's fine.  Why don't I ask that

23   question.  Would you state your full name, please?

24           THE WITNESS:  Jarrell Wayne Perry.

25           THE COURT:  What is your occupation?

1          THE WITNESS:  Special Agent with the Drug Enforcement

2   Agency.

3          THE COURT:  How long have you held that position?

4          THE WITNESS:  This coming September will be 17 years.

5          THE COURT:  Prior to that, did you have any background

6   in law enforcement?

7          THE WITNESS:  Yes, sir, I did.

8          THE COURT:  Tell us about that, please.

9          THE WITNESS:  I was a police officer for the City of

10  Knoxville, Tennessee, for approximately six-and-a-half years

11  prior to being hired by the DEA.

12         THE COURT:  In your work as a police officer, did you

13  get involved in any investigations of illegal substances or

14  other contraband?

15         THE WITNESS:  Yes, sir.  I basically worked patrol, but

16  there were instances where I did make seizures involving

17  illegal narcotics.

18         THE COURT:  Where have you been assigned to work for

19  the DEA?

20         THE WITNESS:  I've been here in Albuquerque my entire

21  career.

22         THE COURT:  All right.  What I'm going to ask you to do

23  is to listen very carefully to Mr. Ganjei's proffer of your

24  direct testimony, and at the end of his proffer, I'll ask you

25  to tell us if you think anything he said was incorrect and what

1    you would like to correct and also if there is anything that

2    you would like to add to his proffer.

3         THE WITNESS:  Yes, sir..

4         THE COURT:  Go ahead, Mr. Ganjei.

5         MR. GANJEI:  Thank you, Your Honor.

6         The United States would submit that if Agent Perry was

7    to give direct testimony, we would establish the following

8    facts:  That on February 5, 2015, Agent Perry and Task Force

9    Officer Pedro Gutierrez went to the Amtrak Train Station here

10   in Albuquerque, New Mexico, for its regularly scheduled stop in

11   Albuquerque, New Mexico.

12        Agent Perry regularly worked interdiction cases, has

13   worked close to 1300 interdiction cases in his career including

14   both bus and train.  That when train number 4 arrived in

15   Albuquerque, New Mexico, Agent Perry approached a female later

16   identified as the defendant, Jennifer Vanessa Amezcua-Aguirre,

17   who is seated at counsel table in a red jail outfit and with

18   headphones.  The defendant was sitting at the top level in

19   bedroom number 8 of Sleeper Car 430.  Agent Perry approached

20   that room.

21        In that room was the defendant and her traveling

22   companion, Luis Garcia, a male.  He knocked on that door.  The

23   room was approximately six-and-a-half-feet long and

24   four-and-a-half-feet wide.  The door was open to the rest of

25   the train passengers.  There was nothing to prevent any

1    passenger walking by that room and engaging any of the

2    individuals there or conversing with any of the people there.

3    He stood to his left of the door which would be the defendant's

4    right of the door.

5           He displayed his DEA badge and identified himself as a

6    police officer, and he asked permission to speak to the

7    defendant and to her traveling companion.  He asked the

8    defendant if she spoke English and she said she did.  After a

9    short conversation, he asked the defendant if she had any

10   luggage with her, and she identified that she had a brown

11   duffel bag that was downstairs in the common luggage areas

12   belonging to her.  She and Mr. Garcia accompanied Agent Perry

13   down to the common luggage area next to which there was an

14   empty bedroom that held overflow luggage.

15          THE COURT:  Let me back up just a little bit.  What

16   would be Agent Perry's testimony as to why he chose to knock on

17   the door of Roomette 8?

18          MR. GANJEI:  Your Honor, Agent Perry did have

19   reasonable suspicion that the defendant may have been engaging

20   in drug trafficking and wished to ask the defendant and her

21   traveling companion a few questions.  We have a ticket that we

22   can submit to the court as Government's Exhibit 1 which has

23   been provided to the defense that the tickets for the defendant

24   and Mr. Garcia were purchased almost -- a very short time to

25   the travel date, about 36 hours before; that they paid over

1    $760 for two one-way tickets.  The address given for the buyer

2    was San Luis, Arizona, which is at or near the Arizona border

3    with New Mexico and is known to DEA agents as a common source

4    city, and that Agent Perry has arrested and been part of the

5    investigation of individuals from San Luis, Arizona.  A one-way

6    trip, which in and of itself is indicative of possible

7    drug-trafficking, was going to Chicago, a known destination

8    city for the receipt of narcotics.

9            THE COURT:  How was the ticket paid for?

10           MR. GANJEI:  The ticket was paid for by credit card.

11           THE COURT:  Whose credit card?

12           MR. GANJEI:  It appears that it was for Mr. Luis

13   Garcia, however, the email address provided was presumably the

14   defendant's, Jenny.V.1979@hotmail.com.  So given the brief

15   period between when the tickets were purchased and when the

16   train was leaving, the fact that ticket prices go up just as

17   plane tickets do, the high cost of the tickets for one-way

18   travel, and the point of origin and the destination as well as

19   the fact that during his encounter and conversation with the

20   defendant, he learned initial information that piqued his

21   interest even further such as the fact that the two said they

22   were -- lived in Las Vegas, Nevada, yet caught the train in

23   Flagstaff, which is over 150 miles from the much closer train

24   station of Kingman, Arizona, to Las Vegas, Nevada.

25           So Agent Perry wished to ask a few questions, and speak

1    to the defendant, which she agreed to do.

2         THE COURT:  When did Agent Perry get this information

3    about the tickets being purchased?

4         MR. GANJEI:  When did he receive this information?

5    Your Honor, I imagine sometime prior to boarding the train.

6    I'm not sure how the court wishes me to answer that.  I don't

7    know --

8         THE COURT:  What would be his testimony?

9         Agent Perry, when did you get the information that

10   piqued your interest if --

11        THE WITNESS:  It wasn't a ticket.  We refer to it as a

12   Passenger Name Record or PNR.  I got it the morning prior to

13   the train arriving.

14        THE COURT:  Where do you get that from?  The train?

15        THE WITNESS:  That specific PNR came from a

16   confidential source.

17        THE COURT:  Okay.

18        MR. GANJEI:  Does the court have any additional

19   questions regarding reasonable suspicion?

20        THE COURT:  No.

21        MR. GANJEI:  So Agent Perry was the only agent engaging

22   the defendant and Mr. Garcia at this time.  A task force

23   officer was down the hallway at the top level of the train, and

24   Agent Perry would testify that he was out of the view of the

25   defendant and Mr. Garcia, so therefore, they would only know at

1   the time they consented to that encounter that Agent Perry was

2   the only agent there.

3           They traveled with him downstairs to the common luggage

4   area.  Again, there is an exit/entrance to the train on either

5   side, front and back, exit/entrance to other sides of the train

6   to the left and right, and a public area of the train.  The

7   defendant and Mr. Garcia indicated their bags in the overflow

8   area where they pointed to Agent Perry.  That's how he was able

9   to identify them as "these two."  He searched those bags, found

10  no contraband.

11          He then asked the defendant whether she would consent

12  to a search of her person.  Defendant several times stated

13  that -- requested a female officer so she could get naked, is

14  the term she used.  Agent Perry tried to explain to her several

15  times that he did not wish her to get naked, that he did not

16  wish to see any of her private areas or anything like that.  In

17  fact, he asked the defendant whether she had an undershirt or a

18  shirt underneath her outer shirt.  She replied that she did.

19  He asked for permission, whether she, not he, could lift it up

20  and see if she was carrying any contraband.  She said no.

21  Agent Perry understood that no to mean no, that he was not

22  granted any permission, and he no longer asked her whether she

23  would lift up her shirt.

24          He asked whether he could pat her down around her waist

25  and back with the rear of his hand, again using the rear,

1    because it is less invasive than an open hand touching.  She

2    said, "No, why?"  Or -- I think the exact phrase for the court

3    is "no, what for?"  Which Agent Perry understood to be an

4    inquiry as to why he wished to do that.  He said to search for

5    contraband.  She replied "okay."  Agent Perry confirmed, "Okay?

6    Can you turn around for me?"  She said, "Yeah, sure."  He then

7    patted her down, feeling a hard object around her back, which

8    he immediately recognized based on his training and experience

9    as being consistent with narcotics trafficking.

10           At that point, having probable cause, he asked her to

11   raise up her shirt, stating, "I can feel a bundle or something

12   in front of your back, so can you raise up your shirt for me.

13   Okay, go ahead turn around, put your hand behind your back,

14   okay."

