IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

    Plaintiff,


    vs.                                                    15-CR-627 JAP


**JENNIFER AMEZCUA-AGUIRRE**,

    Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

In the UNITED STATES' MOTION FOR RECONSIDERATION (Doc. No. 42) (Motion
to Reconsider), Plaintiff United States of America asks the Court to reconsider and reverse its
earlier decision granting Defendant Jennifer Amezcua-Aguirre's MOTION FOR
SUPPRESSION OF THE EVIDENCE (Doc. No. 20) (Motion to Suppress). Alternatively, the
United States requests that the Court reopen the suppression hearing and allow the United States
to present new evidence relevant to Defendant's Motion to Suppress. Motion to Reconsider at 1.
Defendant opposes the Motion to Reconsider on the bases that the Court's prior analysis is
correct and that the United States has not provided sufficient justification to warrant the taking of
new evidence. *See* DEFENDANT'S RESPONSE IN OPPOSITION TO THE
GOVERNMENT'S MOTION FOR RECONSIDERATION (Doc. No. 50) (Response). After
examining the briefing, including the UNITED STATES' REPLY TO DEFENDANT'S
RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR

RECONSIDERATION (Doc. No. 53) (Reply),[1] and carefully reviewing the relevant legal standards, the Court has decided to grant the Motion to Reconsider in part and deny it in part. The Court will reopen the evidence for the limited purpose of admitting the updated audio recording the United States has provided to the Court. Additionally, at the United States' request, the Court will issue corrective and supplemental factual findings and will reanalyze the legality of Agent Perry's search. Having made this more thorough analysis, the Court again concludes that Defendant did not give clear and unequivocal consent to be searched. Hence, the Court will reaffirm its early decision to suppress the evidence the United States acquired from the search of Defendant's person.

## BACKGROUND

### I.  Defendant's Arrest and Indictment

The background facts surrounding Defendant's February 5, 2015 arrest are well documented in the Court's prior MEMORANDUM OPINION AND ORDER (Doc. No. 35) and need not be restated here. After Defendant's arrest, on February 25, 2015, a federal grand jury returned a one-count indictment charging Defendant with possession with intent to distribute 100 grams and more of a mixture containing a detectable amount of heroin. *See* REDACTED INDICTMENT (Doc. No. 13).

---

[1] Defendant moved to strike the United States' Reply for exceeding the page limits. DEFENDANT'S MOTION TO STRIKE GOVERNMENT'S REPLY (Doc. No. 55). Defendant claims that when she sought the United States' position regarding this motion, the United States opposed the motion and preemptively filed a motion to extend the page limits. *Id.* at 2. As Defendant points out, this motion was filed late, after the deadline for the United States' Reply had passed. *See* DEFENDANT'S MOTION TO STRIKE GOVERNMENT'S MOTION FOR LEAVE TO FILE EXCESS PAGES AS UNTIMELY FILED (Doc. No. 56). Nevertheless, in issuing this decision, the Court considered the entirety of the Reply, thereby granting UNITED STATES' MOTION TO EXCEED PAGE LENGTH (Doc. No. 54) and denying Defendant's two motions to strike. (Doc. Nos. 55-56). The Court notes that it did not find the extra pages the United States submitted to be necessary or useful. In the future, the Court cautions the United States to abide by the local rules when filing its briefs.

## II.      Filing and Development of Defendant's Motion to Suppress

On May 21, 2015, Defendant filed a motion to suppress "all evidence seized as a result of the search of Ms. Amezcua Aguirre and all evidence obtained as a consequence of that illegal search, including any inculpatory statements made by Ms. Amezcua Aguirre." Motion to Suppress at 8. As part of the recitation of the facts, Defendant provided a partial transcription of her conversation with Agent Perry,[2] including the following critical exchange:

> Agent Perry: …..how bout I just use the back of my hand and pat down around your waist and around your back?
>
> Ms. Amezcua-Aguirre: **No, what for?**
>
> Agent Perry: To make sure you don't have anything strapped to your body?
>
> Ms. Amezcua-Aguirre: Mmhuh.
>
> Agent Perry: **Okay, can you turn around for me?**
>
> Ms. Amezcua-Aguirre: Ya sure.

*Id.* at 4. Defendant pointed out that because Agent Perry did not have a warrant to detain or search her person and was instead relying on consent to justify the lawfulness of his conduct, the government carried the "burden of proving that the consent was in fact, freely and voluntarily given." *Id.* at 2, 4 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). After paraphrasing the law regarding when consent is properly considered voluntary, Defendant argued that she was seized and "not at liberty to ignore the police presence" throughout her encounter with Agent Perry. *Id.* at 4-5. She then reiterated that it was the government's burden to "show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Id.* at 6 (quoting *United States v. Soto*,

---

[2] At the June 22, 2015 hearing, the United States provided the Court with a copy of the audio recording of Agent Perry's encounter with Ms. Amezcua-Aguirre. Throughout this opinion, the Court will cite to the recording simply as "Audio Recording."

988 F.2d 1548, 1557 (10th Cir. 1993)). She concluded that the government could not meet this

burden because the facts showed that "she was coerced into any consent." *Id.* at 6-7.

The United States interpreted Defendant's Motion to Suppress as containing two

arguments: (1) that Defendant's "discussion with S/A Perry was not consensual encounter [sic],

but rather that she was illegally 'seized' against her will when he began to speak to her" and (2)

that "the permission [Defendant] gave S/A Perry to be briefly patted down was not consensual."

*See* UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO

SUPPRESS (Doc. No. 27 at 3) (Motion to Suppress Response). The United States responded to

the second argument as follows:

> Whether a Defendant's apparent consent is truly voluntary is a question of fact
> determined by the totality of the circumstances. *United States v. Lyons*, 510 F.3d 1225,
> 1239 (10th Cir. 2007)(citing *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th
> Cir. 2001)). The government bears the burden of showing the consent was voluntary. *Id.*
> To meet its burden, the government (1) "must proffer clear and positive testimony that
> consent was unequivocal and specific and freely given" and (2) "prove that this consent
> was given without implied or express duress or coercion." *Id.* (quotations omitted). The
> government expects to easily satisfy both prongs of this test.

*Id.* at 11. The United States objected to Defendant's transcription, which, in its view, omitted

significant facts and contextual information that would show Defendant had willingly permitted

Agent Perry to briefly pat her waist and back with the back of his hand. *Id.* at 14-15. The United

States provided its own transcript excerpt with portions of the conversation Defendant had

allegedly omitted in bold print. This excerpt included the following proposed supplementation

and correction of the Defense excerpt quoted above:

> SA: **Well, ma'am we don't….I don't have a female. I don't wanna, I don't wanna
> see any of your private areas. I don't wanna see any of that stuff, so… That's why
> I'm askin' you if you will give me permission.** How 'bout if I just use the back of my
> hand and pat-down around your waist, around your back.
>
> AA: No, what for?

4

SA: To make sure you don't have anything strapped to your body.

AA: **Okay.**

SA: Okay? Can you turn around for me?

AA: Yeah, sure.

*Id.* at 13-14. The United States' proposed excerpt highlighted a highly contested section of the recording. Defendant claimed she muttered "Mmhuh" after Agent Perry said "To make sure you don't have anything strapped to your body." Motion to Suppress at 4. The United States maintained that she said "Okay." Motion to Suppress Response at 14. In its response, the United States proposed a detailed reading of Defendant and Agent Perry's conversation consistent with its interpretation of the recording. It opined that "[o]nce Defendant understood that S/A Perry was not asking her to remove her clothes, or 'get naked,' or 'see [her] private areas' – and instead only wished to briefly pat her waist and back for the purpose of checking for contraband – she relented and granted such permission," saying the word "Okay." *Id.* at 15-16.

On June 19, 2015, Defendant filed a short reply brief contesting various facts and arguments relevant to the consensual nature of Defendant's encounter with Agent Perry. *See* REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS (Doc. No. 28). Defendant did not, however, organize her reply brief to address the two arguments the United States gleaned from the Motion to Suppress. Nor did Defendant otherwise indicate whether she agreed or disagreed with the United States' reading of the Motion to Suppress. The Court cannot draw any conclusions from Defendant's silence because the reply brief is not comprehensive. Defendant did not reply to several of the arguments and points raised by the United States in its response (e.g., Defendant did not reply to the United States' contention that Agent Perry had reasonable suspicion to question Defendant).

The Court held an evidentiary hearing on Defendant's Motion to Suppress on June 22, 2015. At this hearing, Irma Rivas represented Defendant, who was present; Nicholas Ganjei and Joel Meyers represented the United States. From the very beginning of the hearing, the Court signaled its belief that a resolution of the parties' competing transcripts was a prerequisite to the proper disposition of Defendant's Motion to Suppress. The Court began the hearing by explaining that it had yet to receive a working copy of the recording of Defendant's encounter with Agent Perry. TRANSCRIPT OF JUNE 22, 2015 HEARING (Doc. No. 39 at 2:15-21) (Hearing Transcript). The Court twice noted that it would need to listen to the recording to determine which transcript (the Government's or Defendant's) best matched the recording. *Id.* at 3:7-10. Using Defendant's transcript, the Court then questioned the parties about the location, timing, and context of the recorded conversation. *Id.* at 3:11-19. The parties agreed that Agent Perry initially approached Defendant and her traveling companion, Mr. Garcia-Isicardia, in their roomette on the second floor of the train. *Id.* at 3:22-25; 12:18-13:6. After a brief discussion and search of the roomette, Defendant and Mr. Garcia-Isicardia accompanied Agent Perry downstairs to find their luggage. *Id.* at 5:23-8:22. The parties agreed that the remainder of the encounter, including Agent Perry's search of the luggage and Agent Perry's contested pat-down search of Defendant, occurred in the downstairs area of the train. *Id.* at 22:21-24.