15           Agent Perry would testify at no time did he display a

16   firearm, that his tone was conversational, friendly, and did

17   not raise his voice, make any threatening gestures to the

18   defendant.  He at no point physically touched the defendant

19   until she gave her consent to do so, did not grab or take any

20   of her items until she gave him permission to do so.

21           Even though he identified himself as an officer, he was

22   not in any police uniform.

23           THE COURT:  What would be his testimony about whether

24   he had a weapon and whether it was visible?

25           MR. GANJEI:  Your Honor, he would testify that he did

1    have a weapon and that it was not visible.

2            THE COURT:  Where was he wearing it?

3            THE WITNESS:  I was wearing it on my right side, Your

4    Honor, on my belt.  It's a smaller --

5            THE COURT:  Did you have an untucked shirt on?

6            THE WITNESS:  Yes, I always wear an untucked shirt.

7            THE COURT:  I actually asked about a weapon, and you

8    said something about its size.  What did you say about it?

9            THE WITNESS:  We're issued a Glock 22 which is a larger

10   size Glock .40 caliber.  I purchased a Glock 27, which is

11   smaller version, which is easier to conceal.

12           THE COURT:  So you bought it specifically so it would

13   not be visible to people?

14           THE WITNESS:  Correct.

15           THE COURT:  Well, were you in uniform on that day?

16           THE WITNESS:  No, sir, we don't have uniforms.

17           THE COURT:  What were you wearing?

18           THE WITNESS:  I don't remember specifically.  It was in

19   February.  I'm sure -- I do wear shorts in the summer, but I

20   don't know specifically, probably blue jeans, maybe khakis, a

21   long-sleeved shirt.  I could have been wearing a hoodie if it

22   was cold that day.  I sometimes wear a hoodie to cover up my

23   weapon depending on the weather.

24           MR. GANJEI:  So at the time he received permission to

25   enter her room, he was standing outside her room.  At the time

1   he asked for permission to touch her back and waist with the

2   back of his hand, that was in a common area visible to the

3   public, and although we cannot state who those individuals are

4   that are in the audio recording, it is indicative that indeed

5   there was the public traveling through that area of the train

6   because they were not law enforcement officers.

7          He would also testify that Task Force Officer Gutierrez

8   did not participate in the encounter at any point where the

9   defendant was giving her consent or making up her mind about

10  giving consent, and at the point that Agent Small was involved,

11  defendant was placed under arrest, and he was waiting outside

12  the train platform outside the doorway which the two were

13  standing near at the bottom level of the train.

14         Additionally, Your Honor, Special Agent Banach, which

15  is referred to in defendant's motion, was at the Albuquerque

16  District Office and in no way participated in the encounter on

17  the train that day.

18         So for all relevant portions of this encounter, Your

19  Honor, Agent Perry was the only one interacting with the

20  defendant and only for a brief period was Task Force

21  Officer Gutierrez even visible to the defendant.

22         Unless the court has specific questions.

23         THE COURT:  Let me ask Agent Perry, is everything that

24  Mr. Ganjei said true and correct?

25         THE WITNESS:  Yes.  The only thing that we already

1   clarified was what he was going to put in as an exhibit is not

2   an actual ticket but a PNR, and we talked about that earlier,

3   and I think cleared that up.  That's the only thing I saw that

4   I would change.

5          THE COURT:  Is there anything you want to add to what

6   Mr. Ganjei said?

7          THE WITNESS:  No, not that I can think of, Your Honor.

8          MR. GANJEI:  Your Honor, may we introduce Government's

9   Exhibit 1 which is a copy of the PNR at this time?

10         THE COURT:  Any objections to that?

11         MS. RIVAS:  Your Honor, if I could have a moment, I

12   would like to possibly ask Agent Perry about this document

13   before I can have a position.

14         THE COURT:  That's fine.  Why don't we take a recess

15   before doing that.

16         Let me ask Mr. Ganjei some questions.  In the briefing,

17   you started an argument, I didn't see the conclusion of it,

18   that you felt that Agent Perry had reasonable suspicion that

19   justified a pat-down even in the absence of consent.  How would

20   that work?

21         MR. GANJEI:  Your Honor, I -- Your Honor, in terms of

22   the reasonable suspicion, I believe the reasonable suspicion

23   would factor into the concept of the consensual encounter.  I

24   can review my brief just quickly to see if I made that same

25   argument in regard to the consent to actually search her

1   person.

2          THE COURT:  Let me take a look at what I was reading.

3   Let me see.  It's at the bottom of page 9.  "Even if the

4   encounter between Special Agent Perry and the defendant was not

5   consensual, it was nevertheless supported by reasonable

6   suspicion."

7          MR. GANJEI:  Yes, Your Honor.

8          THE COURT:  Well, is there any law that says reasonable

9   suspicion as distinct from probable cause would justify a

10  pat-down other than for safety reasons?

11         MR. GANJEI:  Your Honor, I think there is some

12  confusion.  I saw it in the defendant's brief to begin with in

13  terms of conflating of the two tests that the court has to

14  resolve today.  First, there is whether his interaction with

15  her, just speaking to her, is consensual, and for that,

16  reasonable suspicion is our alternative argument even if the

17  court finds it was not a consensual encounter, because

18  certainly with reasonable suspicion, if he has that, he's

19  allowed to ask a few questions of the defendant.

20         The second inquiry is having that consent and having

21  that consensual encounter whether she freely and voluntarily

22  gave him permission to search her purse.  In absence of that,

23  he would require probable cause.  But the reasonable suspicion

24  argument is merely that he was able to speak to her and ask her

25  these questions.

1          THE COURT:  Okay.  Thank you for clarifying that.

2          Let's take a recess of about five minutes.

3      (Court recessed at 2:55 p.m. to 3:01 p.m.)

4          THE COURT:  Court's in session.  Have a seat, please.

5          Ms. Rivas, you may cross-examine at this time.

6          MS. KATZE:  She's not here, Your Honor.  The

7   investigator went to get her.

8          THE COURT:  All right.  Thank you.

9          Ms. Rivas, you may cross-examine now.

10         MS. RIVAS:  Thank you.  Your Honor, there is one

11  administrative matter before we begin, I want to address the

12  court.  I apologize.  We do have an investigator here, Robert

13  Sisneros, with our office who may be a witness on behalf of

14  defense.

15         THE COURT:  Okay.

16         MR. GANJEI:  Your Honor, if that is the case, we would

17  ask that he be sequestered prior to any testimony Agent Perry

18  would give.

19         THE COURT:  Is he in the courtroom now?

20         MR. GANJEI:  Yes, Your Honor.

21         MS. RIVAS:  Your Honor, I would ask that the court

22  allow him to stay.  He's our assigned investigator on the case.

23         THE COURT:  What is the objection to him being here?

24  The Rules of Evidence don't apply in these hearings.

25         MR. GANJEI:  If that's the court's preference, Your

1   Honor.  Typically, it is only the case agent and the defendant,

2   so people don't --

3              THE COURT:  That's true during a trial before a jury.

4              MR. GANJEI:  All right, thank you, Your Honor.

5              THE COURT:  He can stay.  That's fine.

6              MS. RIVAS:  Thank you.

7              THE COURT:  It is my understanding he was not present

8   during any of this.

9              MR. GANJEI:  Not during the encounter, no, Your Honor.

10                         **CROSS EXAMINATION**

11  **BY MS. RIVAS:**

12  Q.  Agent Perry, you've had many encounters on the Amtrak

13  train.

14  A.  Yes, ma'am.

15  Q.  How long have you been investigating cases out of the

16  Amtrak train?

17  A.  For over 15 years.

18  Q.  For over 15 years?

19  A.  Yes, ma'am.

20  Q.  How many would you say you do a year?

21  A.  Encounters?

22  Q.  Yes.  Or how many times are you on the train per year?

23  A.  It's daily almost unless I'm in court or somewhere else.

24  Q.  So would it be fair to say hundreds of times a year?

25  A.  On the train?

1   Q.   Yes.

2   A.   Yeah, I would say hundreds.

3   Q.   So you have a good idea about the size of the train.

4   A.   I know how many cars and stuff are on the train, but I

5   don't know what you mean by size of the train.

6   Q.   Are you familiar with the dimensions of one train car?

7   A.   No, ma'am, I'm not.

8   Q.   If I said -- if I told you that a train car is about

9   10-and-a-half-feet wide, would you agree with that?  10 feet 2

10   inches, I apologize.

11   A.   I'm not exactly sure of the width of the whole train.

12   Q.   And would you say that the width of a room is about

13   three-and-a-half-feet wide?