At the conclusion of the Court's questioning regarding the locations and timing[3] of Defendant's conversation with Agent Perry, the United States called Agent Perry to the stand as its first and only witness. *Id.* at 26:4-6, 22-23. To expedite the hearing, the Court directed counsel to "proffer the direct testimony of Agent Perry" rather than conducting a traditional examination. *Id.* at 26:17-18. The Court explained that, at the end of the proffer, the Court would

---

[3] When asked about the timing of various portions of Defendant's interaction with Agent Perry, counsel for the United States repeatedly referred the Court to the recording as the "best evidence of that." *Id.* at 7:5-12; 13:22-14:6, 22:25-23:8; 24:10-13.

ask Agent Perry whether the proffer was true and correct and whether he wished to add or

correct anything. *Id.* at 26:19-20. The United States did not object to this procedure.

Consequently, Mr. Ganjei proffered the following account of Agent Perry's request to pat-down

Defendant:

> [Agent Perry] then asked the defendant whether she would consent to a search of her person. Defendant several times stated that - - requested a female officer so she could get naked, is the term she used. Agent Perry tried to explain to her several times that he did not wish her to get naked, that he did not wish to see any of her private areas or anything like that. In fact, he asked the defendant whether she had an undershirt or a shirt underneath her outer shirt. She replied that she did. He asked for permission, whether she, not he, could lift it up and see if she was carrying any contraband. She said no. Agent Perry understood that no to mean no, that he was not granted any permission, and he no longer asked her whether she would lift up her shirt.
>
> He asked whether he could pat her down around her waist and back with the rear of his hand, again using the rear, because it is less invasive than an open hand touching. She said, "No, why?" Or - - I think the exact phrase for the court is "no, what for?" Which Agent Perry understood to be an inquiry as to why he wished to do that. He said to search for contraband. She replied "okay." Agent Perry confirmed, "Okay? Can you turn around for me?" She said, "Yeah, sure." He then patted her down, feeling a hard object around her back, which he immediately recognized based on his training and experience as being consistent with narcotics trafficking.[4]
>
> At that point, having probable cause, he asked her to raise up her shirt, stating, "I can feel a bundle or something in front of your back, so can you raise up your shirt for me. Okay, go ahead turn around, put your hand behind your back, okay."

*Id.* at 33:11-34:14. The parties agreed that Agent Perry arrested Defendant at this point. *Id.* at

23:16-24. During his proffer, Mr. Ganjei represented that Agent Perry "at no point physically

touched the defendant until she gave him her consent to do so." *Id.* at 34:18-19. At the end of the

---

[4] This part of Mr. Ganjei's proffer conflicts with Agent Perry's later testimony. Mr. Ganjei represented (and Agent Perry affirmed) that Agent Perry asked Defendant to turn around and **then** patted her down. On cross examination, however, when Defense counsel attempted to confirm that Agent Perry conducted the pat-down and discovered the bundle after having Defendant turn around, Agent Perry answered: "**I felt the bundle in the front, then I asked her to turn around**, and she turned around, and that's when I felt the bundle in the back." *Id.* at 56:1-23. Because Agent Perry only asked Defendant to turn around twice (once immediately before or during the search and once after the search, as part of the arrest), Agent Perry's cross-examination testimony indicates that he began the pat-down search **before** asking Defendant to turn around.

proffer, Agent Perry confirmed that Mr. Ganjei's description of his conversation with Defendant

was true and correct. Agent Perry declined to add any further details. *Id.* at 36:23-37:7.

Midway through her cross examination of Agent Perry, Defense counsel revisited the

issue of Defendant's alleged granting of voluntary consent to the pat-down search:

Q: You asked Ms. Amezcua if you could search her bags.

A: Yes, ma'am, I did.

Q: And she said yes.

A: Yes, she did.

Q: You asked if you could search her room.

A: Yes, ma'am, I did.

Q: And she said yes.

A: Yes, she did.

Q: And you asked if you could search her purse, and she said yes.

A: Yes, ma'am, she did.

Q: And you asked if you could search her bags and she said yes.

A: Yes, ma'am.

Q: Now, when we move on to when you asked her about her person, she never said the word "yes."

A: I don't know if she specifically said yes. I don't remember that specific word, no.

Q: Instead, her responses were "What's the problem?"

A: I believe she said that on a couple of occasions.

Q: And you continued your inquiry, correct?

A: I asked her - - when she asked me what the problem was, I explained what my duties were.

Q: So you continued speaking to her. You did not end the encounter at that point?

A: No, I did not.

*Id.* at 49:10-50:10. Defense counsel continued to pursue this line of questioning and when the Court asked what her purpose was she explained that during Defendant's conversation with Agent Perry about the proposed pat-down search, Defendant "responded with 11 specific statements that none of them were indicating consent." *Id.* at 54:12-14; *see also id.* at 52:6-11.

In what the Court assumed was an attempt to rebut this argument, counsel for the United States used his redirect, among other things, to reiterate Agent Perry's understanding that Defendant consented to the pat-down search. This portion of the redirect closely tracked Mr. Ganjei's earlier proffer:

Q: What was her response when you asked if you could pat around her waist with the back of your hand?

A: I believe she said, "No, what for?"

Q: So what did you understand that to mean?

A: She was wanting to know what I was wanting to pat down around her waist and back area for.

Q: Did you explain that to her?

A: Yes, I did.

Q: What was her answer?

A: She said, "Okay."

Q: And you understood "okay" to mean what?

A: That she gave me permission to use the back of my hand to pat down her back and waist area.

Q: Did you do so?

A: Yes, sir, I did.

Q: Upon doing so, did she comment on "what are you doing, stop doing that"?

A: No, she didn't make any comments.

*Id.* at 66:1-18. This concluded Agent Perry's testimony about Defendant's provision of consent. While Defense counsel conducted a re-cross examination, it focused on Agent Perry's acquisition of Defendant's Passenger Name Record (PNR) and Defense counsel's concern that Agent Perry may have obtained the PNR in violation of Defendant's constitutional rights. *Id.* at 68:9-69:7. Over the United States' objection, the Court gave Defendant one week to file a supplemental brief on this issue. *Id.* at 73:2-19.

Defendant's supplemental brief, filed June 29, 2015, set forth a variety of opaque arguments about the propriety of Agent Perry's acquisition of the PNR and the relevance of the source of the PNR to Defendant's suppression arguments. Defendant ultimately conceded, however, that these issues were likely immaterial because "neither reasonable suspicion nor consent justified Agent Perry's patdown of Ms. Amezcua-Aguirre." *See* BRIEF REQUESTING DISCLOSURE OF THE IDENTITY OF THE AGENT'S SOURCE OF THE PASSENGER NAME REGISTRY (Doc. No. 30 at 2-4) (Supplemental Brief). Given this position, Defendant devoted nearly half of her supplemental brief to re-arguing issues already raised in the earlier briefing. Specifically, Defendant contended (1) that Agent Perry lacked reasonable suspicion to detain her, *id.* at 4-6, and (2) that she "did not consent to a patdown," *id.* at 6.[5] The United States moved to strike Defendant's supplemental brief as nonresponsive to the issue presented. *See*

---

[5] Defendant's entire argument regarding consent read as follows: "Ms. Amezcua-Aguirre gave her unequivocal consent to Agent Perry to search her luggage and her roomette and even her purse. She did not consent to a patdown. When directly asked by Agent Perry whether she would consent to a patdown, Ms. Amezcua-Aguirre responded, 'no, what for?' After Agent Perry explained that he wanted to ensure she did not have anything strapped to her body, Ms. Amezcua-Aguirre acknowledged she understood his explanation, replying 'mmhuh.' Agent Perry then asked her to turn around and she responded, 'ya sure.' The government's burden to establish voluntary consent 'cannot be discharged by showing no more than acquiescence to a claim of lawful authority.' *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)." *Id.* at 6-7.

UNITED STATES' MOTION TO STRIKE, OR IN THE ALTERNATIVE, RESPONSE IN

OPPOSITION TO DEFENDANT'S MOTION REQUESTING DISCLOSURE (Doc. No. 31)

(Motion to Strike). It argued that instead of addressing the issue on which the Court requested

supplemental briefing, Defendant "provide[d] additional argument concerning issues already

dealt with at the suppression hearing." *Id.* at 2. The United States underscored this point, saying

"[j]ust as the United States should not be permitted to rehash all of its arguments from the

suppression hearing, so too should the Defendant be limited to the discrete issue the Court

permitted her to brief." *Id.*

Defendant moved to file a reply to the United States' Motion to Strike. *See* MOTION

FOR LEAVE TO REPLY (Doc. No. 32). The United States opposed this Motion. *See* UNITED

STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO

FILE REPLY (Doc. No. 33). On July 14, 2015, Defendant filed a REPLY TO UNITED

STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO

FILE REPLY (Doc. No. 34), thereby concluding the briefing surrounding the Motion to

Suppress.