14   A.   That's what I was informed last week.  I would say that's

15   probably pretty accurate, maybe a little bit larger, but I'm

16   not exactly sure.

17   Q.   And on each side of the train, there is a room on each

18   side?

19   A.   I don't understand your question.

20   Q.   As you're walking down the hall, is there a room to your

21   left?

22   A.   It depends on which hallway you're walking down and the car

23   you're on.

24   Q.   If you're on the upper level as you were walking on the

25   upper level toward Ms. Amezcua's room, was there a room on your

1    left?

2    A.  Yes, there were rooms on both sides if you're walking down

3    that specific hallway, yes.

4    Q.  Was there a room on your right?

5    A.  Yes, ma'am.

6    Q.  Each room is about three-and-a-half-feet deep.

7    A.  To my knowledge, that's probably pretty accurate, yes.

8    Q.  And if the train is 10 feet 2 inches, that leaves you no

9    more than about three feet in the hallway.  Is that right?

10   A.  I'm not a very good mathematician, but that would be three

11   foot -- that would be seven, that would leave three feet, yes,

12   if your math is correct, I believe you're right.

13   Q.  I'm going to show you what I submitted and the government

14   has a copy from the web page of the Amtrak.  I'm going to show

15   you two pictures.

16           MS. RIVAS:  Your Honor, I would like to mark these

17   three sheets of paper as Defendant's Exhibits A, B and C.  One

18   is the dimensions of the roomette.  One is the dimension -- B

19   is the dimensions of the exterior, and C is the dimensions of

20   the lower level.

21           THE COURT:  Okay.  Show them to opposing counsel if

22   they haven't seen them.

23           Any objection to Exhibits A, B or C?

24           MR. GANJEI:  Your Honor, I think we need more testimony

25   as to the relevance of this particular one, if this is the room

1  that she was staying.

2          THE COURT:  Which exhibit is that?

3          MS. RIVAS:  I marked it as C, Your Honor.

4          MR. GANJEI:  So A and B, no objection.  Unless she has

5  testimony on Exhibit C that that is the specific room she was

6  in, we object.

7          THE COURT:  A and B will be admitted, then, without

8  objection.

9      (Defendant's Exhibits A and B admitted.)

10          THE COURT:  Go ahead and ask questions about those.

11  Let me ask you this so I can be looking at Exhibits A and B.

12  Are they attached to the defendant's reply?

13          MS. RIVAS:  Yes, they are, Your Honor, and I actually

14  lettered them differently, and I would -- I apologize, I should

15  probably letter them consistent with our reply.

16          THE COURT:  Well, on the reply, which pages are they?

17          The document is shown at the top of these as document

18  28- and then different numbers.  Which one is Exhibit A?

19          MS. RIVAS:  Exhibit A is document 28-2.

20          THE COURT:  28-2?  Okay.

21          MS. RIVAS:  Exhibit B is 28-4.

22          THE COURT:  Okay.  Thanks.

23          MS. RIVAS:  Your Honor, may I approach the witness?

24          THE COURT:  Sure.  You don't need to ask permission.

25          MS. RIVAS:  Thank you, Your Honor.

 1    Q.   (By Ms. Rivas)   These are two printouts we have directly

 2    from Amtrak indicating the size of the exterior and a layout of

 3    the lower level.   From your experience of being on the train,

 4    does that picture in the upper right-hand corner on Exhibit B

 5    look familiar to you?

 6    A.   You said Exhibit B?

 7    Q.   Yes.

 8    A.   Upper right-hand corner?

 9    Q.   Right, that picture.

10    A.   No, that doesn't look familiar to me.

11    Q.   You're saying that you have not been on the train that

12    looked that way out of 15 years on the Amtrak?

13    A.   It looks like -- I could tell you what I think it looks

14    like, but I'm not exactly sure.

15    Q.   What's it look like?

16    A.   It looks like the deluxe sleepers that's on the top level

17    of an Amtrak train in a sleeper car, number A through, I

18    believe, E or F, the deluxe sleepers, not the area that's

19    pertaining to this case.

20    Q.   Even though it says it is the lower level, that's not where

21    you --

22            MR. GANJEI:   I don't think it says "lower level"

23    anywhere.

24            THE COURT:   The one I'm looking at, 28-4, says "upper

25    level."

1           MS. RIVAS:  I apologize, Your Honor, I'm very sorry

2     about that.  Your Honor, I'll reserve my motion to submit those

3     items into evidence.

4     Q.  (By Ms. Rivas)  I would like to show you one more picture

5     labeled as Exhibit C, and it is 28-5.

6           MR. GANJEI:  Your Honor, I think we objected to C

7     before.  I think it would probably be easier if we made this D

8     as --

9           THE COURT:  I'm sorry?

10          MR. GANJEI:  Your Honor, our understanding is that

11    document 28-3 was marked as D.  We objected to it pending

12    further foundation.  I believe defendant has another exhibit

13    they wish to proffer.

14          MS. RIVAS:  I apologize, just one more.

15    Q.  (By Ms. Rivas)  Does that picture on the top right hand

16    look like the lower level in your case on this train?

17    A.  It is a picture of a lower level showing partially common

18    luggage area and some bedrooms and then a larger bedroom at the

19    end of the hallway, but I'm not exactly sure if that's accurate

20    of the exact dimensions and layout of the train that we were

21    on.

22    Q.  Did it look that way?

23    A.  I'm not exactly sure if it had an enlarged bedroom in this

24    hallway on that date, but it shows a partial area of the common

25    area, doesn't show the overall view of the common luggage area,

1   it just shows a small portion of it.

2   Q.   Okay.

3          THE COURT:   What exhibit are we talking about now?

4          MS. RIVAS:   D, Your Honor, and it's --

5          THE COURT:   D as in dog?

6          MS. RIVAS:   D as in dog.

7          THE COURT:   Any objection to D?

8          MR. GANJEI:   Your Honor, Agent Perry stated that the

9   photo was not necessarily representative, but we have no

10  objection to the document itself.

11         THE COURT:   I'll admit Exhibit D.

12     (Defendant's Exhibit D admitted.)

13  Q.   (By Ms. Rivas)   Agent Perry, when trains stop at the Amtrak

14  station, how much time will -- especially this particular

15  train, how long are they at the station?

16  A.   That depends if the train is on time, if it is not on time.

17  Generally, even if it is not on time, if it is late, it is

18  always there for about 30 minutes because they have to refuel

19  and change crews.   But sometimes the train comes in early.   If

20  it comes in early, it might be there for an hour, hour 30

21  minutes.   Just depends on each day.

22  Q.   On this day, when did the train come in?

23  A.   I'm not exactly sure when the train arrived on this date.

24  Q.   So the train is scheduled to be there approximately 30

25  minutes.   That's what it is scheduled to be there?

1    A.   It is scheduled to arrive at 11:42 and depart at 12:10 if

2    everything goes as normal.

3    Q.   You made a recording of your interaction with Ms. Amezcua,

4    correct?

5    A.   I'm sorry?  I didn't hear your question.

6    Q.   You made a recording of your interaction with Ms. Amezcua?

7    A.   Yes, it was recorded.

8    Q.   Did you review that before today?

9    A.   Yes, I did.

10   Q.   And that recording is almost 20 minutes.

11   A.   I don't know the exact length.  It may be.  I know I looked

12   at it this morning.  I remember it was 16 minutes and

13   something, but it may have been longer.

14   Q.   The recording was 19 minutes 51 seconds.  Does that --

15   A.   I'm not exactly sure.  I didn't look at the entire length

16   of the recording.

17   Q.   Did you record anyone else that day?

18          MR. GANJEI:   Objection, Your Honor, what is the

19   relevance of this line of questioning?

20          THE COURT:   What's the relevance?

21          MS. RIVAS:   Your Honor, the relevance is that it

22   appears from the record, especially considering the testimony

23   proffered earlier, that Agent Perry had some sort of reasonable

24   suspicion, and only spoke to Ms. Amezcua, and we would like

25   some information and confirmation that that was the case.

1           THE COURT:  Well, what difference does it make whether

2    it is or is not the case?

3           MS. RIVAS:  Your Honor, it supports the fact that this

4    was not a consensual encounter.  It appears from the record

5    that he was not randomly asking people their whereabouts, where

6    were they coming from, where were they going.  It is apparent

7    from what information we have had that he only spoke to

8    Ms. Amezcua.

9           THE COURT:  Well, I think it's clear that he said

10   through the proffer that he had suspicions about her in

11   particular and that's the reason he focused on her.