**III.     The Court's July 24, 2015 Memorandum Opinion and Order**

After considering all of the arguments and evidence summarized above, the Court

granted Defendant's Motion to Suppress on the ground that Agent Perry failed to obtain

Defendant's consent before conducting his pat-down search of her person. *See*

MEMORANDUM OPINION AND ORDER (Doc. No. 35 at 20). In reaching this conclusion,

the Court made the following factual findings regarding Defendant's conversation with Agent

Perry:

11

1.  After searching Defendant's and Mr. Garcia-Isicardia's luggage, Agent Perry asked Defendant: "Would you consent for a pat-down search of your person, ma'am, for contraband?" *Id.* at 5

2.  Instead of giving a short, direct answer---as she had done previously when Agent Perry had requested permission (1) to speak to the Defendant, (2) to see the Defendant's ticket and identification, (3) to consent to a search of her luggage, (4) to search items inside Defendant's bedroom, (5) to enter the Defendant's roomette for a search for contraband, and (6) to look through Defendant's purse— Defendant retorted with a question: "Can I know what's the problem?" *Id.*

3.  Agent Perry responded by mentioning security and by saying he was going to other cars to "talk to as many people as we can." [6] *Id.* at 6.

4.  Agent Perry then tried a different question: "Do you have anything . . . do you have a shirt underneath that shirt?" *Id.*

5.  Defendant said "yes" and asked if there was a "woman around" who could conduct the search.[7] *Id.*

6.  Agent Perry answered: "We don't have a female here."[8] Then asked: "How 'bout if I just use the back of my hand? That be okay with you?" *Id.*

---

[6] In the interest of focusing attention on the most pertinent and audible parts of the conversation, in the previous Memorandum Opinion and Order, the Court elided reference to the exact words exchanged during this part of the conversation. As best the Court can tell, Agent Perry responded in full: "We're just checking the train for security, ma'am. We'll go in the other cars and speak to the other passengers. There's no security on here." Defendant replied: "Everybody? I haven't seen this before." Agent Perry further explained "Well, we're gonna talk to as many people as we can." After a pause, Defendant said: "I don't understand what's your problem." Agent Perry then stated: "Well, it's [or possibly there's] not a problem ma'am, just doin' my job and askin' the same thing. I'm uh, speaking with passengers just like I asked you earlier." Audio Recording at 16:26-16:46.

[7] While not previously incorporated into the Court's factual findings, Defendant's exact words appear to be: "Do you have any, um, woman around so she can . . . like touch me and I can just get naked?" Audio Recording at 16:49-16:54.

7. Defendant insisted: "If you could bring a woman, I can just get undressed; if that's okay with you." *Id.*

8. Agent Perry rejoined (in part): "Well, na, well, I don't have a fe, we don't have a female that's available to come to the . . ." *Id.*

9. Defendant interjected: "It's that I'm just seeing it's only us," to which Agent Perry replied (in part): "Once I get done talkin' to you, I'm gonna go talk to other passengers." This conversation continued with Defendant insisting "Like in the train, I was the picked one" and "on this train I was the one that was picked." Agent Perry responded untruthfully saying "No, you weren't the one we picked." Defendant, however, maintained that she was concerned saying: "I just felt like so . . . racist or something." *Id.* at 6-7.

10. Agent Perry redirected the conversation to the topic of the search, asking: "Do you have a shirt underneath that shirt?" Defendant said "yes" again, prompting Agent Perry to ask "Would you be able to just lift up the, the, the outer shirt so I can see inside what you have underneath?" *Id.* at 7.

11. Defendant responded quickly and unequivocally: "No." *Id.*

12. Agent Perry then[9] proposed "How 'bout if I just use the back of my hand and pat-down around your waist, around your back?" *Id.*

13. Defendant's undisputed response was: "No, what for?" *Id.*

14. Agent Perry replied: "To make sure you don't have anything strapped to your body." *Id.*

---

[8] Once again, the Court merely summarized Agent Perry's response. Agent Perry also clarified that he did not want Defendant to get naked. Audio Recording at 16:54-16:59.

[9] In summarizing the facts, the Court left out a brief exchange that occurred at this point in which Defendant once again suggested that Agent Perry bring a woman to search her. Audio Recording at 17:49-18:01.

15. Defendant's response was muddled, ambiguous, and unintelligible. It was definitely not "okay" as the United States contends. Nor was it any other verbalization indicating consent to a pat-down. It was closer to the "Mmhuh" listed in Defendant's transcript. *Id.*

16. There is no evidence that Defendant made non-verbal facial or other gestures indicating that she assented to the pat-down search. *Id.* at 8.

17. Agent Perry arrested Defendant immediately following Defendant's mumble.[10] *Id.* at 7.

In light of the above findings, the Court acknowledged and quickly rejected the United States' argument that Defendant consented to the pat-down search by saying "okay" in response to Agent Perry's explanation of the purpose of the requested search. *Id.* at 13. The Court explained that the more reliable evidence, the audio recording, established that Defendant did not say "okay," but rather mumbled an incoherent response to Agent Perry's comment. Furthermore, the Court reasoned that even if Defendant had said "okay," this would not have constituted unequivocal and specific consent because Defendant had already said "no" to the pat-down search and saying "okay" to Agent Perry's explanation of the purpose for this search could have been interpreted, not as consent, but as a mere acknowledgement that Defendant understood Agent Perry's explanation. *Id.* at 13-14.

The Court also discussed why it was not persuaded by the United States' position that Defendant and Agent Perry's earlier discussion provided vital context showing that Defendant

---

[10] As the United States points out, prior to the arrest, Agent Perry conducted the pat-down search of Defendant. By "immediately" the Court did not mean that literally no time passed between the mumble and the arrest. To the extent the Court suggested otherwise (for example, by finding that Agent Perry did not touch Defendant until the time of arrest), this was an inadvertent mistake. There was a brief conversation and search, which the Court did not include in its summary. This portion of the conversation and its relevance to the Court's decision will be discussed in more detail subsequently.

initially refused to be searched, but then consented after slowly coming to the understanding that

Agent Perry did not want her to remove her clothes. *Id.* at 14. The Court emphasized that

Defendant had "twice told Agent Perry 'no' in clear and unambiguous terms" and that "the

context before the Defendant's alleged consent (clear and unequivocal 'yes' responses to Agent

Perry's requests to search the Defendant's luggage) reinforce[d] the conclusion that Defendant

did not consent to the pat-down search." *Id.* at 14-15. For all of these reasons, the Court

concluded that Defendant had not consented to the search and that Defendant's Motion to

Suppress should, therefore, be granted.

## DISCUSSION

### I.      Standard of Review

Although the Federal Rules of Criminal Procedure do not authorize the filing of motions

to reconsider, it is well-established that district courts are allowed to correct "alleged errors in

[their] dispositions." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014). In a criminal

case, the court may grant a motion to reconsider "when the court has misapprehended the facts, a

party's position, or the law." *Id.* Circumstances warranting reconsideration include "(1) an

intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the

need to correct clear error or prevent manifest injustice." *Id.* A motion to reconsider is not an

appropriate vehicle for the losing party to revisit issues already addressed, reformulate stronger

arguments in favor of its position, or advance arguments that could have been raised earlier.

*United States v. Huff*, 782 F.3d 1221, 1224 (10th Cir. 2015). The decision to grant a motion to

reconsider rests in the sound discretion of the district court. *Id.*

Consistent with the above principles, the district court is permitted to consider a variety

of factors when determining whether to reopen a suppression hearing. *Id.* at 1224-25. No bright-

line rule requires the court to ignore, absent government justification for its untimely submission,

evidence that is relevant to the constitutionality of a search. Rather, the Court may weigh, as one

of the many considerations in deciding whether to reopen a suppression hearing, "society's

interest in admitting all relevant evidence" that has been constitutionally obtained. *Id.* at 1224.

This interest is not, however, automatically controlling. Countervailing interests include avoiding

piecemeal litigation and discouraging government gamesmanship (e.g., holding back stronger

arguments to obtain rulings on unresolved or novel legal issues).[11] Given these interests, when

ruling on a motion to reopen a suppression hearing, a district court "may prefer, even require, the

government to explain why it failed to introduce" the proposed evidence earlier. *Id.* at 1225.

The Seventh Circuit has succinctly explained the important role district court discretion

plays in deciding whether to reopen a suppression hearing in a particular case:

> By leaving the matter to the district court's discretion, the court remains free to refuse to
> reopen the suppression hearing or to decline to consider the government's evidence if the
> government is wasting judicial resources or proceeding in a way that is unfair to the
> defendant. At the same time, adopting a more flexible approach protects society's interest
> in ensuring a complete proceeding where the court considers all relevant, constitutionally
> obtained evidence. Thus, a district court should be permitted, in the exercise of its
> discretion and in light of the totality of the circumstances, to determine whether its
> suppression ruling should stand.

*United States v. Ozuna*, 561 F.3d 728, 735 (7th Cir. 2009) (cited favorably by the Tenth Circuit

in *Huff*, 782 F.3d at 1224-25). In other words, like with all motions to reconsider, the decision to

reopen a suppression hearing remains within the sound discretion of the district court. *United*

*States v. Berrelleza*, 90 F. App'x 361, 365-366 (10th Cir. 2004) (citing *United States v. Wiseman*,

172 F.3d 1196, 1207-08 (10th Cir. 1999)).

---

[11] By providing this example, the Court in no way means to imply that the United States has engaged in
gamesmanship in this case. The Court merely provides this as an example of the importance of
encouraging litigants to raise all of their arguments and defenses during the first round of briefing.