12          Now, do you agree with that, Mr. Ganjei?

13          MR. GANJEI:  I do.  Your Honor, Agent Perry's

14   subjective mind-set, even if it is what defendant says it is,

15   is irrelevant to whether the defendant consented to speak to

16   him.

17          MS. RIVAS:  Your Honor, I also don't see the harm in

18   finding out whether he spoke to any other passengers that day.

19   It seems to me that the resistance indicates to us that there

20   may be some information there that could be useful as a defense

21   to Ms. Amezcua.  If there were no one else that they talked to

22   and they don't feel that it affects the case, I just would like

23   to hear that answer.

24          THE COURT:  Well, to move this on, why don't I

25   hypothetically assume that on this date he had suspicion to

1  think that she may be involved in drug trafficking, and that's

2  the reason he knocked on the door to talk to her.  That seems

3  to be consistent with the testimony.  And that he didn't knock

4  on anyone else's door.

5          MS. RIVAS:  Yes, Your Honor.

6          THE COURT:  I'm not sure where this is going, but...

7          MS. RIVAS:  Your Honor, I'll move on.

8  Q.  (By Ms. Rivas)  Agent Gutierrez speaks Spanish, right?

9  A.  Yes, ma'am, he does.

10  Q.  You asked Ms. Amezcua if you could search her bags.

11  A.  Yes, ma'am, I did.

12  Q.  And she said yes.

13  A.  Yes, she did.

14  Q.  You asked if you could search her room.

15  A.  Yes, ma'am, I did.

16  Q.  And she said yes.

17  A.  Yes, she did.

18  Q.  And you asked if you could search her purse, and she said

19  yes.

20  A.  Yes, ma'am, she did.

21  Q.  And you asked if you could search her bags and she said

22  yes.

23  A.  Yes, ma'am.

24  Q.  Now, when we move on to when you asked her about her

25  person, she never said the word "yes."

1    A.   I don't know if she specifically said yes.  I don't

2    remember that specific word, no.

3    Q.   Instead, her responses were "What's the problem?"

4    A.   I believe she said that on a couple of occasions.

5    Q.   And you continued your inquiry, correct?

6    A.   I asked her -- when she asked me what the problem was, I

7    explained what my duties were.

8    Q.   So you continued speaking to her.  You did not end the

9    encounter at that point?

10   A.   No, I did not.

11   Q.   And she says, "Everybody?  I don't see this," and you

12   continue to speak.

13   A.   I don't remember her exact words.

14   Q.   But you didn't end your encounter?

15   A.   The encounter wasn't ended until she was placed under

16   arrest.

17   Q.   So you did not end that encounter at that point.

18   A.   I don't remember those exact words that you said her

19   saying, so I don't know at what point you are talking about.

20          THE COURT:  Let me circle where on the transcript you

21   are referring to, Ms. Rivas.

22          MS. RIVAS:  Yes, Your Honor.  On defendant's

23   transcript -- defendant's transcript, beginning at the bottom

24   of page 9.  Her responses are "Can I know what's the problem?"

25   Agent Perry speaks.  She says, "Everybody?  I haven't seen this

1  before."  "Well, we're going to talk to as many people as we

2  can."  "I don't understand what's your problem."  Agent Perry

3  keeps speaking.  She asks if there is a woman around, and at

4  time marker 16:52 --

5          MR. GANJEI:  Your Honor, I believe she said page 9.

6  I'm not seeing it on page 9.

7          MS. RIVAS:  At the bottom of page 9, continuing to page

8  10.

9          THE COURT:  Where she is now is the middle of page 10

10  of the defendant's transcript.

11          MR. GANJEI:  Thank you, Your Honor.

12  Q.  (By Ms. Rivas)  She indicates "If you could bring a woman,

13  I could just get undressed."  Agent Perry keeps speaking.  "I'm

14  just saying it's only us," more conversation, "Like in the

15  train, I was the fifth one."  More conversation.  "On this

16  train, I was the one that was picked."  More conversation.

17  "It's just so weird.  I just feel like so racist or something."

18  More conversation.  "Bring a woman and I can just get naked."

19  Continue the conversation.  "No, what for?"

20      So Agent Perry, I know you don't have the transcript in

21  front of you, I can provide a copy to you, but that's one, two,

22  three, four, five, six, seven, eight, nine, 10, 11 times that

23  she responded and did not say yes to you.  Is that correct?

24  A.  I don't know exactly.  I can't answer the question because

25  I don't have the transcript.  I can't listen to a recording.

1        MR. GANJEI:  We would object, Your Honor.  If she wants

2  to cross-examine him about what transpired, we would ask that

3  the audio recording be played, not the defendant's transcript.

4        MS. RIVAS:  Your Honor, I'm doing it for ease of the

5  court.  If I could have a moment, I could cue this up.

6        THE COURT:  What is it you want to do here?  I'm not

7  sure I understand.

8        MS. RIVAS:  Your Honor, the conversation -- during the

9  conversation between Agent Perry and Ms. Amezcua, there are 11

10  times when she responds to his inquiries, and in none of those

11  inquiries is there a yes.

12        THE COURT:  When you say "inquiry," you mean requests

13  for permission to search?

14        MS. RIVAS:  Yes, Your Honor.

15        THE COURT:  That would begin at --

16        MR. GANJEI:  Your Honor, just to clarify, is defense

17  representing that he asked 11 times for permission?

18        THE COURT:  That's what I'm trying to figure out.

19  Well, let's just walk through it.  At the bottom of page 9,

20  let's see, "Okay, would you consent for a pat-down of your

21  person and for contraband?"  Is that the first time you request

22  permission for a pat-down?

23        THE WITNESS:  Are you asking me, Your Honor?

24        THE COURT:  No, I'm asking Ms. Rivas.

25        MS. RIVAS:  Yes, Your Honor, it does appear that that's

1    the first time he requests.

2            THE COURT:  Okay.  What is the next time he requests

3    permission to pat down?

4            MS. RIVAS:  And, Your Honor, the point that we're

5    trying to make is that she continuously objects to his

6    questioning, and yet, he does not end the encounter at any of

7    her objections.

8            THE COURT:  Yes, but the conversation is basically

9    Ms. Amezcua asking Agent Perry if there is a female agent

10   around, and he keeps responding no.  There is a conversation

11   about talking to other passengers.

12           Let's see.  Looks like the next time he asked for

13   something is where he asked her to lift up her outer shirt on

14   page 11.  Is that right?  Or before that, did he ask her for

15   permission to pat her down after the bottom of page 9?  Oh,

16   yes, the middle of page 10, he says, "How about if I just use

17   the back of my hand?  Would that be okay?"  Is that the second

18   time he asked permission?

19           MS. RIVAS:  Yes, Your Honor.

20           THE COURT:  Then on page 11, he says, "Would you be

21   able to just lift up the outer shirt so I can see inside what

22   you have underneath?"  And is that the third time he asked?

23   And right after that, he asks again if he could use the back of

24   his hand.  Okay.

25           All right.  Go ahead.  I'm sorry.

1          MS. RIVAS:  Yes, and her answer is specifically, "No,

2   what for?"

3          THE COURT:  Do you have a question for Agent Perry?

4   Q.  (By Ms. Rivas)  Agent Perry, I can provide a copy of the

5   transcript for you.  It is -- we did submit it as an attachment

6   to our reply 28-1.

7          MS. RIVAS:  I can mark it as an exhibit if the court

8   would like me to.

9          THE COURT:  Well, why don't you just ask him the

10   question.  What is it that you need to have him look at the

11   transcript for?

12          MS. RIVAS:  In response to his inquiry, she responded

13   with 11 specific statements that none of them were indicating

14   consent.  "Can I know what's the problem?  "Everybody?  I

15   haven't seen this before."  "I don't understand your problem."

16   "I'm just saying it is only us."

17   Q.  (By Ms. Rivas)  So after each of these responses, you did

18   not end the talk with her.  You continued to talk to her.

19   A.  Yes, ma'am, I believe I testified to that already.

20   Q.  And all of those responses, three of those times, she

21   specifically asked for a woman officer.

22   A.  I don't know exactly how many times she asked.  She asked

23   if I could have a woman do it on numerous occasions, but I

24   don't remember exactly how many.  I explained to her that we

25   didn't have a female available, and I went on to explain each

1    of her questions or each of her responses to her.

2         MS. RIVAS:  I'm going to move on, Your Honor.

3    Q.  (By Ms. Rivas)  Let's talk about the reasonableness.  You

4    said you had some reasonable suspicion.  Let's talk about the

5    reasonableness of buying a same day sleeper car ticket.