II.     **The United States' Proposed Submission of New Evidence**

The primary thrust of the United States' Motion to Reconsider is that it was deprived of a "full and fair" opportunity to present evidence and argument on the issue of whether Defendant consented to Agent Perry's pat-down search. Motion to Reconsider at 6. To remedy this alleged defect, the United States seeks the admission of the following new evidence: a digitally remastered clip of the February 5, 2015 audio recording amplifying Defendant's mumbled response to Agent Perry. *Id.* at 21. Additionally, if the Court is not inclined to change its decision based on the new recording and the prior record, the United States requests that the Court schedule a second evidentiary hearing on the issue of consent. *Id.* at 27. The decision to grant these requests, which involve reopening the suppression hearing, rests within the sound discretion of the Court. *Berrelleza*, 90 F. App'x at 365-366. Significant considerations include the reason for the tardy introduction of the evidence and the value of the evidence in establishing the constitutionality of the challenged search. *See Huff*, 782 F.3d at 1224-25.

a.   **The Reason for the United States' Tardy Introduction of Evidence**

The United States provides two interrelated justifications for its untimely production of relevant evidence. First, the United States asserts that it did not present evidence on the issue of consent because Defendant did not raise, brief, or argue this issue. Second, the United States claims that the Court's instruction that the United States proffer the testimony of Agent Perry "compounded" or "complicated" the United States' inability to develop the record. Motion to Reconsider at 7, 11. Defendant vehemently disagrees. She reads her Motion to Suppress as challenging Agent Perry's claim that Defendant provided valid consent to the pat-down search. Response at 3. Consequently, Defendant maintains that the United States has had "ample

17

opportunity to present its evidence." *Id.* at 11. As discussed in greater detail below, the truth lies

somewhere in the middle.

> ### i. *While Defendant's muddled briefing focused almost exclusively on the issue of coercion, the United States nevertheless received fair notice of its burden to prove Defendant consented to Agent Perry's pat-down search.*

It is well-settled that the government bears the burden of proving a warrantless search is

justified by consent. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). To

do so, the government must (1) proffer "clear and positive testimony that consent was

unequivocal and specific and freely given" and (2) "prove that this consent was given without

implied or express duress or coercion." *Id.* at 1162; *see also United States v. Jones*, 701 F.3d

1300, 1317 (10th Cir. 2012); *United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007) ("The

government bears the burden of showing the consent was voluntary. To meet its burden, the

government (1) 'must proffer clear and positive testimony that consent was unequivocal and

specific and freely given' and (2) 'prove that this consent was given without implied or express

duress or coercion.'"); *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998); *United

States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996) ("When the government relies on a

defendant's consent for the validity of a search, the government bears the burden of proving that

defendant's consent was freely and voluntarily given . . .).

As the Court understands it, the United States' position is that, by focusing on the

voluntariness of her alleged consent, Defendant somehow neglected to trigger the United States'

duty to present evidence on the first, and logically prior, aspect of consent: the existence of

Defendant's consent to the challenged search. Whatever the theoretical merits of this argument

may be, it is not supported by a review of the record. The United States repeatedly underscores

Defendant's failure to argue that her mumbled response to Agent Perry was not an expression of

consent. The Court acknowledges that Defendant did not hone in on this issue. On the other

hand, neither did Defendant concede the issue. To the contrary, she pointed out that the United

States carried the burden to show that she had consented to the search and, by saying that "any

consent" that may have been obtained was the result of coercion, she intimated that she may not

have consented to Agent Perry's search. These aspects of Defendant's Motion to Suppress are

admittedly mushy. As a result, if the Motion to Suppress comprised the entirety of the record, the

Court would be more sympathetic to the United States' assertion that it was surprised by the

Court's attention to the element of consent.

But the filing of Defendant's Motion to Suppress commenced, rather than terminated, the

development of the parties' various positions about the consensual nature of Agent Perry's

search. Despite the flaws in Defendant's opening brief, three factors strongly suggest that the

United States had adequate notice of its burden to present evidence on the issue of Defendant's

consent.

*Government's Response.* In the response to Defendant's Motion to Suppress, even though

the United States did not identify Defendant's provision of consent as one of the specific issues

Defendant argued, the United States affirmed that it carried the burden to show Defendant

consented to Agent Perry's pat-down search. Furthermore, the United States represented that it

would be presenting evidence on this issue:

> To meet its burden, the government (1) "must proffer clear and positive testimony that
> consent was unequivocal and specific and freely given" and (2) "prove that this consent
> was given without implied or express duress or coercion." *Id.* (quotations omitted). **The
> government expects to easily satisfy both prongs of this test.**

Motion to Suppress Response at 11 (emphasis added). These statements place the United States'

current assertion – that it did not have an opportunity to present evidence on the issue of consent

– in a strange light. Either the United States tossed the above sentences into its response *pro*

19

*forma* without actually reading or considering what they meant or the United States intended to offer evidence on the issue of consent and is crying foul now that it has discovered that the Court did not consider the proof it offered sufficient. In either case, the Government's earlier briefing belies its position that it did not argue the issue of consent and lacked fair notice that it ought to argue this issue. Placed side by side the United States' response to the Motion to Suppress and the United States' Motion to Reconsider reveal a change in litigation strategy (whether intentional or not), which appears to have been prompted by the Court's unfavorable ruling.

*Evidentiary Hearing.* As should be apparent from the Court's earlier review of the June 22, 2015 evidentiary hearing, the issue of consent was raised and addressed at the hearing. First, via proffer, the United States summarized Agent Perry's anticipated testimony about his belief that Defendant agreed to be searched. Second, Defendant responded to this testimony by questioning Agent Perry about whether Defendant ever said "yes" to being searched. Defense counsel argued to the Court that none of Defendant's answers to Agent Perry ever indicated consent. Finally, on re-direct, counsel for the United States elicited testimony from Agent Perry about why he believed Defendant had assented to the pat-down search. As is typical, this evidence was interspersed with and overlapped with other matters, including the taking of evidence more obviously relevant to the voluntariness of Defendant's words and conduct. But this is the nature of trial practice. Having reviewed the transcript of the June 22, 2015 hearing, the Court cannot say, as the United States insists, that Defense counsel's "singular focus" during her cross examination was whether Agent Perry overcame Defendant's will "producing an involuntary grant of consent."[12] Motion to Reconsider at 10.

---

[12] The United States later admits that "Defendant asked . . . a single question that could . . . [possibly] be considered tangentially related to the actual consent to search." *Id.* at 10. The United States does not identify this question. So the Court is in the dark about which part of the hearing the United States is referencing and why the United States thinks it is irrelevant.

*Supplemental Briefing.* On June 29, 2015, Defendant filed a supplemental brief arguing, *inter alia*, that she did not consent to Agent Perry's pat-down search. The United States characterized this brief as inappropriately rehashing issues already dealt with at the suppression hearing. If the United States thought the absence of consent was not an issue in this case, it is curious that it did not object to Defendant's supplemental brief as raising a new argument. Significantly, the United States did not express any surprise at Defendant's assertion that she had not consented to the search. If the United States truly did not realize that consent was at issue, its response to Defendant's supplemental brief was the appropriate time to request the suppression hearing be reopened. The United States did not take this approach, however, but instead moved to strike Defendant's supplemental brief as repetitive and nonresponsive.

Taken together the above facts show that the United States had sufficient notice that the issue of consent was contested prior to the Court's unfavorable ruling.

### ii. *The Court provided the United States ample opportunity to elicit testimony at the June 22, 2015 hearing.*

The United States' Motion to Reconsider contains both a weak and a strong variation of the United States' assertion that the court-chosen proffer format led to the inadequate development of the facts. In the weaker iteration, the United States asserts that the Court's request that the United States proceed by proffer exacerbated the problems caused by Defendant's failure to raise or brief the issue of consent. Motion to Reconsider at 7.  The United States attributes this effect to the allegedly superior nature of witness testimony: "unlike a witness who will generally speak in a linear narrative about the facts that transpired, an attorney will instead focus on the issues raised by moving counsel." *Id.* at 11. The United States' position appears to be that the proffer format was problematic, at least in this case, because it prevented Agent Perry from testifying on an issue the United States believed was uncontested and

irrelevant. If this is the United States' argument, it adds nothing to its contention that it lacked fair notice that consent was a viable issue.