6    Wouldn't it be reasonable that a person may want to just take a

7    trip across the country?

8    A.  Yes, I know people who just want to take trips across the

9    country, yes, ma'am.

10   Q.  Or enjoy the view from Flagstaff to Chicago?  Would that be

11   reasonable?

12   A.  Yes, ma'am.

13   Q.  Could people be afraid of flying?

14   A.  That's also true.

15   Q.  Or afraid of falling asleep while driving?

16   A.  I'm sure there are people that are afraid of falling

17   asleep.

18   Q.  Or who don't have a car?

19   A.  I'm sure there are people that don't own cars, yes, ma'am.

20   Q.  You didn't ask Ms. Amezcua any of these questions.

21   A.  I'm sorry, any of what questions?

22   Q.  You didn't ask her about other reasons why she might take a

23   train?

24   A.  No, I don't believe I specifically asked her why she was

25   traveling by train, no.

1  Q.  When you did pat down Ms. Amezcua, you asked her to turn

2  around.

3  A.  Yes, ma'am, I did.

4  Q.  And your words were, "Okay, can you turn around for me?"

5  A.  I don't know my exact wording, but the U.S. Attorney's

6  transcript, I'm sure if it is on our transcript, I'm sure

7  that's what I said.

8  Q.  And that's when you felt the bump?

9  A.  I'm sorry, ma'am, I couldn't hear you.

10  Q.  That's when you felt the bump.

11  A.  The bump?

12  Q.  The bump on her body?

13  A.  I wouldn't describe it as a bump.

14  Q.  You felt something in her waist?

15  A.  She had -- from my experience, she had a bundle, a thin

16  bundle, in her front of her waist area and in the lower back.

17  From my experience, it wasn't a bump; it was consistent with

18  paneling, a concealment method of other passengers I've seen

19  with illegal narcotics traveling on the train and the bus.

20  Q.  And that happened after you asked her to turn around?

21  A.  I felt the bundle in the front, then I asked her to turn

22  around, and she turned around, and that's when I felt the

23  bundle in the back.

24  Q.  As you further investigated the case, you made a decision

25  to arrest her.

1   A.   Yes, I did make a decision to arrest her.

2   Q.   And when you made that decision, you said, "Okay, go ahead

3   and turn around and put your hands on your back."

4   A.   I'm not exactly sure my exact wording, but that sounds

5   accurate.

6   Q.   You never told Ms. Amezcua that she was free to leave?

7   A.   No, ma'am, I don't believe I did.

8   Q.   And you never told Ms. Amezcua that she could refuse to

9   answer your questions?

10  A.   No, ma'am, I don't believe I did that either.

11        MS. RIVAS:   Your Honor, may I have a moment?

12        THE COURT:   Sure.

13  Q.   (By Ms. Rivas)   Regarding the ticket that you showed --

14  that was shown to us earlier, you saw that, the persons you

15  were investigating were a man and a woman?

16  A.   You said ticket.   Are you referring to the Passenger and

17  Name Record?

18  Q.   Yes.

19  A.   Yes, there was a male and female name on there.

20  Q.   And you knew you were going to speak to them.

21  A.   I was going to the Amtrak train in an attempt to locate

22  them and speak with them, yes.

23  Q.   And you find drugs on people's persons.

24  A.   I'm sorry, ma'am, I couldn't --

25  Q.   Have you found drugs on other persons's bodies?

1   A.   In the past?

2   Q.   Yes.

3   A.   Yes, ma'am, on numerous passengers.

4   Q.   But you didn't bring a woman officer with you?

5   A.   We don't have a woman assigned to our unit, and there was

6   not a woman available to come to the train with me.

7   Q.   So this Agent Banach is not available to come with you?

8   A.   Agent Banach, I had not met her before this date.  She's

9   assigned to the Yuma, Arizona, resident office, and she was in

10  our office for training.  When I knew that I had a female in

11  custody, I called every agent or task force officer in our

12  office to attempt to have them do a thorough search of the

13  defendant in this case.  No woman was available.  I went in and

14  understood that there was trainings going on and a female agent

15  was in there, so we went in and asked her if she would do it.

16  I had never met her before.

17          MS. RIVAS:  Your Honor, I would like an opportunity to

18  play the recording, but I would need just a minute or two to

19  turn on the computer and cue up the recording.

20          THE COURT:  You want to play the entire recording?

21          MS. RIVAS:  No, I could if the court would like to, but

22  I just wanted to play the section regarding the interaction

23  between Agent Perry and Ms. Amezcua.

24          THE COURT:  At what point?

25          MS. RIVAS:  It is about a two-minute --

1           THE COURT:  But where in the --

2           MS. RIVAS:  What point in the --

3           THE COURT:  It goes on for some time, apparently.

4           MS. RIVAS:  Your Honor, defense transcript beginning at

5    the bottom of page 9 to about the bottom of page 11.

6           THE COURT:  Okay.  That's fine.  Go ahead.

7      (Recording played.)

8           MR. GANJEI:  Your Honor, could we indicate for the

9    record when we stopped and started the audio for evidentiary

10   purposes?

11          MS. RIVAS:  We started the audio at about 16:15 and the

12   the audio was completed at 18:48.

13          THE COURT:  And it started where?

14          MS. RIVAS:  Approximately 16:18.

15   Q.  (By Ms. Rivas)  So you had a chance to read through that,

16   and I'm counting 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 times that

17   she does not say yes.  Is that correct?

18   A.  As I testified earlier, ma'am, I don't know the exact

19   amount of times or conversation that she didn't say yes.

20   Q.  And the language you used to have her turn around when you

21   did do the pat-down was "Okay, can you turn around for me?"

22   A.  I don't remember the exact words, but I did ask her to turn

23   around.

24   Q.  And when you arrested her, your language was very similar,

25   "Okay, go ahead and turn around."

1   A.   I don't know my exact wording.

2          MS. RIVAS:   Your Honor, I would move that recording

3   into evidence.   I believe that we're on Exhibit E at this

4   point.

5          MR. GANJEI:   Your Honor, we already moved this into

6   evidence.

7          THE COURT:   I think the government's exhibits there are

8   admitted.   That's the full transcript, is it?

9          MR. GANJEI:   It is, Your Honor.

10          THE COURT:   Okay.   Any further questions?

11          MS. RIVAS:   Your Honor, before we began the hearing

12   this afternoon is the first I heard regarding a case that I was

13   unaware of.   I would like to ask Agent Perry --

14   Q.   (By Ms. Rivas)   Can you tell us what happened in United

15   States versus Geraldo de la Campa Rangel?

16   A.   Do you want the full details or -- basically, I don't

17   understand your question.

18   Q.   The Tenth Circuit, it appears from the information we

19   received from the government, which is the only information

20   that I have, that the court specifically -- let me see here.

21   The Tenth Circuit discusses your testimony in that case and had

22   an opinion regarding your credibility as a witness.   What was

23   that opinion?

24   A.   I don't know the exact opinion.   That case was heard by

25   Judge Parker, and the case was remanded back to, I believe,

1   Judge Parker because of some issues that they had with my

2   testimony and also with the Assistant United States Attorney

3   who was assigned to the case.

4   Q.  What was the issue?

5        MR. GANJEI:  Your Honor, just going to object.  What's

6   the relevance?  Your Honor is familiar with the case.  You were

7   the presiding judge.  This would only go to the witness'

8   credibility, which the court will probably understand better

9   than anybody, so we would ask what the relevance would be to

10  this.

11       THE COURT:  Tell me again about the case.  I'm having a

12  hard time remembering it from what's been discussed.

13       MR. GANJEI:  Your Honor, my knowledge of it is very

14  limited.  My understanding is that there was conflicting

15  testimony between a government witness and Agent Perry.  It was

16  remanded.  Agent Perry never got a chance to be vindicated

17  because the defendant later plead and was deported to Mexico

18  where he was subsequently killed.  So there is this allegation

19  language out there, I don't know if the defendant is making, I

20  believe numerous times by the Public Defender's office.  It is

21  a nonissue.  To the extent it does matter, it goes to Your

22  Honor's assessment of Agent Perry's credibility.

23       THE COURT:  Tell me again about the case.

24       MR. GANJEI:  I think it was 2008, Your Honor.  I

25  believe I have a citation to it.

1          THE COURT:  Why don't you provide me a copy of it.

2     Based on the skimpy information so far, I'm not recognizing the

3     case.