In the stronger iteration of its argument, United States maintains that even if the issue of consent was raised, the United States "was unable to provide direct testimony as to this point, given the Court's instruction to proceed by proffer." *Id.* at 7. A cursory review of the record shows this to be untrue. At the June 22, 2015 evidentiary hearing, during the redirect, counsel for the United States elicited testimony from Agent Perry on the issue of consent. The United States' current position suggests that it would have liked to elicit additional testimony regarding Defendant's alleged consent. The United States' failure to do so, however, is not attributable to the Court's structuring of the hearing. The Court did not limit or otherwise restrict the United States' ability to ask questions about the issue of consent on redirect examination. Moreover, towards the end of the hearing, before excusing Agent Perry, the Court provided the United States a final opportunity to ask any overlooked questions. Hearing Transcript at 78:14-15. The United States confirmed that it had no further questions. *Id.* at 78:16. Because the Court provided the United States with two opportunities to examine Agent Perry, the United States cannot plausibly argue that the proffer structure prevented it from providing direct testimony on the contested and relevant issues. [13]

### b. The Probative Value of the United States' Proposed Evidence in Determining whether Agent Perry's Search was Constitutional

Having determined that the United States has not presented compelling justification for its failure to present its evidence on the issue of consent in a timely fashion, the Court will next consider whether the probative value of this evidence nevertheless weighs in favor of its admission. As for the enhanced audio recording, the Court does not feel that it better elucidates

---

[13] It is worth nothing that this argument suffers from an additional defect; the United States did not timely object to the Court's instruction that it proffer the testimony of Agent Perry.

Defendant's mumbling. However, because the Court can admit this recording into evidence without consuming court resources or imposing a significant burden on defense counsel, the Court will accept the recording into evidence. The Court stresses that it has reached this decision out of an abundance of caution, not because the Court is persuaded that the United States was unfairly blinded-sided by the Court's prior ruling.

The same reasons that weigh in favor of admitting the enhanced audio recording – ease and lack of prejudice to Defendant – weigh against granting the United States' request to hold a second evidentiary hearing on the issue of consent. Scheduling a second evidentiary hearing would unquestionably expend finite court resources and impose a significant burden on defense counsel in the period before trial. The United States has not shown that its desire for a second hearing outweighs these significant costs. In the Motion to Reconsider, the United States never describes the evidence it would like to present at a second hearing (other than the "enhanced" audio recording) or explains how this proposed evidence would show that no constitutional violation occurred, i.e. that Defendant voluntarily consented to Agent Perry's search. The United States' Reply, while lauding the importance of truth-seeking, is only marginally more specific about how additional evidence presentation would further the United States' opposition to Defendant's Motion to Suppress. In the reply, the United States clarifies that a second hearing would allow the United States to present evidence "on the physical and verbal responses of Defendant" and on Agent Perry's impression that Defendant consented to the pat-down search. Reply at 14-15. These categories are very broad, encompassing a range of potential evidence some of which would only be repetitive of Agent Perry's earlier testimony about his conversation with Defendant and his belief that she consented to the search. In the absence of any indication that the United States is in the possession of new evidence that would undermine

this Court's ruling on the issue of consent, the Court is not inclined to haul Defendant into Court for a second, possibly needless, evidentiary hearing. The Court will, therefore, deny the United States' request to schedule a second evidentiary hearing.

### III.    The Correctness of the Court's Prior Decision

The United States has identified two alleged errors in the Court's prior disposition plus one alternative basis for reconsideration. First, the United States argues that the Court made a clearly erroneous finding about the timing of Defendant's arrest which contributed to the Court wrongly deciding Defendant did not consent to Agent Perry's pat-down search. Second, the United States maintains that the Court failed to make adequate findings about Defendant's mumbled response and that the findings it did make contained an inherent conflict. Once again, the United States argues that correction of this error would result in a finding that the search was a valid consent search. Finally, the United States asks the Court to consider, for the first time, whether the good-faith exception to the exclusionary rule allows for the admission of evidence obtained from Agent Perry's search.

#### a.    Timing of Defendant's Arrest

In its July 24, 2015 Memorandum Opinion and Order, the Court issued two flawed factual findings: (1) that Agent Perry arrested Defendant immediately following Defendant's mumble and (2) that Agent Perry never touched Defendant until he arrested her. The Court can only assume that these findings resulted from its attempt to restate the key facts as succinctly as possible and are, therefore, an example of the maxim "haste makes waste."[14] To correct the

---

[14] From the briefing and the evidentiary hearing, the Court was certainly aware that Agent Perry searched Defendant and uncovered a bundle on her person prior to arresting her. In other words, despite the misleading factual findings quoted above, the Court was **not** under a misapprehension regarding the timing of Defendant's arrest and these findings did not have a drastic impact on the Court's decision as the United States appears to have feared (e.g., the Court's decision was not secretly infected by the belief that Agent Perry arrested Defendant for no reason at all before uncovering evidence of drug smuggling).

record, the Court will withdraw both findings and replace them with the following, updated findings of fact.

1. After Defendant's mumble (which is transcribed as Mmhuh in the Defendant's transcript), Defendant and Agent Perry's conversation continued as follows:

Agent Perry: Okay. Can you turn around for me? [15]

Defendant: Yeah, Sure.

Agent Perry: Okay . . . . Okay. What is that ma'am?

Defendant: It's my waist straightener.

Agent Perry: Okay. Can you go ahead and step over there for me, please?

Defendant: Sure.

Agent Perry: Okay. Ma'am I can feel a, uh, . . .

2. At this point, Agent Perry made a brief aside to an unidentified male. He then resumed this conversation with Defendant, saying:

Agent Perry: Ma'am I can feel a bundle or somethin' in the front and in the back, so can you raise up your shirt for me?

[Pause]

Agent Perry: Okay. Go ahead and turn around, put your hands behind your back. Okay.

---

[15] The United States transcribes Agent Perry's response as a double inquiry: "Okay? Can you turn around for me?" Based on this transcription, the United States characterizes Agent Perry as confirming Defendant's affirmative response and then asking her if she would turn around. Motion to Reconsider at 3. During its analysis, however, the United States does not identify Agent Perry's alleged confirmation as additional evidence of Defendant's consent. The Court agrees that Agent Perry's use of the word okay is not confirmation that Defendant consented to be searched. Agent Perry does not pause for a response between saying "Okay" and "Can you turn around for me?" Moreover, Agent Perry repeatedly says "okay" before and after many of his statements to Defendant, including his order that she turn around and put her hands behind her back. Given this context, the Court has chosen to transcribe Agent Perry's many "okays" without question marks.

3.   At this point in the conversation, Agent Perry arrested Defendant.

The United States argues that the above conversation, on which the Court did not previously

focus, "provides rather strong evidence that Defendant did, in fact, consent to a search of her

person." Motion to Reconsider at 14. The United States makes this point twice in its opening

brief, once in the section entitled "The Court made a Clearly Erroneous Factual Finding that is

Critical to the Determination of Defendant's Consent" and again in the section entitled "The

Court Must Make Findings As to What Exactly Was Defendant's Verbal Response." Id. at 12,

14, 16, 17-20. The Court will consider the import of this evidence below after first addressing the

United States' request that the Court issue revised findings regarding Defendant's mumble.

### b.   Nature of Defendant's Mumbling

In its Memorandum Opinion and Order granting Defendant's Motion to Suppress, the

Court made detailed factual findings regarding the nature of Defendant's mumbled response to

Agent Perry's statement "To make sure you don't have anything strapped to your body."

Specifically, the Court found (1) "that the Defendant's muddled, ambiguous utterance is simply

unintelligible," (2) that Defendant's "vocal expression definitely was not 'Okay,' or words close

to that, or any other verbalization indicating consent to a pat-down," and (3) that Defendant's

version of the mumbling was "closer to the recorded incomprehensible mutter than to what the

government propounds." MEMORANDUM OPINION AND ORDER (Doc. No. 35 at 7).

Focusing on the first finding, the United States maintains that the Court improperly declined to

determine exactly what Defendant mumbled.

As the Court understands it, the United States is demanding that the Court transcribe

Defendant's mumble into one definitive string of letters using the English alphabet. The Court

declines to undertake this Sisyphean task.[16] Contrary to the United States' suggestion, Defendant's mumble is not susceptible to one unique translation, such as "Mmhuh" rather than "Mmhmm." The United States' repeated protestations to the contrary (in the face of the Court's contrary factual findings) suggest that the United States is under the misperception that there is a one-to-one correspondence between verbal expression and written language. Inconvenient as it may be, this is not the case. Verbal expression and written language are divergent mediums of communication; humans are capable of creating a variety of mumbles, mutters, grunts, grumbles, hoots, sighs, squeaks, screams, and other sounds that are not neatly encompassed within the 26 letters of the English alphabet.

In light of this problem and the Court's inability to decipher Defendant's mumbled response as a coherent series of "h" or "m" sounds, the Court originally issued findings describing the sound as a "mutter" that did not convey or communicate consent to a pat-down search. These findings do not, as United States maintains, treat all utterances the same. The Court recognizes that in context some utterances may be commonly interpreted as sounds of agreement. The Court found, however, that Defendant's mumble was not intelligible as a definite expression of consent rather than as some other more benign sentiment, such as skepticism, hesitance, or attentiveness.

Upon review, the Court sees no reason to revoke or otherwise change this finding. The United States' updated "enhanced" audio recording of Defendant's mumble is not significantly

---

[16] Notably, despite its repeated assertions that the Court has an obligation to issue "actual" findings about Defendant's mumble, the United States has not submitted any proposal regarding what these updated findings should be. By and large, the United States' position regarding what the Court has termed Defendant's mumble remains obscure. The United States originally argued that Defendant said "okay" at this juncture in the conversation. While the audio recording definitively refutes this position, the United States has neither retracted nor reasserted its position in light of this evidence. Thus, it is unclear to the Court whether the United States remains firm in its belief that Defendant supposedly said "okay" after Agent Perry said "To make sure you don't have anything strapped to your body." In any event, the United States has not submitted a realistic proposal for transcribing Defendant's mumble.

clearer than the original recording. Having carefully, intently, and repeatedly listened to both

recordings, the Court reaffirms its earlier factual findings.[17] Defendant's mumble is not

intelligible as a documented, easy-to-transcribe word. It is definitely not the word "okay." Nor,

considered in context, is it any other assent sound. It is a string of "h-like" or "m-like" sounds

akin to a sound one might make to indicate attentiveness or listening.