4          MR. GANJEI:  Yes, Your Honor.  I can email the court.

5          THE COURT:  Do you have a copy of it printed out?

6          MR. GANJEI:  I have one copy for myself.

7          THE COURT:  Let me look at it real quickly.  In fact,

8     let's take a recess, and I'll go look at it.

9        (Court recessed at 3:50 p.m. to 4:02 p.m.)

10          THE COURT:  Court's in session.  Have a seat, please.

11          Thank you for providing a copy of the Tenth Circuit

12     opinion in United States versus Rangel.  I remember this case

13     well.  It was quite disturbing to me because during the course

14     of the first trial I was compelled to declare a mistrial

15     because of what I thought was rather egregious conduct by the

16     prosecuting assistant U.S. Attorney, who is not Mr. Ganjei or

17     Mr. Meyers, I'll note for the record.  That disturbed me a lot.

18          We did go to trial the second time.  At the first

19     trial, Agent Perry did not testify, and that's probably -- I

20     don't know if he was intending -- if the assistant U.S.

21     Attorney intended to have him testify or not, but by the time I

22     declared a mistrial, he had not testified, although he did

23     testify in the preliminary hearing.  Then at the second trial,

24     the testimony that he gave appeared to be in contradiction of

25     the earlier testimony.

1             What the Tenth Circuit did was interesting.  It abated

2      the appeal.  It didn't decide the appeal of the conviction at

3      the second trial.  It abated the appeal to give the defendant,

4      Mr. Rangel, an opportunity to pursue a motion under 28 United

5      States Code Section 2255.

6             My understanding of what happened after that from what

7      Mr. Ganjei said is that the parties worked out a plea

8      agreement, and the case disappeared, I guess.  So what happened

9      on the appeal, was it eventually dismissed?

10            MR. GANJEI:  Your Honor, I would not know.  I think

11      that's probably -- we could look up in Pacer if the court

12      wanted a specific answer about that.

13            THE COURT:  I guess it doesn't make any difference.

14            In any event, I guess what you're saying, Mr. Rangel

15      worked out a plea agreement with the government specifically

16      pursuing a 2255 motion?

17            MR. GANJEI:  That's my understanding, Your Honor.

18            THE COURT:  Well, let's go back.  Let's see.  There was

19      a question Ms. Rivas wanted to ask Agent Perry about the case,

20      I guess.  What is that, Ms. Rivas?

21            MS. RIVAS:  Your Honor, I just didn't know what the

22      case was, and this was the first that I had heard of it, was

23      with this notice that I received from the government this

24      afternoon.  I have no other questions.

25            THE COURT:  Okay.  Any redirect examination?

1          MR. GANJEI:  Yes, Your Honor.

2          THE COURT:  Go ahead.

3                    **REDIRECT EXAMINATION**

4    **BY MR. GANJEI:**

5    Q.  Agent Perry, defense played a two-and-a-half minute clip of

6    their choosing on the audio there.  Would you say that that

7    audio portion was consistent with the encounter as a whole on

8    behalf of the defendant?

9    A.  Yes, sir, I would.

10   Q.  There are no portions that weren't played where you're

11   yelling or threatening to the defendant?

12   A.  No, none whatsoever.

13   Q.  Did she ever indicate to you an inability to understand

14   English?

15   A.  No, none whatsoever.

16   Q.  Did she say she understood English?

17   A.  I asked her early if she spoke English, she said yes, she

18   did.

19   Q.  Did she later give a post-arrest confession?

20   A.  Yes, she did.

21   Q.  What language was that done in?

22   A.  It was also in English.

23   Q.  When she said "it's only us," did she mean -- at the time

24   she said that, was it just you and her?

25   A.  I believe she was stating "us" as referring to her and

 1   Mr. Garcia.

 2   Q.   And at any time, to your knowledge, was it just you and the

 3   defendant?

 4   A.   No, I was never with the defendant by ourselves.

 5   Q.   You were asked about numerous occasions where the defendant

 6   didn't indicate positively that you could search her person or

 7   her luggage.  I'm sorry, her person.  Did she ever say to you

 8   that she did not wish to speak to you any further?

 9   A.   No, she did not.

10   Q.   Did she ever indicate that she wanted to leave or walk

11   away?

12   A.   No, she did not.

13   Q.   And what if she had done so?  What would have been the

14   reaction?

15   A.   She was free to go wherever she wished.

16   Q.   When you asked for her to lift up her outer shirt, what was

17   her response?

18   A.   I don't remember her exact response, but basically, she

19   said no.

20   Q.   And what did you interpret "no" to mean?

21   A.   That she didn't want to lift up her bottom of her shirt to

22   show me what was around her waist area.

23   Q.   Did you continue to press and ask for her to lift up her

24   shirt?

25   A.   I did not.

1    Q.   What was her response when you asked if you could pat

2    around her waist with the back of your hand?

3    A.   I believe she said, "No, what for?"

4    Q.   So what did you understand that to mean?

5    A.   She was wanting to know what I was wanting to pat down

6    around her waist and back area for.

7    Q.   Did you explain that to her?

8    A.   Yes, I did.

9    Q.   What was her answer?

10   A.   She said, "Okay."

11   Q.   And you understood "okay" to mean what?

12   A.   That she gave me permission to use the back of my hand to

13   pat down her back and waist area.

14   Q.   Did you do so?

15   A.   Yes, sir, I did.

16   Q.   Upon doing so, did she comment on "what are you doing, stop

17   doing that"?

18   A.   No, she didn't make any comments.

19   Q.   She also indicated earlier that she wished to have a woman

20   officer present.

21   A.   Yes, sir, she did.

22   Q.   Was it your understanding that she was willing to consent

23   to search of her body or even get naked if there was a female

24   officer present?

25   A.   Yes, she said that on maybe three occasions, I remember.

1   Q.   And you explained to her that none was available?

2   A.   That's correct.

3   Q.   Now, we also discussed the, I think it's the PNR, Passenger

4   Name Record.

5   A.   Yes, sir.

6   Q.   You stated -- I'm sorry, I proffered that some of those

7   facts were interesting to you as a narcotics investigator.

8   A.   Yes, sir.

9   Q.   Did you believe you had probable cause to go and arrest her

10  at the train based on that information?

11          MS. RIVAS:   Objection, Your Honor.

12          THE COURT:   What is the objection?

13          MS. RIVAS:   Your Honor, could I have a minute?  Your

14  Honor, it is our position that it is not -- the agent's -- it's

15  not the agent's duty whether or not there is probable cause.

16  It's the court's -- it is in the court's jurisdiction to

17  determine whether probable cause existed or not.

18          THE COURT:   I agree with that, but what's the question?

19          MR. GANJEI:   Segue to the next question.

20          THE COURT:   Go ahead.

21  Q.   (By Mr. Ganjei)  So were you planning on going to the train

22  and arresting her at the time?

23  A.   No, sir.

24  Q.   Based on the information you had, what were you planning on

25  doing when you went to the train?

1   A.   Going to the train and attempting to locate the two

2   individuals that were assigned that room and speak with them

3   and conduct a consensual encounter.

4   Q.   Is that exactly what you did?

5   A.   Yes, sir.

6        MR. GANJEI:   No further questions, Your Honor, thank

7   you.

8        THE COURT:   Did you have anything else, Ms. Rivas?

9                    **RECROSS EXAMINATION**

10  **BY MS. RIVAS:**

11  Q.   Agent Perry, this PNR, what does that means?

12  A.   Passenger Name Record.   We refer to it as a PNR.

13  Q.   Where did you say you got this?

14  A.   It is given from a confidential extortion.

15  Q.   Confidential source or confidential person?

16  A.   I don't understand the question.

17  Q.   Did you get it from a person?

18       MR. GANJEI:   Your Honor, we would object on the grounds

19  of relevance.

20       THE COURT:   What is the relevance of the source of the

21  information?

22       MS. RIVAS:   Your Honor, we would like to know whether a

23  warrant was required for obtaining this information.   If it

24  was, then Ms. Amezcua has the right to object to the search of

25  her personal information on this.   We also had a case of Patel

1    versus Los Angeles with a similar situation where the hotel

2    owners in Los Angeles objected to their rolls being searched,

3    and it was found, I think that it may be pending -- it is not

4    pending?  That they do have a privacy interest in those rolls,

5    and I would like to know if that's how this information was

6    obtained.  If so, then that information was obtained illegally,

7    and Ms. Amezcua has the right to know that information.

8            THE COURT:  What rolls are you referring to?  I'm not

9    sure I understand.