 The United States attempts to challenge the accuracy of the above findings by detecting

an "inherent contradiction" between them and the facts of this case:

> Lastly, the United States would point out the inherent contradiction in the Court's
> finding, when applied to the remaining facts of the case. The Court found that Defendant
> consented to a search of her bags in the lower storage area, and also consented to a search
> of her room. Doc. 25 at 4-5. Mr. Garcia, Defendant's traveling companion, also agreed to
> these same searches, at this same time. Interestingly though, Mr. Garcia's response to
> S/A Perry was not "Yes" or "Sure," but rather "Uh huh." Audio at 4:12-4:27.
>
> . . .
>
> The Court's current findings do violence to the actual facts of this controversy. The
> current findings, taken to their logical extreme, and divorced from contextual evidence,
> means [sic] either that Mr. Garcia did not consent to either his room being searched or to
> accompanying S/A Perry to the luggage area, or it stands for the perplexing notion that
> "Uh Huh" is a valid grant of consent, but "Mmhmm" or "Mmhuh" is not.

Motion to Reconsider at 20. This attempt does not hold together. First, the Court notes that any

perceived contradiction between Mr. Garcia-Isicardia's provision of consent and Defendant's

refusal to consent to the pat-down search is not attributable to the Court. The Court has not

---

[17] In addition to requesting modified factual findings about what Defendant said, the United States asks
the Court to "clarify whether it was making a legal or factual determination when it decided that
[Defendant's mumble] did not evince consent." Motion to Reconsider at 16-17. The Court is not sure
what clarification is needed; in its prior Memorandum Opinion and Order, the Court issued findings of
fact and then, in a separately titled section, summarized the law on consent searches and discussed
whether the law, as applied to the facts, demonstrated that Defendant consented to the challenged pat-
down search. The United States' repeated reference to the Tenth Circuit or the "reviewing court" suggests
that the United States desires clarification about the nature of this Court's findings in order to pinpoint
appellate standard of review. It is not, however, this Court's responsibility or right to determine the
standard of review on appeal. The Court can only encourage the United States to peruse current Tenth
Circuit case law as needed.

issued any findings regarding Mr. Garcia-Isicardia's granting of consent with which to compare its findings regarding Defendant's withholding of consent. Moreover, because the Court does not consider it appropriate to issue advisory findings about Mr. Garcia-Isicardia's provision of consent, it declines the United States' invitation to compare and contrast Defendant's and Mr. Garcia-Isicardia's statements and conduct.

At a more general level, the United States appears to be using Mr. Garcia-Isicardia as a means of comparison in order to emphasize its point that people sometimes communicate assent or dissent using sounds that are not found in the dictionary, sounds like "uh huh" or "uhn uhn." In response, the Court reiterates that its findings about Defendant's mutter are not universal findings that sounds like "Mmmhmm" or "Mmhuh" can never be a valid grant of consent. In other words, the Court's finding that Defendant's mumble was not an intelligible expression of consent is not a wide-ranging finding that utterances can never constitute consent. Having once again clarified this matter, the Court does not see any inherent contradiction between its actual findings – that Defendant's muttered hmming-ish sound made in response to a statement did not communicate consent – and a hypothetical finding that "Uh huh" said with a certain inflection in response to a request to search may signal consent. The Court, therefore, rejects the United States implication that the Court needs to correct its findings to resolve an "inherent contradiction" between them and the United States' perception that Mr. Garcia-Isicardia consented to have his luggage searched by saying "Uh huh."

### c. Whether the Court erred in finding that Defendant did not Consent to Agent Perry's Pat-Down Search

The United States presents a persuasive argument that the Court should have at least considered evidence of what occurred after Defendant's mumbled response in deciding whether Defendant consented to Agent Perry's pat-down search. When there is a dispute concerning the

consensual nature of a challenged search, the government must establish the existence of consent by "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003). Consent is defined according to an objective reasonableness standard; recitation of certain magic words, for example "yes," is not required to demonstrate consent. The question is whether considering all of the circumstances a reasonable law enforcement officer would have understood that the defendant consented to the search. *United States v. Flores*, 48 F.3d 467, 468-469 (10th Cir. 1995); *see also United States v. Guerrero*, 472 F.3d 784, 789-790 (10th Cir. 2007) ("[A] defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.").

Here, the United States has pinpointed the following exchange as the critical moment when Defendant provided consent to Agent Perry's pat-down search:

> Agent Perry:  How 'bout if I just use the back of my hand and pat-down around your waist, around your back?
>
> Defendant: No, what for?
>
> Agent Perry: To make sure you don't have anything strapped to your body.
>
> Defendant: [Mutters]

Agent Perry's testimony is ambiguous regarding whether he searched Defendant at this point or after asking Defendant "Okay. Can you turn around for me" and hearing her respond "Yeah, Sure." *See supra* note 4.

In either case, contextual evidence indicative of whether Defendant consented to the pat-down search includes: (1) Defendant's unhesitating use of the word "yes" or "sure" to consent to

Agent Perry's requests to speak with her, to view her ticket and identification, to search her bags, to search the items in her bedroom, to search her room for contraband, to search her purse, to show Agent Perry her bags downstairs, and then to search her bags downstairs; (2) Defendant's failure to consent to a pat-down search the first two times Agent Perry asked – the first time Defendant responded "Can I know what's the problem?," the second time Defendant responded "If you could bring a woman, I can just get undressed; if that's okay with you;" (3) Defendant's unequivocal refusal to lift up her outer shirt, (4) Defendant's clear discomfort with being stopped and with Agent Perry's initial requests to search her person, (5) Defendant's counter proposal that she was willing to "get naked" in front of a female officer, (6) Defendant's failure to make any non-verbal gestures or expressions of consent, and (7) Defendant's cooperation with Agent Perry's request that she turn around and Defendant's failure to protest to Agent Perry's pat-down search.

Considered holistically, from the perspective of a reasonable observer, the above occurrences do not constitute clear and unequivocal consent to a pat-down search. While consent need not be verbalized, this is not a case where the defendant has expressed assent to a proposed search by undertaking affirmative conduct facilitating the requested search directly in response to the officer's request for permission to conduct the search. *Compare United States v. Patten*, 183 F.3d 1190 (10th Cir. 1999) (defendant demonstrated non-verbal consent by opening a suitcase in response to officer request to look at the suitcase); *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (handing an officer a key constituted non-verbal, voluntary consent to search a locked bag); *Flores*, 48 F.3d at 469 ("[W]e find that Armendariz's conclusion that defendant's reopening of the trunk indicated her voluntary consent to a continuation of the search was reasonable."); *United States v. Benitez*, 899 F.2d 995, 998-999 (10th Cir. 1990) (affirming

district court decision that appellant consented to a search of his trunk, where appellant voluntarily opened the trunk in response to an officer's request).

Unlike these cases, Defendant resisted Agent Perry's first two requests to do a pat-down search and responded "No, what for?" to his final request. After receiving this response and once again explaining his purpose, Agent Perry never reiterated his request for permission to search Defendant's person and Defendant did not spontaneously retract her "no" with a clear "yes, you can search me," "sure, you can search me," "if that's all you want, no problem," or other statement communicating that she had changed her mind and agreed to be patted down. Nor did Defendant use non-verbal gestures to convey a new-found willingness to be searched, for example by nodding vigorously while raising her hands or motioning to her body thereby inviting a search. All Defendant did was hum a listening response to Agent Perry's explanation and agree to turn around. The United States argues that these relatively unremarkable behaviors communicated Defendant's clear and unequivocal consent to be searched.[18]

In its prior Memorandum Opinion and Order, the Court explained why it does not consider Defendant's mumble clear consent to Agent Perry's pat-down search. First, Defendant's mumble is not loud or clear enough to decipher as a clear expression of assent. During her conversation with Agent Perry, Defendant was so soft-spoken that Agent Perry occasionally had to ask Defendant to repeat herself or clarify what she had said. Second, to the extent Defendant's mumble can be construed has having an upward inflection signaling some type of affirmation, this affirmation is not directly connected with Agent Perry's request to search. Defendant had already rejected this request saying "No, what for?" Agent Perry responded: "To make sure you

---

[18] The only other pre-search evidence the United States has identified as relevant to the issue of consent is Agent Perry's conduct. Motion to Reconsider at 14. Because the standard for determining consent is objective, the Court fails to see how Agent Perry's decision to search Defendant is indicative of whether Defendant consented to this search.

don't have anything strapped to your body." As the Court previously explained, there is nothing in the record to suggest that Defendant's subsequent mumbled response related back to Agent Perry's original request for consent. It is more natural to interpret this mumble as a filler sound signaling that Defendant was thinking or possibly as an acknowledgement that she was listening to or had understood Agent Perry's explanation.[19]

The United States largely ignores this second argument in its Motion to Reconsider. Instead, in an attempt to skew the facts in its favor, it omits reference to Defendant saying "No, what for?" and repeatedly treats Defendant's mumble as if it were her direct response to Agent Perry's request to conduct a pat-down search.[20] The undisputed truth is that Defendant's mumble was not Defendant's immediate response to Agent Perry's request to conduct a pat-down search. Her response was an audible "No, what for?" By refusing to discuss this fact, the United States does not erase Defendant's "no" from existence, but merely weakens its own briefing by wasting pages and pages arguing about a counterfactual scenario. All told, the United States devotes only three sentences to addressing the Court's concern that Defendant's mumble cannot constitute consent because it was not a response to a request to search her person.