10           MS. RIVAS:  Your Honor, hotel guest records in the City

11   of Los Angeles, the motel owners brought an action challenging

12   the municipal code, but they were objecting to the inspection

13   of their hotel guest records.

14           So in our case, we would like to know how this

15   information was obtained as we believe that there may be a

16   privacy interest that Ms. Amezcua is entitled to know this

17   information and know if there is a petition for her to be made

18   on how this information was obtained.

19           THE COURT:  Privacy information in making a reservation

20   for a train trip?

21           MS. RIVAS:  Yes, Your Honor.

22           MR. GANJEI:  Your Honor, if I may.

23           THE COURT:  Go ahead.

24           MR. GANJEI:  Patel concerned the hotel owners

25   themselves challenge an ordinance, a statute, that allowed

1   police for any reason to come in and seize those rolls and see

2   who had been staying there.  That is not at all what this is.

3            Amtrak is not challenging Agent Perry's seizure of

4   records.  By all accounts, it was gotten voluntarily.  She has

5   no standing to challenge this, and this is more akin to a

6   search warrant context where they are trying to challenge a

7   source of information that the agent relied upon in making an

8   affidavit for a search warrant, which is only here, it is only

9   whether he had reasonable grounds to believe it.

10           This is so far removed from the actual reasonable

11  suspicion argument and adds nothing to what's going on.  The

12  fact that I think the exact quote was "we would like to know,"

13  that doesn't really convey any sort of actual Fourth Amendment

14  privilege, Your Honor.

15           THE COURT:  Well, your position is that she has some

16  protected constitutional interest in who not knowing about her

17  train reservations?

18           MS. RIVAS:  Correct.

19           THE COURT:  Pardon?

20           MS. RIVAS:  Yes, Your Honor.

21           THE COURT:  Well, I mean, obviously, the Amtrak with

22  whom she made the reservation knows about it, but you are

23  saying somehow or another that she has a constitutional right

24  of that not being provided to law enforcement?

25           MS. RIVAS:  Correct, Your Honor.  We also feel that if

1    that information was obtained in an illegal way, then that

2    taints this whole investigation, and we would like to know how

3    that information was obtained.

4         THE COURT:  Well, give me an example of how it might

5    have been obtained illegally.  By illegal search of Amtrak

6    records?

7         MS. RIVAS:  It could be that way.  It could be -- I

8    don't know how.  Which is why we're asking for information.  We

9    don't know how it might have been obtained.

10         MR. GANJEI:  Your Honor, even indulging in the pretty

11   wild scenario that Agent Perry illegally searched Amtrak

12   records, I think the remedy there would be a civil suit by

13   Amtrak against DEA.  There is no Fourth Amendment protection to

14   third-party information which is what she conveyed to Amtrak.

15   It is an Amtrak record.  If the court was to find defendant's

16   argument appealing, that would have pretty far-reaching

17   consequences, I think, for like TSA and other agencies,

18   terrorist watch list, fly list, where there would be a

19   constitutional right to know that information which clearly

20   there is not, so we would ask that we move on and conclude the

21   hearing.

22         THE COURT:  Well, I'm not sure what this leads to.

23   What if Agent Perry is saying he got on the Internet and

24   searched the Amtrak records and found this on their records?

25   What would you do with that?

1          MS. RIVAS:  Your Honor, we don't know how these records

2     were obtained.

3          THE COURT:  No, I understand that.  I'm giving you a

4     hypothetical as to how it might have been; but if it happened

5     that way, what would you do with it?

6          MS. RIVAS:  If those records were obtained without

7     permission, there is personal identifying information on this

8     ticket, the address, I don't know if it has a credit card

9     number here.

10          Your Honor, our argument would be that there is a

11     privacy interest.  This information is not -- if I walked to

12     Amtrak and said, "Can you show me who is riding the train

13     today," that information is not available to me.  I'm a member

14     of the public.  But obviously, it is available to Agent Perry,

15     so we think there is constitutional issues possibly there, in

16     that this information which is not public is available to a

17     government agent.  It amounts to a search of her private

18     information.

19          MR. GANJEI:  Your Honor, again, there is no reasonable

20     expectation of privacy with a third-party holding this

21     information.  If she wants to sue Amtrak, I don't think that

22     that would be successful, but that would seem to be the remedy.

23     There is no Fourth Amendment issue here because this

24     information is not held by her, wasn't taken from her.  She has

25     no reasonable expectation of privacy in conveying that

 1    information to a third party who is not a government agency.

 2            THE COURT:  This is the first I've heard of this.  It

 3    wasn't addressed in the briefing.  So why don't I allow the

 4    defendant some time to submit a brief showing that she would

 5    have some constitutional privacy interest in this information

 6    being obtained by law enforcement.  I don't know how it works.

 7    And then what that would mean to a criminal prosecution.  I'm

 8    not sure I understand how that would play out in a criminal

 9    prosecution like this.

10            MS. RIVAS:  Your Honor, this was the first time that we

11    saw this, and we would like an opportunity to brief the court

12    on that issue.

13            THE COURT:  Okay.  Well, how soon can you do that?

14            MS. RIVAS:  I can do it the next few days if the court

15    would like.

16            THE COURT:  Why don't you have it by next Monday, and

17    you can have a week to respond to it, Mr. Ganjei.

18            MR. GANJEI:  Thank you, Your Honor.  For the record, we

19    would object to the additional briefing.

20            THE COURT:  Any further questions?

21            MS. RIVAS:  No.

22            THE COURT:  Any further questions, Mr. Ganjei?

23            MR. GANJEI:  At this point, we have to admit the PNR

24    into evidence, which I think she said she wanted to ask

25    additional questions about it.  I don't know if the defense now

1    objects to Government's Exhibit 1 which we earlier tendered to

2    the court.

3              THE COURT:  Well, what did you want to ask about it?

4              MR. GANJEI:  I just wanted to make sure it was admitted

5    into evidence, Your Honor.

6              THE COURT:  Yes, it is admitted.

7              MR. GANJEI:  And clarify what's been admitted from the

8    defense.

9              THE COURT:  Well, as I understand it, it was exhibits

10   A, B, and D.  Is that correct?

11             MR. GANJEI:  Yes, Your Honor.  We maintain our

12   objection to Exhibit C.

13             THE COURT:  Okay.  I don't know, was C offered?  I

14   don't remember.

15             MS. RIVAS:  It was offered into evidence.  We would

16   move to admit it despite the government's objection, but we

17   leave it to the court to decide.

18             Your Honor, on the issue of this PNR, I would object

19   for lack of foundation, lack of reliability.  We don't have

20   someone from Amtrak to verify that this is a business record

21   and lacks authentication.

22             THE COURT:  Okay.  Well, my recollection of the

23   testimony is Agent Perry said that he had that document and

24   relied on it to make a decision to question the occupants of

25   Roomette 8.  Do you want to ask further questions about that,

1   while he's still on the stand?

2        MS. RIVAS:  Yes, Your Honor.

3            **RECROSS EXAMINATION (Continued)**

4   **BY MS. RIVAS:**

5   Q.  Do you work for Amtrak?

6   A.  No, ma'am, I don't.

7   Q.  Do you keep business records for Amtrak?

8   A.  No, ma'am, I don't.

9        MS. RIVAS:  No other questions, Your Honor.

10       THE COURT:  Okay.  Let me make sure I understand this.

11  I would think what was marked as Exhibit C is attached as

12  document number 28-3 to the defendant's reply.  Is that

13  correct?

14       MS. RIVAS:  Your Honor, could you repeat that question?

15       THE COURT:  Yes.  My understanding of what had been

16  marked as Defendant's Exhibit C is document number 28-3 which

17  was attached to the defendant's reply which was docketed as

18  document number 28.

19       MS. RIVAS:  Yes, Your Honor.

20       THE COURT:  Is that correct?

21       MS. RIVAS:  Yes, Your Honor.

22       THE COURT:  Okay.  And were any questions asked of

23  Agent Perry about this?

24       MS. RIVAS:  Yes, Your Honor, we did ask Agent Perry if

25  the rooms were about three-and-a-half-feet deep, and he did

1   confirm that that was true.

2          THE COURT:  What's the objection to it?

3          MR. GANJEI:  Your Honor, there are several different

4   types of rooms on the train.  There was no testimony that this

5   was the specific room.  It is cumulative in the sense that

6   there are these other exhibits which he was able to identify

7   and was actually asked about, so we would just object to C

8   because it seems that it shows the smallest room available on

9   the train.  We don't know if that's the one that it was that

10  she was actually staying in.