> While [the Court's argument that Defendant's mumble might have been an acknowledgment of Agent Perry's explanation] is interesting, it ultimately fails to account for the contextual evidence in this case, which this Court either failed or declined to consider. In short, it becomes far, far less probable that Defendant was simply acknowledging S/A Perry's explanation, when one considers her quite audible "Yeah, sure" in response to S/A Perry's request to turn around for a search following

---

[19] The United States repeatedly asserts that sounds like "Mm-hm" communicate assent. While this may be true in certain circumstances, sounds like "Mm-hm" are extremely flexible and serve multiple purposes within a conversation, including maintaining the flow of discourse and encouraging the other speaker to continue talking.

[20] *See*, *e.g.*, Motion to Reconsider at 17 ("The United States argues that even if the Court finds in favor of Defendant on this point, and determines that 'Mmhuh' or 'Mmhmm' is the response that Defendant provided to S/A Perry when asked if she would permit a pat-down, . . . ."); Motion to Reconsider at 17-18 (likening Defendant's encounter with Agent Perry to a man asking a waiter "Is the Men's restroom is over there?" and receiving "MmHmm" as the response); *See generally* Motion to Reconsider at 12-14, 16-18, 21 (never once acknowledging that Defendant said the word "no").

> Defendant's verbal response, and also in light of Defendant's complete lack of verbal
> protest as she was actually searched. When one considers all the contextual evidence, the
> common sense interpretation is that Defendant provided her consent to S/A Perry.

Motion to Reconsider at 21-22. Even here the United States stops short of grappling with the

facts and explaining how Defendant's agreement to turn around and lack of protest negated her

earlier resistance to being searched. Having assiduously considered this matter, the Court

remains unconvinced that Defendant's mumble and the contextual evidence the United States has

highlighted constitute clear and unequivocal consent to the pat-down search.

The United States interprets Defendant's willingness to turn around in response to Agent

Perry's saying "Okay. Can you turn around for me?" as agreement to turn around **for the**

**commencement of a search.** There are two problems with this interpretation. First, if Agent

Perry had already started searching Defendant before asking her to turn around, as he testified on

cross examination, Defendant's willingness to turn around cannot be construed as consent to a

requested search, but must be viewed merely as compliance with a pre-existing search. For the

reasons stated more fully below, this type of post-search compliance is not clear evidence of

consent. *See United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) ("Mere submission to

lawful authority does not equate to consent . . .").

Second, even if the Court assumes that Agent Perry did not start searching Defendant

until after she agreed to turn around, an assumption which is more consistent with the pauses on

the recording, Defendant's willingness to turn around cannot reasonably be construed as clear

consent to be searched (or as an indication that her mumble was consent rather than a listening

sound). Given her previous resistance to being searched, it is equally probable that Defendant

agreed to turn around because (1) she did not mind Agent Perry looking at her back although she

did not want him to touch her or (2) she thought Agent Perry wanted to handcuff or arrest her

34

and thought it best to comply with his request rather than be forcibly turned around. Whatever

Defendant was thinking, the Court does not believe a reasonable person in Agent Perry's

position would have understood Defendant's limited agreement to turn around as agreement to a

pat-down search when she had previously expressed her discomfort with the proposed search

and, when asked three different times to consent to the search, had declined to agree, instead

saying: (1) "Can I know what's the problem?" (2) "If you could bring a woman, I can just get

undressed; if that's okay with you" and (3) "No, what for?"[21]

Defendant's failure to protest Agent Perry's search does not add anything of significance

to this analysis. When a law enforcement officer searches a defendant's person or property

without first obtaining permission, it is well-accepted that the defendant's nonresistance does not

equate to consent. *See United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996) (holding that

consent could not be implied from a defendant's failure to object to a car search because officers

did not seek defendant's consent prior to searching the vehicle); *United States v. Most*, 876 F.2d

191, 199 (D.C. Cir. 1989) ("The government's inference of 'implied consent' appears to rest

upon the fact that store employees did not impede the officer's search of the bag. It is clear,

however, that for constitutional purposes nonresistance may not be equated with consent.");

*United States v. Ocean*, 564 F. App'x 765, 772 (6th Cir. 2014) ("Tucker's mere failure to resist

or object when the officers took her into the bedroom is not the legal equivalent of consent.").

---

[21] In the briefing on Defendant's Motion to Suppress, the United States tried to twist Defendant's
immediate resistance to being searched in its favor by arguing that Defendant slowly came to an
understanding that Agent Perry was not asking her to remove her clothes or get naked. The Court rejected
this argument because it is a purely speculative explanation for why Defendant might have changed her
mind about being searched. Other than Defendant's odd and confrontational counteroffer that she "get
naked" in front of a woman officer, there is no objective evidence that Defendant was initially confused
by Agent Perry's requests and then suddenly realized, after multiple explanations and continued
resistance, that Agent Perry did not want to see her naked. The Court finds this interpretation of the
evidence implausible. Agent Perry asked for permission to pat Defendant down three times, twice
specifying that he would only use the back of his hand. All three times she withheld her consent.

While most of the case law in this area involves officers neglecting to seek permission to conduct a challenged search, the same reasoning applies when law enforcement officers seek but fail to obtain consent before instigating a search. *See United States v. Cooper*, 43 F.3d 140, 147 (5th Cir. 1995) (reversing conclusion that defendant's nonresistance demonstrated consent, but ultimately affirming, on different grounds, district court decision that defendant consented to pat-down search). If a defendant has not already indicated a willingness to be searched before the search commences, nonresistance communicates only what its name suggests: nonresistance (or submission) to an imposed search. In other words, nonresistance does not function as a permission slip that retroactively authorizes police searches. To hold otherwise would be to eviscerate the rule that a defendant's consent must be clear and unequivocal. The onus is not on members of the public to object to police behavior or waive their constitutional rights. It is the government's responsibility to acquire clear consent from free citizens before undertaking a search or a seizure that would be otherwise constitutionally prohibited. *See Roybal v. City of Albuquerque*, No. CIV 08-0181, 2009 U.S. Dist. LEXIS 45670, at *39 (D.N.M. Apr. 28, 2009) ("Before the [police] Defendants entered the garage, they needed an unequivocal manifestation of consent. They cannot rely on a lack of objection after entering to justify the entry.").

In this case, the United States appears to be making the argument that any ambiguity in Defendant's provision of consent can be resolved in the government's favor because Defendant did not protest Agent Perry's pat-down search. The United States cites *United States v. Price*, 54

F.3d 342 (7th Cir. 1995) to support its position.[22] In *Price*, Defendant William Pierce denied consenting to a Wisconsin State Patrol Trooper's warrantless search of his car during a routine traffic stop. *Id.* at 344-45. Because the stop was recorded, the basic facts were undisputed. Towards the end of the car stop, the Trooper asked Pierce if there were any guns or drugs in the car. Pierce said no. *Id.* at 344. The Trooper then asked "Do you mind if I take a look?" and Pierce responded "Sure." *Id.* Rather than proceeding immediately with the search, the Trooper asked Pierce to sign a written consent form. *Id.* Their conversation proceeded as follows:

> Trooper: Would you be willing to sign a written consent form?
>
> Pierce: Written consent?
>
> Trooper: A consent form –
>
> Pierce: Saying I don't have drugs there –
>
> Trooper: [interrupting] right.
>
> Pierce: Yes.
>
> Trooper: Okay.
>
> Pierce: [reaching towards the pen on the Trooper's clipboard] – well, what . . . ?

---

[22] Without additional discussion, the United States also cites *United States v. Gonzalez-Basulto*, 898 F.2d 1011 (5th Cir. 1990). *Gonzalez-Basulto* involves the well-settled rule that failure to object to a particular aspect of an otherwise valid consent search is generally considered evidence that the search remained within the scope of consent. This rule has no bearing on the present case as the existence of, rather than the scope of, Defendant's consent is at issue. *See United States v. Wald*, 216 F.3d 1222, 1228 (10th Cir. 2000) ("As a general proposition, this court has determined that a defendant's failure to object when the search exceeds what he later claims was a more limited consent is an indication the search was within the scope of consent. That rule, however, applies only when the defendant initially gave a general authorization to search."); *see also United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000) (defendant's failure to object to a search of a sealed can during a consensual search of his luggage did not justify the officer in opening the can without first obtaining explicit authorization to do so because opening the can was not a reasonable extension of the search); *United States v. Bustillos-Munoz*, 235 F.3d 505, 515 (10th Cir. 2000) (recognizing that courts consider the lack of an objection to be relevant in determining whether a search remained within the scope of consent because, absent some limitation, upon receiving general authorization to conduct a search, police may search all areas reasonably encompassed within this consent).

Trooper: You don't have to sign it. Y'know, it's totally up to you. I just -- I just asked

and you told me I could go ahead and take a look, if you don't want to sign the form

that's fine.