11         THE COURT:  Well, I think Agent Perry did testify that

12  the room was about three-and-a-half-feet wide.  Did he testify

13  as to the length of the room?

14         MR. GANJEI:  Your Honor, I don't know if he testified,

15  but the United States proffered that the room was approximately

16  six-and-a-half-feet long and four-and-a-half-feet wide.

17         THE COURT:  That was in your proffer?

18         MR. GANJEI:  Yes, Your Honor, that's from the United

19  States' statement of facts.

20         THE COURT:  And then what does Exhibit C add to that?

21         MS. RIVAS:  Your Honor, this information was directly

22  obtained from Amtrak.  In just trying to explain the

23  dimensions, it seems that it was impossible for three people to

24  be in this roomette.  From what we can see from the diagrams,

25  this was one of the smallest rooms that this train had, and

1    Agent Perry did confirm that it was about three-and-a-half-feet

2    deep.  Given that the exterior is about 10 feet 2 inches, if

3    the rooms were four-and-a-half feet, that would leave about a

4    foot for passengers to come in and out of their rooms to the

5    hallway.

6              THE COURT:  Well, as I understand the testimony, the

7    point at which Agent Perry would have been in the room with

8    Mr. Garcia and Ms. Amezcua would be a relatively brief period,

9    but what is the significance of the size of the room?

10             MS. RIVAS:  Your Honor, the significance of the size of

11   the room is simply to give the court a picture of how narrow

12   the halls were where Agent Perry was with Luis Garcia and

13   Ms. Amezcua, and the hallway, even though the government has

14   explained that it's a public area, the court will be able to

15   know from listening to the recording they are constantly moving

16   out of the way.  Even though it's a hallway, people are coming

17   across, and Agent Perry has to move out of the way.  Although

18   it was in the hall, the space was very confined, and led to

19   Ms. Amezcua's inability to leave if she wanted to.

20             THE COURT:  Well, what does the size of Roomette 8 have

21   to do with the issues in the case?  I haven't been able to

22   figure that out.

23             MS. RIVAS:  Your Honor, for me, it just gives an idea

24   of how narrow the halls were.  If the rooms in the lower level

25   were roomettes, the rooms in the upper level were roomettes, if

1   they were all three-and-a-half feet, that leaves no more than

2   three feet in the hallway for passengers to come back and

3   forth, for Ms. Amezcua decide to see whether she wants to leave

4   or not.  It makes it a very tight and cramped situation during

5   the encounter between Agent Perry and Ms. Amezcua.

6         THE COURT:  Does the government agree that the hallways

7   are about three-feet wide?

8         MR. GANJEI:  Yes, Your Honor, in fact, they are wider,

9   and makes it less likely that the encounter was coercive.  So

10  we would agree that three feet is better than one foot, but we

11  still don't see why this is a relevant piece of information.

12  But if it moves the thing along, Your Honor, admit it into

13  evidence.  But there is no foundation for that.

14        THE COURT:  Can Agent Perry have a seat back at the

15  table, or does anybody need to ask him any more questions?

16        MR. GANJEI:  No questions from us, Your Honor.

17        MS. RIVAS:  No, Your Honor.

18        THE COURT:  Why don't you have a seat back at the

19  table.

20        Let me ask Ms. Rivas, what is the defendant's position

21  as to when she was first detained?

22        MS. RIVAS:  Your Honor, it is our position that

23  Ms. Amezcua was first detained when Agent Perry entered the

24  room.  She was in a private room.  The doors were closed, the

25  curtains were drawn, and the court will hear the knocking on

1    the door.  At that moment, Agent Perry was outside of the room,

2    and she was at that point not free to leave.  Also, Agent Perry

3    testified that Agent Gutierrez was just down the hall.  Not

4    only was Agent Perry right outside the door, but

5    Agent Gutierrez was down the hall had she decided that she

6    wanted to leave.

7            THE COURT:  Well, his testimony was that

8    Agent Gutierrez could not be seen by the occupants of the

9    Roomette 8.

10           MS. RIVAS:  Right, Your Honor.  The occupants could see

11   Officer Gutierrez.

12           THE COURT:  I'm sorry?

13           MS. RIVAS:  They could see him.

14           THE COURT:  What is the evidence of that?

15           MS. RIVAS:  There is none, but they could see him.

16           THE COURT:  You're saying that Ms. Amezcua, and I

17   suppose also Mr. Garcia, were detained from the point at which

18   Agent Perry knocked on the door?

19           MS. RIVAS:  Yes, Your Honor.

20           THE COURT:  What about when they walked together from

21   the upper level to the lower level?  Is it your position they

22   were still detained at that point?

23           MS. RIVAS:  Yes, Your Honor.  Agent Perry was very

24   close in proximity in this close hallway and asked to search

25   their bags, and at that point, they could see Agent Gutierrez,

1    and they were not free to leave.

2          THE COURT:  Well, let me ask you to tell me at what

3    point you argue that their consent to the various things they

4    consented to by the transcript was not voluntary.

5          MS. RIVAS:  Your Honor, I find that it is similar to --

6    it is similar to many forms of travel, airplane, coming across

7    the border, and can I take a look at your car, where are you

8    coming from, where are you going.  I think those questions were

9    very pertinent, and very precise, and it sounded like

10   Agent Perry, though polite, was very assertive with them, and

11   continued -- as the court could see from the record, he kept

12   searching and searching and searching, and that was the

13   pressure that Ms. Amezcua and Mr. Garcia felt, was that he was

14   going to just keep pressuring and asking them questions, and

15   weren't going to let them go until he found something.

16         THE COURT:  Mr. Ganjei, what's your response?

17         MR. GANJEI:  Your Honor, first, I think we have to

18   object to Defendant's counsel providing very specific factual

19   information about what the defendant observed or did.

20   Obviously, I can't cross-examine Ms. Rivas about these

21   observations, so that they very conveniently saw this agent

22   that was down the hallway.

23         THE COURT:  You don't need to argue that.  You have to

24   argue the case on the basis of the evidence.

25         MR. GANJEI:  Yes, Your Honor.  In terms of I think very

1    similarly, this sort of overbearing of her will, her subjective

2    mind-set, again, is something I don't think defense counsel can

3    represent on defendant's behalf.  Second, as we said in the

4    brief, we're not sure that's even relevant, because it is what

5    a reasonable, objective observer would observe at that point,

6    Your Honor, although she did not give -- immediately give

7    consent and may have regretted giving consent.

8             THE COURT:  You mentioned earlier the investigator

9    might testify.

10            Does the defendant have any -- I skipped over this, but

11   did the defendant have any evidence it wants to provide?

12            MS. RIVAS:  No, Your Honor.

13            THE COURT:  Please provide the Fourth Amendment

14   argument about the information that Agent Perry obtained about

15   the defendant.  And the government can respond by the next

16   week.

17            MR. GANJEI:  Yes, Your Honor.

18            THE COURT:  Court's in recess at this time.  Thank you

19   for your participation.

20       (Court recessed at 4:35 p.m.)

21

22

23

24

25

1                          C - E - R - T - I - F - I - C - A - T - E

2     UNITED STATES OF AMERICA

3     DISTRICT OF NEW MEXICO

4

5          I, John De La Rosa, RPR, CCR, Official Court Reporter for

6     the State of New Mexico, do hereby certify that the foregoing

7     pages constitute a true transcript of proceedings had before

8     the said Court held in the City of Albuquerque, New Mexico, in

9     the matter therein stated.

10         In testimony whereof, I have hereunto set my hand on this

11    30th day of July, 2015.

12

13

14

15

16                _____
                  JOHN DE LA ROSA, CCR
17                United States Official Court Reporter
                  421 Gold Avenue, Southwest
18                Albuquerque, New Mexico  87102
                  Phone:  505.348.2249
19

20

21

22

23

24

25

1                   **I N D E X**                    **PAGE**

2

3   **JARRELL WAYNE PERRY**

4   Direct Examination Proffered by Mr. Ganjei      27

5   Cross Examination by Ms. Rivas      40

6   Redirect Examination by Mr. Ganjei      64

7   Recross Examination by Ms. Rivas      68

8   Recross Examination (Continued) by Ms. Rivas      75

9   REPORTER'S CERTIFICATE

10   **GOVERNMENT'S EXHIBITS**          **ADMITTED**

11   1   Passenger Name Record      74

12   **DEFENDANT'S EXHIBITS**

13   A   Photo printout      43

14   B   Photo printout      43

15   D   Photo printout      46

16

17

18

19

20

21

22

23

24

25