Pierce: Well, why . . . ?

Trooper: Well, I'm just kind of suspicious, there's a lot of things going on in that car.

*Id.* at 346-47. At this point, the Trooper asked to pat Pierce down. Pierce raised his arms and

submitted to the pat-down search. Afterwards he took a seat in the Trooper's patrol car to get out

of the rain, while the Trooper searched his car. *Id.* at 345.

On appeal, Pierce asserted that he did not consent to the search, because he responded

"Sure" to the Trooper's request to search, meaning "Sure, I mind being searched." *Id.* at 346.

The Seventh Circuit acknowledged that Pierce's initial response was ambiguous in the abstract,

but held that:

> The only conclusion to be drawn from the totality of the evidence is that Pierce's
> immediate response "Sure" meant, "Sure, go ahead." The crucial fact is Pierce's failure to
> protest upon learning that [the Trooper] understood his response as a consent to the
> search. Had Pierce not agreed to the search, now was the time to make that clear. Yet
> when confronted with [the Trooper's] understanding of his response, Pierce offered no
> objection at all; instead, he submitted to a pat-down search and took a seat in [the
> Trooper's] patrol car in order to get out of the rain. Given these circumstances it was not
> clear error for the district court to find that Pierce's response "Sure" meant that he agreed
> to the search.

*Id.* From this passage, the United States distills the alarming lesson that ambiguity is not

necessarily "fatal to the government's argument in favor of the presence of consent." Motion to

Reconsider at 15. To the extent *Price* can be made to stand for this proposition, it is inconsistent

with Tenth Circuit law. *See Taverna*, 348 F.3d at 878 (for a consent search to be valid, the

consent must be "unequivocal and specific"). This Court, however, does not read *Price* as a case

about a defendant's failure to speak up and protest an otherwise unauthorized government-

initiated search. In *Price*, as the Seventh Circuit explained, any ambiguity in Pierce's initial response to the Trooper's request to search was cleared up <u>before the search took place</u> when the Trooper explained that he believed Pierce had verbally consented to the search and Pierce did not object to this explanation.[23]

Here, by contrast, before conducting the pat-down search, Agent Perry did not make any attempt to ascertain whether he had correctly interpreted Defendant's mumble and subsequent agreement to turn around as consent to be searched. Thus, any consent Agent Perry believed he had obtained remained, at best, highly ambiguous. To hold that Defendant's failure to protest the pat-down search transformed her earlier indistinct replies into unequivocal consent would improperly encourage law enforcement officials to initiate searches even when they have not acquired constitutionally adequate consent in the hopes that the suspect will not resist thereby allowing the officer to argue that the search was consensual all along. Moreover, in this case, any slight value Defendant's lack of protest has in suggesting she consented is clearly outweighed by her prior resistance to being searched and her use of the word "no" in response to Agent Perry's final request to search her person.

### d.  The Good Faith Exception to the Exclusionary Rule

Courts typically remedy a Fourth Amendment violation by excluding the unlawfully seized evidence from use against the defendant. *United States v. Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006); *see also United States v. Hatfield*, 333 F.3d 1189, 1193-1194 (10th Cir. 2003) ("[T]he exclusionary rule bars the admission of physical evidence and live testimony obtained directly or indirectly through the exploitation of unconstitutional police conduct."). The United States, however, maintains that suppression is not an appropriate remedy in this case because

---

[23] The Court notes that the United States omits this critical piece of information from its factual summary of *Price*. *See* Motion to Reconsider at 15.

Agent Perry "reasonably believed that Defendant's verbal response to him . . . was an affirmative one, and he acted accordingly in good faith." Motion to Reconsider at 24.

The Supreme Court first announced what has become known as the "good-faith exception to the exclusionary rule" in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court reasoned that evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant" should not be suppressed under the Fourth Amendment's exclusionary rule, because suppressing such evidence would not serve to deter illegal police conduct. *Id.* at 922. The Supreme Court has since extended the good-faith exception to a variety of other situations in which "the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.* at 918; *see, e.g.*, *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (applying the good-faith exception to unconstitutional searches conducted in reasonable reliance on subsequently invalidated statutes); *Arizona v. Evans*, 514 U.S. 1, 3-4 (1995) (reasoning that the exclusionary rule does not require suppression of evidence seized during an otherwise unconstitutional arrest, when the officer has reasonably relied on an erroneous computer record maintained by court employees in conducting the arrest); *Herring v. United States*, 555 U.S. 135, 136-37 (expanding the good faith exception to include situations where an officer "reasonably believes there is an outstanding arrest warrant, but that belief turns out to be wrong because of a negligent bookkeeping error by another police employee"); *Davis v. United States*, 131 S. Ct. 2419, 2428 (2011) (confirming that the good faith exception applies when "the police conduct a search in objectively reasonable reliance on binding judicial precedent").

Through this line of case law, the Supreme Court has refined the good-faith exception into "several well-established principles." *United States v. Esquivel-Rios*, 786 F.3d 1299, 1306

(10th Cir. 2015). First, and most importantly, the exclusionary rule's primary function – deterring future police misconduct – determines its applicability in any given case. *Id.*; *see also Leon*, 468 U.S. at 906. The exclusionary rule will only apply when the "benefits of the resulting deterrence" outweigh "the costs of applying the rule." *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009); *see also Herring*, 555 U.S. at 144 (exclusion is improper unless the police misconduct at issue is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system"). Of particular use to district courts in applying this balancing test are the prescriptive principles that (1) while "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," (2) exclusion remains an appropriate remedy "where law enforcement's reliance is not 'objectively reasonable.'" *Esquivel-Rios*, 786 F.3d at 1307 (quoting *Herring*, 555 U.S. at 144 and citing *Leon*, 468 U.S. at 922).

Defendant maintains that the good-faith exception to the exclusionary rule does not apply in cases like this one where the officer is completely responsible for the Fourth Amendment violation. At first glance, the line of Tenth Circuit case law Defendant has identified would appear to support this view. *See United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009) (declining to extend the good faith exception to mistakes made by law enforcement personnel and explaining that the Tenth Circuit "applies the good-faith exception in situations where a neutral third party not engaged in the 'competitive endeavor of ferreting out crime' makes the mistake resulting in the Fourth Amendment violation"); *United States v. Cos*, 498 F.3d 1115, 1132 (10th Cir. 2007) ("[T]he officers proceeded into the apartment because of their mistaken belief that Ms. Ricker had the authority to consent. In such circumstances, the good faith

exception to the exclusionary rule is inapplicable."); *United States v. Herrera*, 444 F.3d 1238, 1250 (10th Cir. 2006) ("[B]ecause the purpose underlying th[e] good-faith exception is to deter police conduct, logically *Leon's* exception most frequently applies where the mistake was made by someone other than the officer executing the search that violated the Fourth Amendment."). But the continued validity of this case law is arguably limited in light of subsequent Supreme Court case law, specifically *Herring*, which the Tenth Circuit has described as "extend[ing] the good-faith exception to police reliance upon the negligent mistake of a fellow law enforcement employee, as opposed to a neutral third party." *McCane*, 573 F.3d at 1043. The United States, oddly enough, does not take this position in its reply and does not make any other attempt to rebut Defendant's claim that the good faith exception is inapplicable in the present case.

Whatever the lingering precedential value of *Clarkson*, *Cos*, and *Herrera* may be, however, the Court agrees with Defendant that the good-faith exception to the exclusionary rule does not allow for the introduction of evidence when an officer, through no fault of anyone else, mistakenly concludes that he has obtained consent to search a defendant. The law is clear that deterrence and objectively reasonable reliance are the cornerstones of the good faith exception to the exclusionary rule. *See Esquivel-Rios*, 786 F.3d at 1306-1308. Here, both of these factors weigh in favor of suppression. First, unlike a mere oversight, Agent Perry's decision to search Defendant without first obtaining constitutionally adequate consent was a deliberate decision that can be meaningfully deterred. Suppressing the evidence in this case serves a vital function: it encourages law enforcement officials, like Agent Perry, to obtain clear consent before searching a person, rather than obtaining ambiguous consent and hoping the good-faith exception will allow for the introduction of any incriminating evidence that may be found. Second, there is simply no element of reliance in this case. Agent Perry did not decide to search Defendant in

objectively reasonable reliance on a statute, case law, data base, or other information attributable to an external source. In the absence of such reliance, the good-faith exception does not apply. *See Esquivel-Rios*, 786 F.3d at 1307 ("[T]he Court has imposed an important limit on law enforcement's ability to invoke the good faith exception. . . . [W]here law enforcement's reliance is not 'objectively reasonable,' exclusion remains an appropriate remedy.") (internal citations omitted).

IT IS THEREFORE ORDERED THAT:

1. UNITED STATES' MOTION FOR RECONSIDERATION (Doc. No. 42) is granted in part and denied in part.

2. The United States' enhanced audio recording of Defendant's mumble is admitted into evidence and the United States must file a copy of this recording and the original audio recording with the Court by October 30, 2015.

3. The United States' request for a second evidentiary hearing is denied.

4. The Court's prior findings of fact are updated and amended as described in this MEMORANDUM OPINION AND ORDER.

5. All evidence obtained from Agent Perry's February 5, 2015 pat-down search of Defendant's person is suppressed.

_____
SENIOR UNITED STATES DISTRICT JUDGE